## PETITION FOR WRIT OF HABEAS CORPUS
## UNDER 28 U.S.C. 2254

**Prisoner's name:**        DERRICK TYRONE SMITH
**Prisoner's number:**      DOC No. 490606
**Place of Confinement:**   UNION CORRECTIONAL INSTITUTION
                            Raiford, Florida

### IN THE UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

DERRICK TYRONE SMITH,

    Petitioner,

    v.                                    CASE NO. 8.06CV1330-T17 m4P

JAMES R. McDONOUGH, JR.,
    Secretary, Florida
    Department of Corrections,

    Respondent,

and

CHARLES J. CRIST, JR.,
    Attorney General,

    Additional Respondent.
_____/

### PETITION

1. **Name and location of court which entered the judgment
   of conviction under attack and state court case
   number(s):**

   Pinellas County Circuit Court of the Sixth Judicial
   Circuit, Case No. CRC 83-2653 CFANO.

2. **Date of judgments and convictions:**

   Mr. Smith was originally found guilty and thereafter
   sentenced to death on November 29, 1983.  On appeal, a

new trial was ordered. <u>Smith v. State</u>, 492 So. 2d 1063 (Fla. 1986). Following a retrial, Mr. Smith was again found guilty and the jury recommended death in May, 1990. On July 13, 1990, the judge sentenced Mr. Smith.

3.   **Length of sentence:**

Sentence of death.

4.   **Sentencing judge:**

Honorable Claire Luten.

5.   **Nature of offense or offenses for which you were convicted:**

First-degree murder.

6.   **What was your plea?**

Not guilty plea.

7.   **Type of trial:**

Jury trial.

8.   **Did you testify at trial?**

Not at the guilt phase, but at the penalty phase.

9.   **Did you appeal from the judgment of the conviction?**

Yes.

10.  **If you did appeal, answer the following:**

A)   Name of court:  Supreme Court of Florida.

B)   Result: On appeal after the retrial, the Florida Supreme Court affirmed Mr. Smith's conviction and sentence. <u>Smith v. State</u>, 641 So. 2d 1319 (Fla. 1994).

2

C)   Date of result: 6/9/94, rehearing denied 9/12/94,
     mandate issued 10/14/94.

**If you filed a second appeal or filed a petition for
certiorari in the Florida Supreme Court or the United
Supreme Court, give details:**

Certiorari was denied by the United States Supreme
Court.  Smith v. Florida, 115 S.Ct. 1129 (1995).

11.  **Did you file any postconviction motions under either
     Florida Rule of Criminal Procedure 3.800 or 3.850 with
     the state trial court or any other postconviction
     motions or petitions for writ of habeas corpus with
     the state trial court or state appellate court to this
     judgment and conviction?**

     Yes.

12.  **If you did file any matters within the realm of
     question 11, answer the following as to each motion or
     petition.**

          **A) The type of motion/ petition filed; B) Date
          motion/petition filed; C) Name of court; D)
          Result; E) Date of Result**

     A)   Rule 3.850 Motion.

     B)   4/1/97; amended on 12/3/99, 9/18/2000, 4/1/2000
          and 9/18/2000.

     C)   Pinellas County Circuit Court of the Sixth
          Judicial Circuit.

     D)   Denied.

     E)   2/10/03.

13.  **If your motion or petition described in paragraph 12
     was denied, did you file an appeal of that denial with
     the appropriate state appellate court?**

3

> Appeal of 3.850 denial taken appropriately to the
> Supreme Court of Florida.

**As to each motion or petition indicate:**

> **A) Name of court where appeal filed; B) Date**
> **appeal filed; C) Result; D) Date of Result**

A)   3.850 denial appealed to the Supreme Court of
     Florida.

B)   Notice of appeal filed on 3/13/03.

C)   Florida Supreme Court affirmed the denial of
     relief.

D)   <u>Smith v. State</u>, 2006 Fla. LEXIS 388 (March 9,
     2006), rehearing denied 6/8/06, mandate issued
     6/26/06.

**14.   If you did file any other matters within the realm of
question 11, answer the following as to each motion or
petition.**

> **A) The type of motion/ petition filed; B) Date**
> **motion/petition filed; C) Name of court; D)**
> **Result; E) Date of Result**

A)   Petition for writ of habeas corpus.

B)   1/18/05.

C)   Florida Supreme Court.

D)   Denied.

E)   <u>Smith v. State</u>, 2006 Fla. LEXIS 388 (March 9,
     2006), rehearing denied 6/8/06, mandate issued
     6/26/06.

**15.   State concisely every ground on which you claim you
are being held unlawfully.   Summarize briefly the
facts supporting each ground.**

4

### GROUND I

**MR. SMITH WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO AN ADEQUATE ADVERSARIAL TESTING WHEN THE STATE WITHHELD EVIDENCE WHICH WAS MATERIAL AND EXCULPATORY IN NATURE AND/OR KNOWINGLY PRESENTED FALSE OR MISLEADING EVIDENCE AND/OR ARGUMENT AT HIS CAPITAL TRIAL.[1]**

### A.    The State Withheld Exculpatory Evidence

At his capital trial, the State violated Mr. Smith's due process rights under the Fourteenth Amendment by withholding favorable evidence and/or information from the defense and/or knowingly presenting false or misleading evidence and argument.  The State's case against Derrick Smith largely rested on the testimony of three witnesses.[2] Derrick Johnson, Mr. Smith's co-defendant who obviously had an interest in reducing his own criminal liability, testified that he was with Mr. Smith participating in a robbery of Mr. Songer, a cab driver, when he saw Mr. Smith

---

[1]Citations in this petition are as follows:  References to the direct appeal record of Mr. Smith's original trial are designated as "R.____".  References to the direct appeal record of Mr. Smith's retrial are designated as "R2.____". References to the postconviction record on appeal are designated as "PC-R.____".  All other references are self-explanatory or otherwise explained herewith.

[2]Mr. Smith was first tried in 1983, and after the Florida Supreme Court reversed his conviction, retried in 1990.

shoot Mr. Songer.  Melvin Jones, an individual with 17

pending criminal charges who came forward three months

after the homicide only after he was arrested and was

placed in the county jail, testified that he witnessed the

shooting while in route to his residence a half of a block

away; he said he saw Derrick Smith shoot the cab driver as

Derrick Johnson fled the scene.  As corroboration, the

State presented David McGruder, who had observed two men

get into Mr. Songer's cab at the Hogley Wogley Bar-B-Q.[3]

His testimony was that even though he could not identify

Derrick Smith in the courtroom, he had picked his photo

from a photo-pack lineup shortly after the shooting (R2.

881).

The important role these three witnesses played can be

seen in the closing arguments at the 1990 retrial.  There,

defense counsel told the jury:

> I would suggest to you that the crucial
> witnesses in the case of all of the evidence we
> heard comes down to three, three that the State
> presented, that's David McGruder, Derrick Johnson
> and Melvin Jones.  Those are the three witness that
> tell you something about who shot the cab driver.

---

[3]The State also called Mellow Jones, Melvin's wife, to
corroborate her husband's story as to the time that he
arrived home and to explain why she did not tell the police
that Melvin had witnessed the shooting when a police officer
questioned her shortly after the shooting.

Now, David McGruder was working in the Hogley
Wogley at the time. What can you say about David
McGruder? He seems like a nice fellow, hard-working
fellow, I guess. He appears to be honestly trying
to be honest. I'm not suggesting he's up here lying
his teeth off because he has nothing better to do or
anything like that. But I guess to put it politely
as possible, Mr. McGruder's a little slow on the
uptake, and he's someone who seems to be very easy
to lead, to lead into saying what you want him to
say. It's not that he's trying to lie. It's just
that he's easy to convince. It's easy to convince
him this is what he saw or this is what he heard.

You recall we went back and forth at one point
where the State was asking him, Are you sure this is
the guy? He said yeah. I said, Didn't you just say
you weren't sure this was the guy; there's a doubt
in your mind? Yeah. Then the State would get back
up there. Are you sure that's him? Yeah. Didn't
you say there was a doubt? Yeah, I did.

He's just easy to confuse. He's easy to lead
into things. What does David McGruder tell you?
What did he testify to? Well, there were two guys
at the Hogley Wogley. One of them came in and used
the phone, the other guy stayed outside. The first
guy went out, came back in the bar, and used the
phone again, and asked for a glass of water and went
back outside again. A few minutes later, a cab
pulled up. Then he also tells you he saw one guy
get in the cab in the front seat and the other guy
get in the cab in the back seat.

Now, when he testified here today, he said it
was the same guy that came in the store both times,
used the phone both times. And he picked out a
picture, I guess, about seventeen days or so after
this supposedly happened. As I recall the dates, it
would have been March 21st, I believe. That picture
is dated April the 8th. That's about 17 days. I
guess, 18 days.

He picks out a picture that he says is the guy
that came in the store twice. The State tells you

7

that's a picture of Derrick Smith. I don't know if that's Derrick Smith or not. We didn't have anybody to say it was a picture of Derrick Smith.

Anyway, they say it's a picture of Derrick Smith. You'll have to decide whether that's Derrick Smith or not. Of course, they showed him several other photopacks. You didn't hear anything about whether Melvin Jones' pictures was in any of those photopacks. That's interesting.

\* \* \*

The other two State witnesses, the other two people that are important here, of course, are Derrick Johnson and Melvin Jones. Mr. Martin [the prosecutor] was pointing out to you that Derrick Johnson and Melvin Jones had an opportunity to observe and know what they testified to, and their testimony indicates they had an accurate memory - - they seemed to have an accurate memory.

Well, I would suggest to you, ladies and gentlemen, there's a certain similarity to that, a certain boot-strapping, as we call it.

The reason we can say they seemed to have an accurate memory, they seemed to have an opportunity to observe or know what they were testifying to is because that's what they said. In effect, they said, yeah, I had an opportunity to observe, and this is what I observed. I remember very well. This is what I observed, and I remember it. In others words, they're bolstering their own credibility, if you accept that kind of argument.

The fact is, these two witnesses are not credible witnesses at all. Derrick Johnson, if you believe his testimony is an accomplice here. I suggest to you his primary concern was to escape as much of the blame as possible and pass the blame on somebody else.

\* \* \*

8

He was up there saying, I didn't know it was going to happen.  I didn't notice where we were going.  I didn't know what we were going to do.  Back in 1983, he said under oath **he was the one that gave the cab driver this address, 3130 30th Street South or whatever it was**.

**And it is interesting to note that address is about four blocks from Derrick Johnson's house and about a block from Melvin Jones' house.**  Maybe that's just a coincidence.  Just a coincidence.

Of course, it's really a benefit to poor old Melvin, good citizen Melvin, who's ducking through the alley ways, trying to hide from the police with all his warrants, needing some kind of a break from the State, needing something to get himself out this mess.  And isn't lucky for Melvin that on this particular night this murder goes down right in front of him.  He gets a perfect view of it.  He gets a little something he can bargain with, a little something he can catch a break with.  And Derrick Johnson steers the cab right over to where he is.  Isn't that lucky for Melvin Jones?

* * *

Then we have Larry Martin telling you that Derrick Johnson told him that Derrick Smith didn't have anything to do with it.  He wouldn't tell him anything else.  He wouldn't tell him anything else, but he didn't [sic] tell him that Derrick Smith didn't have anything to do with it.

Now, what possible benefit has Larry Martin got to get out this?  He's going to come in here and commit perjury for what?  For what?  What possible benefit he's got?  Is he getting some break on some pending charges?  Not likely.  He's testifying as a defense witness.  He's got some ax to grind; some cross to bear?  Is he looking to minimize his own participation in this?  No.

There's no evidence he had anything to do with it.  He's just a poor slum [sic] over there, another

9

inmate over there in the jail with Derrick Johnson talking about their cases, as inmates very often do. Larry Martin has nothing to do with this case. He's just somebody who happened to overhear something. What motive has he got to lie? Absolutely nothing. Absolutely none.

That brings us to Melvin Jones. I talked a little bit about Melvin Jones already. Melvin Jones has 24 felony convictions. I believe he said he - - I don't know how many arrest warrants he had pending at the time this supposedly happened. He eventually ended up pleading to 14 felonies. After he came forward with this testimony, he pleads to 14 felonies and he gets three years in the Department of Corrections.

But he's not expecting any break. He wasn't asking for any break. He's coming forward as a good citizen because Melvin Jones knows that is a citizen's obligation. If you have information regarding a serious crime, you have to come forward and tell the police what you know because that is your obligation as a citizen. It's part of our duty as members of this great country, blah, blah, blah.

\* \* \*

So what does Melvin Jones do, good citizen Melvin? Does he come forward with what he knows? That's his obligation as a citizen. That's his only purpose here. Does he tell Detective San Marco what he knows? No. Didn't tell a lie. He just altered the facts. Altered the facts. Melvin would have made a good press secretary for Richard Nixon. It's not lying. He's altering the facts.

Of course eventually, old Melvin does manage to have himself a little deal, and he gets the State Attorney in there for him when he's sentenced, and here he is. There he is. Is Melvin expecting any preferential treatment for his testimony? Oh, no. No. No. He's just doing his duty. He's just doing his duty.

10

That, ladies and gentlemen, I suggest to you, is the heart of the State's case. **Those are the crucial witness we have here; David McGruder, Derrick Johnson, Melvin Jones.**

(R2. 1327-41)(emphasis added).

In the State's rebuttal argument, the prosecutor

argued:

Mr. Sanders [defense counsel] said that there were only three - - "crucial" was his word - - witnesses for the State. I submit to you every one of those witnesses was crucial. Mr. Sanders singled out three of the more important witnesses, and three witnesses, who two of them have criminal records. One of them, Mr. McGruder.

It was very obvious to everyone in the courtroom that Mr. McGruder is not the brightest person that has ever taken the witness stand and tried to tell what he remembered.

\* \* \*

Believe me, the State of Florida wishes that Mr. McGruder was a little smarter than he was, and could remember and answer questions a little better than he did.

But what did he say? What did he say? **He said that man walked in** and used the phone in his business when he was there, **and he saw him.** It's just like that.

\* \* \*

Now Mr. Sanders got up here and argued two versions, two very, very inconsistent versions of how this all could have gone down that you should believe and find that man not guilty. **One thing he was trying to say is that somehow Derrick Johnson and Melvin Jones, the guy hiding behind the bushes, plotted [] this together.**

11

Well, **first of all, they didn't even know each
other.** Derrick Johnson didn't know who Melvin Jones
was. Melvin Jones heard of, by nickname, by street
names, Derrick Johnson. **But what possible motive -
-** and think of **how ludicrous that scenario really
is.** Derrick Johnson says, I'm going to plan a
robbery and set up my buddy Smith; and we're going
[to] get in this cab, and I'm just going to happen
to direct it to right where Melvin Jones is hiding
behind the tree.

To follow the argument put forth by Mr.
Sanders, you would have to believe that that's what
happened; **two of them were in league** from the very
beginning, **which is totally ludicrous.** And then
he's trying to tell you that in the same argument
that Melvin Jones came up with all this to get
himself a break. **Well, he did get himself some time
off his sentence. That was never denied. He didn't
think much of it. He sort of shot everybody a dirty
look and said, Well, yeah, I did three years. He
didn't think much of that break that he got.**

(R2. 1345-50)(emphasis added).

At the state court evidentiary hearing in 2002, the

State acknowledged that during the time period of Mr.

Smith's case, the Pinellas State Attorney's Office relied

upon <u>Miller v. State</u>, 360 So.2d 46 (Fla. 2nd DCA 1978), as

defining its discovery duties.[4]  Under <u>Miller</u>, police

---

[4]The prosecutor at the retrial did concede during his
testimony that Rule 3.220 was amended effective July 1,
1989, prior to Mr. Smith's retrial (PC-R. 4810). <u>In re
Amendment to Fla. R. Crim. Pro. 3.220</u>, 550 So.2d 1097 (Fla.
1989). Under the amended rule, all police reports were
discoverable under Florida law. <u>Miller</u> was effectively
overturned. Yet, the prosecutor at the retrial did not
recall complying with the amended rule (PC-R. 3971).

12

reports were not discoverable except for those portions
containing verbatim statements from witnesses listed by the
State (PC-R. 4812-13).  The police reports provided to the
defense in Mr. Smith's case were subject to a "Millerizing"
process after which a small number of redacted reports were
found to be discoverable and disclosed (R1. 26-61).

   The packet of police reports that were disclosed to
Mr. Smith's counsel before the 1983 trial were made part of
the record from that trial in 1983 (R1. 26-61).  This
packet was also introduced into evidence at the
postconviction evidentiary hearing as D-Ex. #12.  And the
evidence showed that the State relied upon this 1983
discovery packet as satisfying its obligation for the 1990
trial (D-Ex. #1, bsp 96).

   Introduced as D-Ex. #2 at the postconviction
evidentiary hearing was a packet of those same police
reports with passages marked with an "X" and the word "out"
appearing.  When compared to the documents actually
disclosed, it was apparent that the disclosed copies had
been heavily redacted.  By comparing the disclosed versions
to the undisclosed versions of these police reports, the
information withheld by the State can be readily
identified.  At the state court evidentiary hearing, the

13

State did not contest the fact that it redacted the police reports and "withheld" material pursuant to Miller (PC-R. 3971).

Other police reports (not correlating to any that were disclosed to the defense at trial, but which were obtained from the State Attorney's Office in postconviction proceedings) were introduced as D-Ex. #3, #19, #20. No portion of these documents were disclosed to the defense. The fact that these police reports and the information contained therein was not disclosed was also uncontested.

However, not just police reports were withheld from the defense. During the postconviction evidentiary hearing, the 1983 trial prosecutor, Tom Hogan, acknowledged using his state attorney subpoena power to obtain sworn testimony from numerous witnesses. Hogan prepared documents, each entitled "Synopsis," summarizing the sworn testimony of the witnesses who appeared before him. According to Hogan, testimony obtained pursuant to a state attorney subpoena was absolutely privileged and not discoverable (PC-R. 4855-56). Similarly, investigative reports prepared by either the assigned assistant state attorney or a state attorney investigator detailing statements of various witnesses were also viewed as

14

privileged and were not considered discoverable and were in fact not disclosed. Glenn Martin, the prosecutor from the 1990 trial, agreed that such documents and the information contained in those documents were not discoverable and were not disclosed to the defense (PC-R. 4833). The documents that were part of the state attorney investigation that were not disclosed to the defense in this case were introduced into evidence at the state court evidentiary hearing as Def. Ex. #4, #5, #6 ,#7, #8, #9, #10, #13, and #14.

As a result of the State Attorney's policy, a wealth of favorable evidence and information contained in documents in the State's possession was not revealed to the defense. For example, an excised portion of a redacted report from March 21, 1983, indicated that Melvin Jones "who lives on Fairfield Ave. So. in the 3000 block and who has warrants on him pending allegedly" was a suspect due to his residence's proximity to the shooting (D-Ex. #2, bsp 4736). This was information that was favorable to the defense. It constituted impeachment of Melvin Jones. It also constituted impeachment of the police investigation into the murder because apparently no investigation of Melvin Jones, a listed suspect, was conducted.

15

Another example of the undisclosed information
contained within the withheld police reports was the fact
that Melvin Jones' residence was visited twice by officers
conducting neighborhood canvasses in the hours after the
shooting.   One undisclosed police report indicated that
shortly after the homicide a neighborhood canvass was
conducted.   The list of house contacted included the
following:

>       2918 Fairfield Ave. So.          No phone
>       Melow Jones B/M 3/20/52
>       NEGATIVE

(D-Ex. #2, bsp 4736).   This report set forth that the
"Melow" who answered the door was a black male who provided
a birth date and indicated in a conversation that there was
no phone at the address.[5]   This report certainly could have
been used to raise questions as to whether it was Melvin
who answered the door and misidentified himself; but at a
minimum, it was inconsistent with Mellow Jones' trial
testimony regarding what she discussed with the police
officer.   Another undisclosed police report concerning a
second neighborhood canvas after daylight contained the
following:

---

[5]Mellow Jones is the wife of Melvin Jones.

16

> On 3/21/83, at approximately 0830 hours writer
> conducted a neighborhood [ ] of the following
> locations with negative results.
>                        * * *
> Mellow Jones, BF 2918 Fairfield Ave So. no phone
>                        * * *

(D-Ex. #3, bsp 4701).

Melvin Jones testified at trial that only one officer
had stopped at the residence and talked to his wife.  This
visit was shortly after Jones had supposedly gotten home
within minutes of witnessing the shooting, but the
inquiring officer was provided no information regarding
this.  According to his testimony at both trials, Jones
told his wife about the shooting right after the police
officer left.  This testimony provided a relatively benign
explanation for the failure to advise the officer of what
Jones had just observed, i.e. Jones had not yet told his
wife of his observations.  Neither Jones nor his wife ever
indicated that a second officer stopped by hours later and
received no information about the shooting, even though by
then Mellow Jones had heard her husband's account of the
shooting.[6]  This too was undisclosed information that was

_____

[6]Mellow Jones testified that Melvin Jones had gotten home
before the police officers' visit in the "late night, early
morning" (R2. 1014).  She was mad at Melvin because he had
forgotten her birthday and thus had not paid attention to
                                              (continued...)

17

favorable to Mr. Smith's defense and could have been used

to impeach Melvin Jones, his wife, Mellow, and law

enforcement's investigation into the homicide.

Yet another undisclosed "Investigative Report"

prepared by the State Attorney's Investigator dated July 6,

1988, before the retrial, provided another contradictory,

but undisclosed, statement from Mellow Jones:

> Mellow advised she does recall the day in question
> when a cab driver was murdered down the street,
> although she does not recall the specific date.
> Mellow advised that Melvin had come home during the
> late evening or early morning hours.  Mellow advised
> that she was half asleep when Melvin came home,
> however, she believes it was 20 minutes to 30
> minutes prior to receiving a knock on the door.
> Mellow answered the door and found it to be a St.
> Petersburg Police Officer who advised her that
> someone had been shot nearby and was asking if she
> had heard anything to which she stated she had not.
> After the police officer left, Melvin told her that
> he had seen two guys shoot a cab driver.  It should
> be noted that she was upset at the time and did not
> know that whoever had been shot was dead.  She
> advised that Melvin did not go into any details as

---

⁶(...continued)

him when he told her that he had witnessed a murder and that
was why she did not tell the police.  She claimed she was
merely asked if she heard "the noise" (R2. 1014).  But, the
reports clearly established that she was asked more than
that one question.  The second report revealed that she was
interviewed at 8:30 a.m., which according to her testimony
was after her anger with Melvin had subsided.  These reports
were entirely contradictory to Melvin's testimony and
constituted valuable impeachment of both Mellow and Melvin
Jones and their stories (R2. 988-91).

18

> to the crime itself, however, he did state he was
> behind a tree when he saw it.

(D-Ex. #5).  This report contained numerous inconsistencies

that could have been used to impeach Ms. Jones had it been

disclosed.  Moreover, it also raises questions, when read

with the police report regarding the canvass after Melvin

told Mellow he saw the shooting, as to why she did not

advise the police about what Melvin had seen.

Also undisclosed was prosecutor Hogan's undisclosed

summary of Derrick Johnson's 9/19/83 statement to him,

"D.J. says [] the first time he ever saw Melvin Jones

7/11/83 in a holding cell before prelim [sic] and Melvin

**Jones showed D.J. map and said** [] **he would help D.J.** at

trial" (PC-R. 4860, 4878; D-Ex. #8)(emphasis added).[7]

According to what Johnson told the prosecutor, Johnson and

Jones met in a holding cell, Jones showed Johnson a map of

the crime scene, and said he would help Johnson at trial.[8]

---

[7]Mr. Smith's first trial commenced on November 1, 1983,
months after the July 11th meeting between Johnson and
Jones.  At that time, Johnson denied "discuss[ing] this case
at all with a Melvin Jones" (R1. 1536), and Jones denied
"ever ha[ving] a conversation with Mr. Johnson about
[Jones'] testimony" (R1. 1693).

[8]Jones was arrested on unrelated charges on June 13, 1983,
nearly three months after the shooting of Mr. Songer, the
cab driver.  He faced seventeen felony charges (R2. 998).
(continued...)

Johnson's acknowledgment of a July 11th encounter with Jones
in which he was shown Jones' map of the crime scene was not
disclosed to Mr. Smith's trial attorneys, even though the
defense at the first trial maintained that Johnson and

---

[8](...continued)

Four days later, he met with the State to bargain for a deal
in exchange for his testimony against Mr. Smith. At the
meeting, Jones gave what he later claimed was a false
account of what he had said he witnessed at Fairfield and
30th St. the night Mr. Songer was shot. Weeks after the
June 17th meeting, Jones wrote an undated letter to the
attention of Tom Hogan at the State Attorney's Office,
giving a new account that was now generally consistent with
Johnson's version of the shooting. Included with this
letter was a map of the crime scene.

   Following his testimony against Mr. Smith in 1983,
Jones was sentenced in his pending cases to concurrent
three-year suspended sentences followed by two years
probation (D-Ex. 16, 12/1/83 Sentence).

Jones met and conspired against Mr. Smith.[9] Clearly, this undisclosed information was favorable to the defense.

The significance of this information was not lost on the prosecuting attorney who learned of it in 1983. On the same day that the prosecutor met with Jones, (D-Ex. #8, #14), Hogan requested that his investigator determine whether or not Jones ever had "extensive contact with or

---

[9]A time line for the events of 1983 in regard to this matter shows:

```
March 21th  - homicide occurs
March 22nd  - Johnson first interviewed
April 1st   - Johnson arrested
April 7th   - Smith arrested
May 24th    - Smith indicted
June 13th   - Jones arrested on unrelated charges
June 17th   - Jones tried to negotiate a deal with
              Det. San Marco for info on Smith case, but info
              was bad
June 23rd   - Smith prelim at which Johnson testified
              without a deal or any expected benefit
July 5th    - SA Investigator met with Johnson
July 11th   - Jones told Johnson that "he will help
              him"
July 21st   - Hogan said a new witness contacted him
              on the 20th; later said the new witness was
              Jones
Aug 22nd    - Johnson pled to second degree murder
Sept 12th   - Hogan interviewed Jones; same day sought
              an investigation of Johnson's contact with
              Jones
Sept 19th   - Hogan interviewed Johnson, and recorded
              Johnson's statement regarding July 11th meeting
Nov 1st     - Smith's trial began; during trial both
              Jones and Johnson denied contact with the
              other.
```

21

shared a cell with" Johnson.  He wanted the information

before he spoke with Johnson at a meeting planned for the

next week.  Obviously, the prosecutor was concerned.  But

neither his concern nor the fruits of that concern were

shared with the defense.  When both Jones and Johnson swore

that they did not meet or converse about the case, counsel

had no means of developing evidence to support his theory

of defense - collaboration between Johnson and Jones to pin

the shooting on Mr. Smith.[10]  Moreover, this July 11th

meeting occurred after Melvin Jones' June 17th failed

attempt to get consideration for his story that he admitted

_____

[10]Mr. Smith's defense was that he was not in the cab and did
not participate in the robbery and/or murder.  His only
explanation for the matching testimony from Johnson and
Jones was that they collaborated somehow and came up with a
story that placed most of the culpability upon Mr. Smith and
allowed Johnson to escape the death penalty and deal down to
second degree murder.  Mr. Smith was not in a position to
know if Johnson and Jones committed the murder together or
if Johnson committed the murder alone.  Either way, it was
clear that Johnson's ticket out was to pass the buck.  Yet,
the evidence that most supported Mr. Smith's defense
regarding the testimony of Johnson and Jones was kept from
him.  Johnson could not get a deal with the State until he
produced a witness to corroborate his story.  After meeting
an investigator from the State Attorney's Office on July 5th
and failing to get a deal for himself, Johnson met with
Jones on July 11th at which time Jones promised to help.
Soon thereafter, the prosecutor received a letter from Jones
(apparently on July 20th), and struck a deal with Johnson.
Together, Johnson, Jones, and the prosecutor then sent Mr.
Smith to death row.

22

was bogus regarding what he had observed on March 21st. The State's failure to disclose the July 11th meeting precluded the defense from cross-examining both Johnson and Jones about the meeting and suggesting to the jury that this meeting was when the two were able to strike a deal to save Johnson from death row and to send Smith there in his place.

Further evidence of the State's concern regarding the import of the undisclosed July 11th meeting lies in the fact that, after the first trial began, the State had Jones take a polygraph examination (D-Ex. #20). The undisclosed report of the polygraph stated, "Subj. Has aleged [sic] through testimony to the state attorney that he was an eye witness to this homicide. JONES had previously agreed to voluntarily submit to a polygraph examination **to help establish the truthful [sic] of his written statement and credibility to his pending testimony.**" (D-Ex. 20)(emphasis added). This undisclosed report would have provided the defense with additional impeachment of Jones. The State did not disclose to Mr. Smith's counsel that a polygraph of Jones was given on November 3, 1983, after Mr. Smith's trial had commenced (D-Ex. #20; 5458). The State never told Mr. Smith's counsel about this polygraph, nor the fact

23

that Jones did not pass.  This information, which was favorable to the defense, went undisclosed as well.

Besides the undisclosed reports of Jones' polygraph examination, the State failed to disclose that Johnson too had failed polygraph examinations.  San Marco's report of April 3, 1983, was not disclosed (PC-R. 5395; D-Ex. #19).  This report included Johnson's statements made during the course of the polygraph.  One of his statements was that "this was the absolute truth & the reason he did not tell us about being with RE-RUN earlier in the NAME OF THE GAMR LOUNGE was because he was afraid he would be implicated in the AR."  This statement revealed Johnson's real motivation and if disclosed would have provided impeachment of Johnson.  It provided a specific example of Johnson's willingness to lie in order to try to get out of or reduce his criminal liability.  However, the defense was precluded from using this statement made during the polygraph examination because it was not disclosed.

Yet another example of the undisclosed favorable information was the fact that, prior Mr. Smith's retrial, Melvin Jones contacted the assigned prosecutor regarding his testimony against Mr. Smith and sought to barter yet again.

24

An undisclosed handwritten note dated 8/9/89 on the

stationary of prosecutor, Mary McKeown, stated:[11]

> TC from Melvin Jones,
> His daughter, Elizabeth Jones age 16 (already has a
> child of her own) has accused him of sexual abuse
> which occurred 3-6 yrs ago.
> He's trying to get back with mother, Elizabeth
> doesn't like it, has made allegations.
> He's willing to take polygraph. Wants her to take
> polygraph. He's afraid he'll be arrested. No legal
> advise given.

(D-Ex. #6, bsp 1565). Jones advised Mr. Smith's prosecutor

that his 16-year-old daughter had accused him of "sexual

abuse which occurred 3-6 yrs ago" and that "[h]e's afraid

he'll be arrested" (D-Ex. #6). In 1989, Jones was "afraid

he'll be arrested." This was in advance of the second

trial. It revealed a motive on Jones' behalf to curry favor

with the State. As such, the defense was entitled to

question Jones regarding his fear of arrest. Jones'

undisclosed fear of prosecution for sexual abuse constituted

information favorable to Mr. Smith.

Also undisclosed was a Synopsis prepared by Glen Martin

on April 20, 1989, that detailed Jones' sworn statement to

---

[11]In 1989, Ms. McKeown was an assigned prosecutor on Mr.
Smith's case (PC-R. 4808).

25

him on April 19, 1989.[12]  In this statement, Jones indicated

that he had several violations of probation currently

pending with the State Attorney's Office, and a "GT" (D-Ex.

#7).  He indicated that he "was somewhat disappointed in

[the prior assistance provided] and [had] hoped that the

State could have done a little bit more for him."  According

to the Synopsis, "Melvin Jones indicated that he is hopeful

that the State will speak in his behalf, however, he

indicated that the State has made no specific promises to

him whatsoever re[garding] how these case will be

disposed."[13]  Jones's expression of hope for assistance from

---

[12]Glen Martin was Ms. McKeon's co-prosecutor until her
departure from the case.  He was the lead prosecutor at the
1990 retrial.

[13]Jones also discussed the circumstances by which he came
forward in the "Clinton Jackson case."  According to
Martin, "Melvin stated that when he learned that the police
were looking for a black truck that was normally in his
possession as being the suspect vehicle in this case, that
he did contact the SPPD and inform the PD as to the names of
the indivs who were in the possession of his black pick-up
truck at the time of the homicide." (D-Ex. #7).  This
undisclosed statement revealed that Jones had been a suspect
in the Clinton Jackson case when he came forward as a
purported eyewitness, just as the undisclosed police report
revealed that he was a suspect in the Songer homicide.
      After testifying against Mr. Smith in November of 1983,
Jones received a suspended sentence and was released from
custody.  In January of 1984, he claimed to have witnessed
Clinton and Nathaniel Jackson on their way to a robbery in
which the victim was shot and killed.  Jones testified
                                                (continued...)

26

the State, expressed to the State, was clearly information
favorable to the defense that was not disclosed.

Still yet another example of the State's failure to
disclose favorable information is contained in the documents
entitled "Synopsis" prepared by Hogan recording sworn
testimony obtained pursuant to State Attorney subpoenas (D-
Ex. #10).  According to Hogan's Synopsis of David McGruder's
sworn statement, "McGruder gave descriptions fitting both
defendants in this case, however, he was unable to pick
either of the defendants out of a photopak."  This

_____

¹³(...continued)
against Clinton Jackson in his 1985 trial.  By then, Jones
was back in custody in the same cases that he had received a
suspended sentence seeking a bond reduction (D-Ex. 16,
12/19/84 Motion for Bond Reduction).  When Clinton's case
was reversed and remanded for a new trial, Jones who was on
the street with no pending charges was unavailable to
testify.  Jackson v. State, 575 So. 2d 181 (Fla. 1991).
Later, he was picked up on a probation violation and a grand
theft charge.  While those charges were pending, in April of
1989 he met with prosecutor Martin and discussed testifying
at Mr. Smith's retrial (D-Ex. 7).  He later called
prosecutor McKeown in August of 1989 and discussed his fear
of the sexual assault charges.  With charges and potential
charges pending against him, Jones showed up and testified
against Mr. Smith in 1990.
     The State did not disclose Jones' statement regarding
his testimony in Jackson while it was successfully
precluding the defense from cross-examining Jones regarding
his failure to testify at Clinton Jackson's retrial (See
Ground VII, infra), and while misleading the defense, the
judge and the jury regarding the consideration that Jones
got for his testimony against Mr. Smith in 1983.

27

contradicted McGruder's trial testimony (R2. 862-63).
Obviously, McGruder had been shown a photopak lineup that
included Mr. Smith's photo prior to April 4th, the date the
"Synopsis" was dictated.[14] Further, during the sworn
statement obtained by Hogan, the description of the "shorter
male" that supposedly matched Mr. Smith was recognized by
Hogan to be off by "about a 30 pound weight difference" (D-
Ex. #10, backside of bsp 0409).[15]

---

[14]It was never disclosed to the defense that McGruder was
shown a photopak lineup that included Mr. Smith's photograph
on or before April 4th and that McGruder "was unable to pick
either of the defendants out of a photopak" (Def. Ex. #10).
This fact as demonstrated by the "Synopsis" was undisclosed
impeachment of the significance of the trial testimony that
McGruder was shown another photopak on April 8th with
another photograph of Mr. Smith included and that he picked
Mr. Smith's photograph out as of the man that he thought he
saw get in the cab on March 21, 1983 (R2. 863).

[15]In denying relief, the state circuit court found that the
Synopsis was not disclosed, but observed that as to the
undisclosed information regarding McGruder, "[i]t goes
without saying that this information would have been
favorable to the defense." (PC-R. 4097) (emphasis added).
Nevertheless, the circuit court concluded that, "CCRC fails
to meet its burden showing that defense counsel was entitled
to disclosure of this internal investigatory report." (PC-R.
4096).
    The Florida Supreme Court affirmed saying "the State
should have disclosed the document, but [we] hold this
evidence was not material." Smith v. State, Slip Op. at 11.
The Supreme Court elaborated, "When the prosecutor dictated
his synopsis, the police had not yet shown McGruder a
photopak actually containing Smith's picture. McGruder did
not identify Smith's picture until April 8. That was the
(continued...)

28

In another undisclosed police report, Det. San Marco addressed his meeting with McGruder on April 8, 1983. The report notes that after McGruder picked out Mr. Smith's photograph from the photopak shown that day, McGruder indicated that "he was not positive of his ID on the picture of SMITH, but stts [sic] that it definitely looks like him" (Def. Ex. # 10, bsp. 4909).[16]

In yet another undisclosed police report (D-Ex. #3, bsp 4719), McGruder had given a description of the men he saw get into the cab as:

> 1. B/M, 22-23 yrs of age, **5'8" tall, 130 pounds,** med. build, dark skin, having a thin mustache & a short afro type hairdo. This subject was last observed to be wearing a red cloth type jacket, bluejeans & white sneakers.
> 2. B/M approx. 23 yrs of age 6' tall, 140 pounds, slim build, light skin, having a short cut type hairdo. Only clothing description reference to

---

[15] (...continued)
first photopak that included Smith's picture." Slip Op. at 11. But of course, the "Synopsis" contradicts the Florida Supreme Court's conclusion and states that at the time the "Synopsis" was written (April 4[th]), "he was unable to pick either of the defendants out of a photopak" (Def. Ex. # 10).

[16] This report also contradicted San Marco's testimony at Mr. Smith's trial that he did not take the photo of Mr. Smith that was shown to McGruder on April 8th (R2. 810-11). San Marco testified that he did not take the picture, nor was he present when it was taken. Yet, in the undisclosed police report, San Marco wrote that he took "SMITH up to the 4[th] floor to get a new picture taken of him" (Def. Ex. #10, bsp 004908).

> second individual was that he was wearing a
> pair of bluejeans & white sneakers.

(Emphasis added).  In yet another undisclosed report dated

March 24, 1983, the subject at large, Derrick Smith, was

described as **"5'8" tall, 205 pounds, husky build"** (D-Ex. #3,

bsp 4766) (emphasis added).  These undisclosed reports read

together show that at the time Mr. Smith weighed 75 pounds

more than McGruder had described and that McGruder had been

unable to identify Mr. Smith's photo as one the men getting

into the cab; the reports constituted undisclosed

impeachment.[17]  According to Hogan's "Synopsis", McGruder

"was unable to pick either of the defendants out of

photopak" (D-Ex. #10, back of bsp 409).  Thus, contrary to

the State's closing argument to the jury, McGruder was

---

[17]At trial, McGruder testified:

| | |
|---|---|
| Q. | Is that the guy you saw get in the cab that night? |
| A. | Yes. |
| Q. | Are you sure about that? |
| A. | I'm not sure. |
| Q. | Were you sure then? |
| A. | Yes |
| Q. | Is it now, seven years later, you're not sure? |
| A. | No. |
| Q. | Well, then you're going to have to explain. Why aren't you sure? |
| A. | It's been seven years that - I don't know - you know, remember. |

(R2. 881).

30

initially unable to identify Mr. Smith, and described the person who got in the cab as someone who weighed somewhere between 30 and 75 pounds less than Mr. Smith weighed. Better or more favorable evidence destroying the significance of McGruder's testimony is hard to imagine.

According to Hogan's undisclosed "Synopsis", Mike Krause "was the first one to interview McGruder" (Def. Ex. #10, bsp. 000410). According to an undisclosed police report written by Mike Krause, he interviewed McGruder on March 21st, and McGruder told him that he saw both individuals get in the back seat of the cab (Def. Ex. 3, bsp 004739-40).[18]  Yet, Krause testified in a deposition that he did not talk to any witnesses in the case (R1. 656).

Still yet another example of the State's failure to disclose favorable information is in an undisclosed "Investigative Report," in which it is reported that Priscilla Walker told the state attorney investigator that "Smith stayed at their house for several hours and believes he left around five in the morning" (D-Ex. 4, bsp 3343).[19]

_____

[18]At trial, McGruder testified that the shorter guy got in the backseat, while the taller guy got in the front seat (R2. 860).

[19]According to the evidence, Jeffrey Songer was shot at
(continued...)

31

In her testimony, Walker said that Derrick Smith arrived at her residence at 314 Royal Street South "[b]etween twelve and one" (R2. 1020).  Ms. Walker and her boyfriend, James Marshall, were called as witnesses by the State at Mr. Smith's second trial.  Walker claimed that Mr. Smith had told her that he had shot someone (R2. 1020).[20]  Yet according to another undisclosed "Synopsis", Nellie Mae Dixon testified before the assistant state attorney that Derrick Smith was at her residence (1635 Court Ave. South) at 1:20 AM asking to see her daughter Angela (D-Ex. 10, bsp 390), making Walker's story that Mr. Smith was at her house from around midnight to 5:00 AM impossible.  The undisclosed "Synopsis" also shows that Linda Lanier confirmed Nellie Mae Dixon's testimony.  Lanier testified that she was at Ms. Dixons' house and heard Mr. Smith's voice outside her window

---

[19](...continued)
approximately 12:43 AM at 31st Street and Fairfield Ave. South (R2. 751).

[20]In a brief cross-examination, Walker was accused of disliking Mr. Smith (R2. 1023).  During the re-direct, the State responded to an objection to one of its questions, saying:

> [PROSECUTOR]: Judge, I think it's proper redirect, in that he was getting into the question of whether or not she was lying because she doesn't like him.

(R2. 1024).

talking Ms. Dixon "between 1:15 and 1:20 on Monday morning, the day Jeffrey Songer was shot" (Def. Ex. # 10, bsp 004697).

Another undisclosed police report, dated March 23, 1983, reported that Officer Kewin learned on March 23rd that Derrick Smith "might be staying at 314 Royal S/S. The res of James Matthews and Priscilla Walker." D-Ex. 3, bsp 4717. The report subsequently stated, "Writer along with Sgt. Sanders went to 314 Royal S/S + found that a Det. had already been to the house **and they gave no info.**" D-Ex. 3, bsp 4717. This report clearly shows that in 1983 when interviewed by the police neither Walker nor Matthews indicated that Mr. Smith said anything pertinent to them. This report clearly contained information favorable to Mr. Smith that could have been used to impeach Walker and Matthews.

Also undisclosed were "Investigative Reports" summarizing statements given to Scott Hopkins, a state attorney investigator. All of the documents included in Defense Exhibit No. 4 concerned Priscilla Walker and James Matthews, and interviews conducted in the summer of 1988. The Investigative Report dated August 5, 1988, detailed an interview of Ardessa Davis who said, "Priscilla Walker had

33

told her previously that Smith had come to her house the
night of the murder, however, Priscilla would not tell
anybody what Smith said, if anything" (D-Ex. 4, bsp 3341).[21]
The report then indicated that Priscilla Walker was
interviewed and detailed a statement that she provided. The
report noted, "Writer asked Priscilla why they did not tell
the police that Smith had told them that he just shot the
cab driver and Priscilla responded by stating the police
didn't ask. Priscilla stated all the police wanted to know
was where he was" (D-Ex 4, bsp 3343). In this report, there
was no indication that Walker said that Smith used the word
"cracker." Also in D-Ex 4 is a "Synopsis" of Walker's
undisclosed sworn statement of August 10, 1988, in which she
stated that "The only person that she has told the
statements to is Sheila, and all she told Sheila was that
Rerun told her he'd shot the man. – Also told her mother"
(D-Ex. 4, bsp 3344).[22]  The "Synopsis" observed:

> She has never made any statements to the police
> about Smith. She indicated the police did come by
> her residence either before or after the shooting,

---

[21]Davis categorically disputes this. According to Davis,
Walker never told her such a thing and she did not tell
Hopkins that Walker had.

[22]Apparently, Walker also claimed that she had not told this
story to Davis.

34

> she is not sure exactly when, but it could have been
> a week either way, and asked to see Smith, and she
> advised them that he was not there. They did not
> ask her any questions about statements he may have
> made or any knowledge of the murder.

(D-Ex. 4, bsp 3344).

Also undisclosed was an "Investigative Report" dated

August 10, 1988, concerning an interview of James Matthews.

It provided:

> Matthews stated the following day, which would been
> a full 24 to 36 hours after the murder, the police
> came by his house looking for Smith.  Matthews
> stated they asked if they could search the house,
> which he gave them permission to do.  **Matthews could
> not recall whether he lied to the police with
> regards to the above conversation with Smith** or if
> they failed to ask him anything other than where he
> was.

(D-Ex. 4, bsp 3935)(emphasis added).  The report further

indicated that after the interview, Mr. Hopkins contacted

Detective Rossi in order to obtain any police reports

"reflecting that Matthews and Walker were interviewed" (D-Ex

4, bsp 3935).

Also undisclosed to the defense was the fact that

Priscilla Walker had criminal cases pending against her when

she was contacted by Scott Hopkins in 1988.  In 1985,

welfare fraud charges were brought against Walker under a

pseudonym.  In June of 1988, Walker was arrested for

obstruction of justice.  She was charged with violation of

35

probation on July 6, 1988, and on July 25, 1988. Another violation of probation charge was filed on February 8, 1990. On May 4, 1990, an order of probable cause was entered and counsel was appointed. On May 8, 1990, she entered a plea of not guilty. After she testified against Mr. Smith on May 10, 1990, her bond was reduced on May 11, 1990. Mr. Smith was given a death sentence on July 13, 1990. On July 20, 1990, Walker changed her plea to guilty and was placed back on probation. These criminal proceedings against Walker during the time that she came forward and suddenly remembered a previously unreported statement, and at the time of her testimony, were not disclosed to Mr. Smith or his counsel. This was information favorable to the defense that was withheld by the State in violation of Mr. Smith's constitutional right to due process.

Also undisclosed was the redacted portion of a police report regarding the questioning of Mr. Smith. The portion discussing Mr. Smith's invocation of his right to counsel was deleted and not disclosed (D-Ex. #2, bsp 4903; D-Ex. #12, page 26a). The redacted facts (the invocation of silence) came out unexpectedly during the first trial, and lead the Florida Supreme Court to reverse Mr. Smith's initial conviction because the police violated Mr. Smith's

36

rights by questioning him after he initially invoked his
rights.  Smith v. State, 492 So.2d at 1067.[23]  However,
because these reports remained undisclosed after the
suppression of the statements, the defense did not learn how
the police used the information obtained from Mr. Smith in
the course of its investigation.  For example, based upon
the information obtained from Mr. Smith during the statement
obtained in violation of his constitutional rights, San
Marco went and talked to Mr. Smith's family members
including Mr. Smith's uncle and brother.  Through the fruits
of Mr. Smith's unconstitutionally obtained statements, the
State obtained the box of bullets from Mr. Smith's uncle
that were tested by the FBI and resulted in the testimony of
Agent Havekost.  The failure to disclose the police reports
showing the fruits of the unconstitutionally obtained
statement prejudiced Mr. Smith.  The defense was precluded
from seeking to suppress the fruit of the poisonous tree.
Again, information favorable to the defense was not
disclosed in violation of Mr. Smith's right to due process
under the Fourteenth Amendment.

_____

[23]In Mr. Smith's statement that the Florida Supreme Court
suppressed, Mr. Smith indicated that he did not get in the
cab with Johnson and was not involved in the robbery or the
shooting of the cab driver (D-Ex. #2, bsp 4904).

When all of the undisclosed evidence and information is considered cumulatively, as is required, the case is cast in a whole new light. Confidence is undermined in the outcome and habeas relief is required.

## B. The State Intentionally Deceived and/or Misled

At the 2002 hearing, Mr. Smith presented documents obtained from the State during collateral proceedings. These included the investigative memo, dated 9-12-83, containing Hogan's directive to investigate the contact between Jones and Johnson (Def. Exh. #8). The memo included a note stating:

> D.J. says 1st time he ever saw Melvin Jones 7-11-83 in holding cell before prelim - Melvin Jones showed D.J. map and said he would help D.J. at trial.

In 2002, Hogan acknowledged that he wrote the note memorializing Johnson's statement (PC-R. 4877-78).[24]

In 2002, Hogan confirmed that he had been advised that the meeting between Johnson and Jones occurred on July 11, 1983 (PC-R. 4894-97). Hogan had no memory of disclosing

---

[24]Johnson, who was called to testify at the 2002 evidentiary hearing by the State, acknowledged that he "met Jones" the day he had a court hearing in his case (PC-R. 5372). He explained "I think at the second preliminary that's when discussion had begun" (PC-R. 5371). Johnson confirmed that the "discussion" occurred with Jones and that Jones showed him a map. State's Exhibit #3 showed that Johnson had a pretrial hearing on 7-11-83.

this information (Tr. 79, page missing from ROA). The prosecutor from the second trial, Glenn Martin, knew of the July 11th meeting, but had no memory of disclosing it to Mr. Smith's counsel (PC-R. 4840). Mr. Smith's attorney from his first trial, Tom Donnelly, testified that he had no memory of receiving this information (PC-R. 5391-93). Mr. Smith's attorney from his second trial, Richard Sanders, testified that he did not receive information from the State regarding a meeting between Jones and Johnson (PC-R. 4934-35).

Before the first trial began, Mr. Smith's counsel took Jones' deposition on September 26, 1983. During the deposition, Jones gave false and/or misleading answers regarding his incarceration with Johnson and regarding discussions of the case with others (R1. 780; 783). At the first trial, during the cross-examination of Johnson, Mr. Smith's counsel asked Johnson whether he had discussed the case with Jones (R1. 1536). Johnson replied that he had not. A similar question was asked during Jones' testimony. Jones denied the contact, and the State did nothing to correct Jones' misleading answer (R1. 1693)

Leading up to the second trial, Mr. Smith's counsel filed a demand for exculpatory material (D-Ex. #1, bsp 98). In paragraph three of the demand, Mr. Smith requested,

39

"Statements by any person tending to discredit in any
fashion statements by that person or any other witness."
The State responded that counsel should rely on the
discovery presented at the first trial (D-Ex. #1, bsp 96).
Nothing was turned over before the second trial about the
contact between Jones and Johnson, even though the
prosecutor was aware of it (D-Ex. #1; PC-R. 4816-22; R2.
57).

Donnelly, the defense counsel at the first trial,
explained the significance of the undisclosed contact:

> Q    Why did you -- why were you inquiring
> about that? What was the purpose of trying to find
> about contact between those two individuals?
>
> A    The question becomes what contact they had
> was to see whether the testimony is independent
> testimony, if they're getting together before they
> testify, whether it's a collaborative effort; that
> kind of thing.
>
> Q    And were you also trying to see a source
> or a basis for what Melvin Jones was saying?
>
> A    That's correct.
>
> Q    Other than actually having been there?
>
> A    That's right.
>
> Q    Were you given any information to indicate
> that there had been such contact?
>
> A    Not to my -- not to my recollection; no.
>
> Q    And the transcript I showed you, in fact,

40

Mr. Johnson indicated there had not been discussion?

A    That's correct.  That's what this transcript says.

Q    Had you known of any -- had you known of the notes in Exhibit 8, is that something that would have been pursued?

A    Yes, because that would have -- we would have been able to impeach the testimony of Mr. Johnson with this note and it would have shown that Mr. Johnson had presented false testimony in front of the jury.

Q    And does that also, then, not only impeach Mr. Johnson but could you use it to impeach Mr. Jones as well?

A    Yes.  If Mr. Jones said the same thing as Mr. Johnson did, which would have been inconsistent with this note; yes, we could have.

(PC-R. 5392-93).

Mr. Sanders, Mr. Smith's counsel at the retrial,

testified:

Q    Is that information that you would have used had you had it?

A    Yes.

Q    And can you explain?

A    Well, Melvin Jones and Derrick Johnson had -- were together in the jail in a sense they could talk to each other, that would have provided an alternative explanation for where Melvin Jones got his information that he testified about at trial, because in the absence of some second powers, there's only two possible ways Melvin Jones could have known what he testified about; either he saw it or somebody told it to him.  And I had no

41

> information that there was anyone who could've told
> it to him, or presumably the only ones that could
> have told it to him would be another eyewitness,
> and, of course, that would be either Derrick Johnson
> or whoever else was involved.
>     So I certainly would have liked to have known
> that they were at some point, at least at one point
> in the same area of the jail where they could have
> talked to each other.

(PC-R. 4934). Sanders testified that the State's case

rested on Jones and Johnson (PC-R. 4936). Clearly, the

undisclosed meeting between the State's two main witnesses

was material to the case.

Mr. Smith's counsel were affirmatively misled by the

false and/or misleading testimony given by Jones and

Johnson. Counsel specifically asked Jones and Johnson

regarding contact between them, and counsel was repeatedly

told that there was none. Both Hogan and Martin were aware

of Johnson's statement that there was a meeting on July 11th

at which Jones told Johnson that "he would help D.J. at

trial." Yet, neither informed Mr. Smith's counsel of

Johnson's contradictory statement.[25] When the State failed

---

[25]In fact, in his closing argument at the 1990 trial, the
prosecutor relied upon the false or at the very least
misleading testimony in asking the jury to convict Mr. Smith
("One thing [defense counsel] was trying to say is that
somehow Derrick Johnson and Melvin Jones, the guy hiding
behind the bushes, plotted and [planned] this together.
**Well, first of all, they didn't even know each other.**")(R2.
(continued...)

42

to correct the testimony and disclose Johnson's statement about his July 11th meeting with Jones, counsel had every reason to believe that there was no evidence of such a meeting.[26]  The State intentionally misled the defense and violated Mr. Smith's right to due process.  It is a due process violation to fail to correct information and/or evidence known to be false that is provided to the defense. The due process violation is the failure to ever advise the defense that the testimony from Jones and Johnson at the first trial and in their depositions was not accurate.  The prosecutors knew that Jones and Johnson met on July 11th, but never corrected the sworn testimony from the first trial and in depositions denying such a meeting.

In addition to the intentional false or misleading evidence regarding the July 11th meeting, the State affirmatively deceived Mr. Smith's counsel regarding the consideration that Jones received in 1983 for his testimony against Mr. Smith.  After Mr. Smith's 1983 trial, Jones

---

[25] (...continued)
1349)(emphasis added).

[26]Of course, the State redacted the police reports that were disclosed, and deleted reference to the fact that "Melvin Johnson," who had outstanding warrants and lived near the intersection of 30th St. and Fairfield, was the initial suspect in the shooting of Mr. Songer.

43

received a three-year suspended sentence followed by two years probation. It was only after he got into additional trouble that in 1985 he was ordered incarcerated for three years. Jones was permitted to suggest to Mr. Smith's jury that he really did not get much of a deal because he had to serve three years (R2. 1000). Prosecutor Martin falsely told the judge and defense counsel that Jones was not sentenced until after he had also testified against Clinton Jackson and that he then received three years incarceration followed by two years probation (R2. 999, 1001). This was patently false (D-Ex. 16, 12/1/83 Sentence).

The prosecutor argued to the jury, "[Jones] did get himself some time off his sentence. That was never denied. He didn't think much of it. He sort of shot everybody a dirty look and said, Well, yeah, I did three years. He didn't think much of that break that he got." (R2. 1345-50). Thus, the jury was affirmatively misled to believe that after coming forward against Mr. Smith, Jones got a sentence of three years incarceration. However in fact, he received a suspended three-year sentence. The State's intentional deception violated Mr. Smith's constitutional right to due process. The State cannot show that this constitutional error is harmless beyond a reasonable doubt. Accordingly,

44

habeas relief is warranted.

**Exhaustion of Ground I in state courts:**

1) **Did you raise Ground I in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground I in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes.

   a) **If your answer is "yes", then state:**
      I. **Date motion filed:** 4/1/97; amended on 12/3/99, 9/18/2000, 4/1/2000 and 9/18/2000.

      ii. **Whether you received an evidentiary hearing:** Yes.

      iii. **Result:** Denied.

      iv. **Date of Result:** 2/10/03.

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

      I. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

      ii. **Date appeal filed, result of appeal, date of result:** Notice of appeal filed on 3/13/03. The Florida Supreme Court affirmed the denial of relief. Smith v. State, 2006 Fla. LEXIS 388 (March 9, 2006), rehearing denied 6/8/06, mandate issued 6/26/06.

3) **Have you raised Ground I in any other petition, application, or motion filed in the state courts of Florida?** No.

## GROUND II

**MR. SMITH WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE GUILT PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF THE SIXTH AMENDMENT.**

### A.   Undiscovered Witness - Ventura Gibson

At both of Mr. Smith's trials, Melvin Jones testified that he witnessed the shooting of Jeffrey Songer and that Mr. Smith was the triggerman.  Jones was arrested on outstanding warrants on June 13, 1983, nearly three months after the shooting of Songer.  Through his attorney, Jones contacted the police and indicated that he had information regarding the homicide.  Dissatisfied with the consideration offered by the police, Jones gave an "altered" version of the facts that was not true.  Subsequently, he wrote the prosecutor indicating that he was on his way home the evening of the murder when he witnessed the shooting.  Later in a deposition, Jones explained that the night of the shooting he had been with Vincent Gibson on 27th St. and 18th Ave. in St. Petersburg.  Jones further explained that Gibson gave Jones a ride home that night, dropping him off near the murder scene (R1. 787-88).  Jones described what he supposedly witnessed, including seeing Mr. Smith shoot Songer, the direction Mr. Smith and co-defendant Johnson ran

46

after the shooting, what both defendants were wearing, and a detailed description of the gun supposedly used by Smith. Jones' trial testimony tracked the story told in the deposition (R1. 1671-73; R2. 973-75).

In 2002, Mr. Smith presented the testimony of Ventura Gibson.[27]  He testified that he in fact knew Jones because they had shared work space in the past, but he also testified that they were not friends (PC-R. 4903). Regarding Jones' claim that he was with Gibson the night of the murder, and that Gibson had given him a ride home, Gibson testified:

> Q    Try to bring you back, Mr. Gibson, to
> March of 1983.  Specifically, do you remember at
> some point in 1983 do you remember a cab driver
> being shot and killed on Fairfield Avenue?
>
> A    I read it in the paper.
>
> Q    You read it in the paper after it
> happened?
>
> A    Yes.
>
> Q    The following day?
>
> A    The following day.

---

[27]Although the name Jones gave was Vincent Gibson, Ventura Gibson is clearly the same person.  For example, Jones testified that "Vincent" lived at 27th Street and 18th Ave., and Ventura Gibson testified at the evidentiary hearing that he had once lived at 27th and 18th (PC-R. 4903).

Q    Now, we already established that you know
Melvin; correct?

A    Yes.

Q    That would be Melvin Jones, for the
record, your Honor. Was Melvin Jones over at your
house or your brother's house on 27th Street and
18th Avenue?

A    Not as I can recall.

Q    And I mean specifically around the time
that the cab driver was killed?

A    No.

**Q    Do you recall ever taking Melvin Jones
from 27th Street and 18th Avenue over to Fairfield
Avenue South?**

**A    No, I can not.**

**Q    Do you ever recall taking Melvin Jones --
or driving him anywhere?**

**A    No.**

(PC-R. 4904-05) (emphasis added).

During the State's cross-examination, Gibson testified:

Q    And just so the record is clear, your
testimony today is you do not recall whether or not
you gave Melvin Jones a ride in March of 1983; isn't
that your testimony today?

A    Yes, I did not give him a ride.

**Q    No, sir.    I'm asking you on direct
examination didn't you say you do not recall?**

**A    I do not recall giving him a ride; no.**

48

**Q    You could have, but you don't recall?**

**A    No, I did not give him a ride.**

* * *

Q    Mr. Gibson, would it refresh your recollection if this court reporter read back your answer regarding whether or not you recall ever taking Melvin Jones to the area of Fairfield Avenue in March of '83, would that help you?

A    I don't remember taking Melvin to Fairfield.

COURT REPORTER:  I didn't hear him.  Speak up, sir.

THE WITNESS:  I don't remember taking Melvin to no Fairfield Avenue.

* * *

Q    All right.  You're not saying it didn't happen, just 19 years later today you do not recall; is that correct?

**A    I'm not taking Melvin nowhere.**

Q    Melvin Jones had a cabinet shop next to your tile shop; did he not?

A    To my uncle tile shop; yes.

**Q    All right.  And it would not be unusual for Melvin Jones because he knew you to ask you for a ride, that's not something that would be usual; would it?**

**A    Yes, it would.  I know Melvin was working on -- they had their own transportation, I wouldn't be taking Melvin nowhere.**

(Tr. 128-29; 132; 133) (emphasis added).

49

Despite Jones' statement identifying the person who drove him on the night of the shooting, Mr. Smith's trial counsel made no effort to locate this key witness:

> Q    One question I neglected to ask.  I lost my train of thought.  In reference to Ventura Gibson or Vince Gibson, a person who Melvin Jones testified had given him a ride on the night of the homicide, do you recall making any effort to locate him?
>
> A    Not that I recall.
>
> Q    Do you recall having a particular reason for not trying to locate him?
>
> A    No.  Again, that's -- as I look at it now, that's certainly something we should have looked into, no question about that, and I don't remember -- I don't remember even thinking about it.

(PC-R. 4949).[28]

There was ample reason for Mr. Sanders to investigate every aspect of Jones' story.  In fact, doing so seemed a necessity considering Mr. Sanders' belief that the State's entire case rested on Jones and Johnson (PC-R. 4936).  As Johnson himself acknowledged at the hearing, the prosecutor (Hogan) did not know whether to believe him until Jones sent

---

[28]Of course, counsel was not provided with the portion of a police report indicating that "Melvin Johnson" with outstanding warrants who lived near the intersection of 30th and Fairfield was the original suspect in the shooting.  In determining whether Mr. Smith received a constitutionally adequate adversarial testing, cumulative consideration must given to the impact of the State's failure to disclose along with counsel's failure to adequately investigate.

his letter and map to Hogan (PC-R. 5382).

Had Sanders sought to locate Gibson, who had lived in St. Petersburg his entire life, he would have been easy to find. Sanders could have located Gibson in the same way that he was located over 10 years later, by starting at 27th St. and 18th Ave. in St. Petersburg. Had Sanders found Gibson, he would have had powerful testimony to use at Mr. Smith's trial, exposing Jones' false story (PC-R. 4906).

Jones' testimony was the tie-breaker. It broke the stand off during which Derrick Smith and Derrick Johnson told two completely different stories. Until Jones came along and sided with Johnson, law enforcement did not know whom to believe. The State repeatedly cited Jones' account to the jury in their closing arguments, including the claim that Jones saw Mr. Smith with the gun after the shooting (R2. 1295, 1298, 1301-5). Had trial counsel discovered and presented Gibson's testimony, Jones' credibility would have been severely damaged. Mr. Smith's counsel would have been able to attack the thoroughness and good faith of the State's investigation, including their decision not to verify essential elements of Jones' story. Counsel would have been able to point to some evidence to support his argument that Jones' story was false and that he had

51

colluded with Johnson.[29]  Counsel could even have argued that Jones was actually the individual who was with Johnson, not Mr. Smith, and that Jones was covering for Johnson, the real trigger-man, in exchange for Johnson putting Mr. Smith at the murder scene instead of Jones.[30]  Clearly, Mr. Smith was prejudiced by trial counsel's ineffectiveness and was denied a constitutionally adequate adversarial testing.

## B.   Unchallenged Junk Science -- Bullet Lead Analysis

At Mr. Smith's trial, the State presented the testimony of FBI chemist, Donald Havekost.  He conducted a compositional analysis of a lead fragment found on the victim, presumably part of the bullet that killed him.[31] Havekost also analyzed two bullets that the police had

---

[29]During Jones' deposition, when asked how he knew Mr. Smith's real name, Jones stated that he learned it from an investigator working for the Public Defender's Office, and he had the conversation with this public defender investigator before he wrote the letter to Tom Hogan (R1. 808-09).  As the record demonstrates, Johnson was represented by the Public Defender's Office.

[30]It was Jones who, at the time of the murder, was living near the murder scene.  It was Jones who was lying about how he ended up being at the murder scene that night.  And, had the State fulfilled their constitutional obligations, counsel would have also been able to argue to the jury that Jones was, in fact, an initial suspect in this murder.

[31]The actual bullet that killed Songer was never found.

collected from Mr. Smith's uncle, Roy Cone.[32]  Based on his
analysis, Havekost concluded that the quantity of various
elements in the bullets and the lead fragment matched.
Accordingly, Havekost drew the conclusion that the lead used
to make the bullets and the lead used to make the lead
fragments "originated from a common source" (R2. 1071).  At
the conclusion of his direct examination, Havekost
testified:

> Q    As we increase and add more elements that we
> can show are materially indistinguishable, what does
> that do to the odds that there are any boxes with
> those five elements.
>
> A    And if you are able to – well, in the early
> days, we felt if we could characterize three
> elements that the possibility of there being a
> mistake was very remote.  If you can quantitate
> (sic) four elements, five elements, in my opinion,
> **you've reduced the chance to essentially nothing –
> that they match by chance.**

(R2. 1083) (emphasis added).[33]    Mr. Smith's counsel failed

---

[32]Cone had testified that he purchased a gun and box of
bullets approximately ten years before the murder, that his
gun had turned up missing at some inexact point in time, but
the box of bullets was not missing.

[33]At the 2002 hearing, the State's own expert, Charles
Peters, was not willing to commit to the opinion that simply
because you can quantify more elements, the chance of an
overlap is "essentially nothing":

> Q    So in this instance we have Q-1 which is
> unknown fragment, and we're talking about the
> (continued...)

53

to challenge this conclusion that there was no chance that
there were other boxes with materially indistinguishable
levels of the five elements that Havekost tested (PC-R.
5347). Counsel did not cross-examine Havekost concerning
this conclusion. Counsel's performance was deficient.

Havekost's testimony that the odds of another box
having bullets with materially indistinguishable bullets was
reduced "to essentially nothing" could easily have been
refuted. But counsel failed to obtain the assistance of a
metallurgist to advise him regarding bullet-lead analysis.
He was thus totally unprepared to cross-examine Havekost and
expose the absence of scientific support for Havekost's

---

[33](...continued)

> chances of it coming from the box with Q-2 and Q-3.
> Would you say it's fair to say the chance that it
> came from another box, a different box than this
> box is zero, next to nothing?
>     A    Well, I don't think that's what he was
> saying here. He was saying that you're asking --
> was asking about the additional elements adding to
> it, do you think the distinctiveness of this source,
> I -- I don't really see where the box from his
> answer was being dealt with here.
>     Q    Okay. And that's based upon your
> background, your knowledge, your expertise, that's
> how you read his answer; right?
>     A    Yes.
>     Q    Do you know how the jury read his answer?
>     A    No.

(PC-R. 5346-47).

conclusion.[34]

Havekost's opinion misled the jury about the significance of the compositional analysis that he conducted. His testimony amounted to junk science. Mr. Sanders' failure to learn the science and/or seek expert assistance, allowed Havekost's misleading testimony to go unchallenged.

At the 2002 hearing, Mr. Smith presented the testimony of metallurgist Dr. Erik Randich, who explained how misleading Havekost's testimony was:

> So, in fact, these bullets could have come from a common, single source of lead. **But saying that they did is a totally unfounded statement.**

(PC-R. 5223) (emphasis added). Dr. Randich also explained the lack of science behind Mr. Havekost's unsupportable conclusion (PC-R. 5228-30).

The murder weapon was never located in this case, but the State used Havekost's misleading testimony to connect Mr. Smith to it anyway. The State had no evidence that Mr. Smith had stolen his uncle's gun. The uncle, Cone, really

---

[34]Counsel did request and receive funds to hire a firearms or ballistics expert (PC-R. 5456; S-Ex. #23, #24), but merely contacted "a clearinghouse sort of agency" (PC-R. 5455), and was advised no "problems" were seen in "what the FBI expert had done" (PC-R. 5455).

had little idea when the gun disappeared. The State relied on the FBI testimony during their arguments to the jury, using words and phrases like "boggles the mind," "it can't be done," and "infinitesimal" to describe the odds that the lead fragment and bullets could have come from a different source (R2. 1304-05; 1348). Counsel's actions amounted to a tacit endorsement of Havekost's conclusions (R2. 1326). Mr. Smith was prejudiced as a result.

## C. Other Instances of Deficient Conduct.

Mr. Smith's trial counsel failed to challenge for cause jurors who expressed bias in favor of imposing a sentence of death upon a conviction of first degree murder (R2. 634-35, 645-46, 657). The failure to strike jurors who are biased in favor of the death penalty is deficient performance.

Trial counsel's performance was deficient in his failure to adequately investigate potential "alibi" witnesses, Khan Campbell and James Hawkins, who saw Mr. Smith at Norm's Bar, located across the street from the Hogley-Wogley at 11:30 PM on March 20, 1983. Mr. Sanders accepted the State's representations regarding hospital records allegedly demonstrating that the witnesses were in error regarding their recollection of seeing Mr. Smith on the night of the homicide. The witnesses said that they

56

remembered the date because at noon on March 20, 1983,
Hawkins and Campbell had taken Campbell's pregnant
girlfriend, Dylan Walters, to a hospital emergency room and
left her there.  The State produced a hospital record
showing that Walters was treated in an emergency room at
3:20 PM on March 28, 1983.  However, a careful examination
of the hospital record would have demonstrated that on March
28th Campbell was accompanied by her grandmother, Freddie
Mae Hampton, not James Hawkins (PC-R. 2251).  After
receiving this hospital record, Mr. Sanders abandoned the
defense and refused to call the witnesses because of a gut
feeling that they were not telling the truth.  However, Dina
Watkins had testified in 1983 that she was at Norm's Bar
that night and saw Mr. Smith outside of the bar around
midnight (R1. 1959-79).  Inexplicably, Mr. Sanders neither
called her, nor sought to introduce her prior testimony.

Counsel was also deficient in failing to object to
improper comments made by the State in its closing
arguments.

Mr. Smith did not receive a constitutionally adequate
trial.  His counsel rendered deficient performance for the
reasons set forth above.  Mr. Smith was prejudiced by each
of counsel's failings.  Confidence in the reliability of the

outcome of his trial is undermined by counsel's deficient performance. Certainly, when the deficiencies are considered cumulatively, confidence in the outcome is more than undermined. Moreover, counsel's deficient performance must be evaluated cumulatively with the prejudicial impact of the State's failure to disclose favorable evidence to the defense, and its knowing deception of defense counsel. When the cumulative consideration is given, it is clear that habeas relief is required.

**Exhaustion of Ground II in state courts:**

1) **Did you raise Ground II in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground II in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes.

   a) **If your answer is "yes", then state:**
      **I. Date motion filed:** 4/1/97; amended on 12/3/99, 9/18/2000, 4/1/2000 and 9/18/2000.

      **ii. Whether you received an evidentiary hearing:** Yes.

      **iii. Result:** Denied.

      **iv. Date of Result:** 2/10/03.

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

58

    **I.**    **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

    **ii.**    **Date appeal filed, result of appeal, date of result:** Notice of appeal filed on 3/13/03. The Florida Supreme Court affirmed the denial of relief. <u>Smith v. State</u>, 2006 Fla. LEXIS 388 (March 9, 2006), rehearing denied 6/8/06, mandate issued 6/26/06.

**3)**    **Have you raised Ground II in any other petition, application, or motion filed in the state courts of Florida?** No.

### GROUND III

### MR. SMITH RECEIVED INEFFECTIVE ASSISTANT OF COUNSEL AT THE PENALTY PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF THE SIXTH AMENDMENT.

Richard Sanders, Mr. Smith's trial counsel, failed to conduct an adequate investigation for the penalty phase. Mr. Smith's early childhood years were spent in New Jersey. After his mother's death, he was moved to St. Petersburg to live with his aunt and uncle, the Cones. Mr. Sanders did not conduct an investigation into the circumstances of Mr. Smith's life in New Jersey (PC-R. 4944-46). Mr. Sanders testified at the evidentiary hearing that he *did not* send anyone to New Jersey for any type of investigation.[35] Trial

---

[35]The transcript of Mr. Sanders' testimony was corrected to make clear that Mr. Sanders never sent an investigator to New Jersey. In fact, the State filed a notice of correction
(continued...)

counsel failed in his duty to conduct an adequate and reasonable investigation of available mitigation and evidence which negated aggravation.

Mr. Sander's strategy consisted of doing the same thing that was done in the first trial. "I guess I put on the same people that testified in the first one, . . . That's basically what I did. That's basically – presented the same thing they did before." (PC-R. 4944). Mr. Sanders never did any investigation into Mr. Smith's life in New Jersey or his life on the streets after the Cones threw him out. Mr. Sanders explained in 2002:

> It's certainly true that I don't know - - since I don't know what I could have found had I looked harder, I don't know what else I could have presented, but to me, there's no doubt that I should have looked harder. Now, whether there's something else out there to find that would have been significant enough to have possibly changed his outcome, that, I don't know because I don't know what I didn't find. But to me, I did not pursue certain possible avenues that could have possibly led to fruitful significant evidence that I should have and could have pursued.

(PC-R. 5014).

Mr. Sanders also failed to investigate what happened in

---

[35] (...continued)
with the Florida Supreme Court on September 29, 2005, acknowledging this correction and the fact that the circuit court had issued an order correcting the record in this regard (PC-R. 4122-23).

Mr. Smith's life after he left his aunt and uncle's
residence in the years leading up to the homicide (PC-R.
4947). For Mr. Smith, these years were marked with drug
use, poverty and homelessness. Mr. Sanders did not have a
reason for not performing this investigation, "And I'm
really - - I really couldn't tell you why I didn't look into
that. I think I certainly should have" (PC-R. 4947). Mr.
Sanders stated:

> I think - - the only way I could try to explain it
> is I kind of got this case prepackaged, it had
> already been tried once and it was almost like doing
> an appeal. You've got - - here's the facts you're
> dealing with, now make the best out of it you can.
> And I guess I didn't - - I didn't look at it - - I'm
> trying to think of a better expression than thinking
> outside of the box. I guess I didn't stand outside
> the case and look at it differently than what it was
> presented before, I guess is the way I explained it,
> although I don't know if that makes any sense.

(PC-R. 4946).

Had counsel investigated Mr. Smith's childhood in New
Jersey he would have discovered a wealth of mitigating
evidence. Derrick Smith lived with his six siblings and his
drug-addicted mother Beatrice in New Jersey. Their house
was filthy (PC-R. 5496). The children were unkempt and
smelled of urine (PC-R. 5492). Sometimes they drank from
the toilet (PC-R. 5492). Beatrice could not care for them,
because her drug habit took all her time (PC-R. 5488-90).

61

The children were reduced to begging in the street and stealing for food (PC-R. 5479). As Ruby McClary, a friend of Mr. Smith's reported:

> Q     Did Bea take care of her kids.
>
> A     No. After she got on drugs, she didn't provide for them.  Most of the time, Derrick was there to watch the kids.  So if they didn't have food, she would send Derrick - - tell him to go to the store and get a loaf of bread, just take it and come on out, run with it.
>
> And he would go to the store and get bread and Kool-Aid and sugar and stuff.  And that was the only way the kids got something to eat.  He would, you know, go out and steal it, because when she got her money from the public assistance, she would use it up on drugs.

(PC-R. 5469).

Beatrice was using drugs every day (PC-R. 5480, 5496). Her children would see her shoot herself up with needles (PC-R. 5480).  She received public assistance, but she spent the money on drugs (PC-R. 5497).  Most of the burden of taking care of the household fell on Mr. Smith.  He was the man of the house, even though he was just a child himself, and had to take care of his siblings and feed them (PC-R. 5490).[36]

---

[36]During the penalty phase, Mr. Smith was called as a witness.  Certainly, his credibility was challenged by the State.  His testimony was uncorroborated because Mr. Sanders

(continued...)

62

When Mr. Smith was eleven years old, he witnessed his

mother die of a drug overdose (PC-R. 5490-91). Sylvia Smith

Ball, Mr. Smith's cousin, testified about the day Beatrice

died from a heroin overdose. She said Beatrice came home

that day "really cooked" (PC-R. 5498). She related:

> And she came home with her girlfriend, and she told
> us to take the kids in the room. And about ten or
> fifteen minutes later, we heard this screaming. Her
> girlfriend was screaming. She called - - she called
> 911. And when we all come running out of the room,
> that's when my aunt was dead. She was laying there
> with a needle in her arm.

(PC-R. 5498).

Dr. Toomer, who evaluated Mr. Smith in the

postconviction proceedings and was provided access to the

information obtained from New Jersey, reported:

---

[36](...continued)

failed to conduct the necessary investigation. Mr. Smith
stated that his relationship with his mother was much more
like a sister/brother than mother/son relationship (R2
1439). That statement becomes much more significant,
however, when one realizes that Mr. Smith was forced to
steal food to support his family because his mother had
spent all their money on drugs (PC-R. 5469), and that he was
forced to beg on the street for food with his brothers and
sisters (PC-R. 5479). Mr. Smith's testimony would have had
much more meaning and impact had defense counsel
investigated and presented those who observed the impact Mr.
Smith's horrific childhood had on him. This unpresented
mitigation is simply not cumulative to what was presented at
trial. Nor is the fact that he witnessed his mother's death
by heroin overdose cumulative to the very bare bones trial
testimony that his mother died when he was eleven.

> A    His mother died when he was 11.  He, based
> upon his own account and based upon the accounts of
> others, he found her having overdosed, with a needle
> in her arm and a rubber - - a rubber band tied
> around her arm.  He found her that way.  And it was
> around 11 years of age, 10 or 11 years of age.

(PC-R. 5148).  Dr. Toomer explained the trauma of this

discovery upon Mr. Smith:

> A    It would be traumatic.  And that trauma is
> heaped upon the aforementioned variable that I have
> described.  And the totality of those circumstances
> is - - goes beyond just the trauma, because what
> happens is all of the things - - all of the factors,
> all of the characteristics that we assume or that we
> talk about when we describe individuals as being,
> quote/unquote, normal, as being adult, as being,
> quote/unquote, fully functioning members of society,
> all of those factors are learned.  They don't just
> happen by magic.  They don't just happen when a
> person a reaches a certain age.
>
> And when an individual grows up in an
> environment characterized by lack of nurturance,
> characterized by deprivation, characterized by
> instability, when you then get is a situation where
> the individual is unable to develop the skills
> necessary to function in an appropriate manner - -
> adult-like manner, skills such as being able to
> weigh consequences, project - - to weigh
> consequences, to project alternatives, to make
> appropriate decisions.

(PC-R. 5149).

After his mother's death, Mr. Smith and his siblings

were forced to go to St. Petersburg, Florida to live with

their aunt and uncle.  Mr. Smith was unhappy about the move,

and would periodically run away back to New Jersey  (PC-R.

64

5505-06).

Mr. Sanders acknowledged that this life history was crucial information which he wanted to present at trial, but failed to do so:

> That's what was missing in Derrick's case.  For example, I've been told - I think it was Mr. Martin told me that Derrick was the one that found his mother laying presumably on the floor of the apartment with a needle sticking out of her arm. I don't remember knowing that at that time. That's the kind of detail that I'm talking about. I feel like I should have gone in and looked for that sort of stuff more.  Where was he living when this is happening, this robbery and everything that we're here on.  Where was he living, where was he sleeping, where is he taking a shower if he was taking a shower.  What's he eating, where is he gaining his food, I mean, you know, these type of things.  None of this - I still don't know and that the type of thing that I think I really should have gone after and didn't.

(PC-R. 5016-17).  Mr. Sanders' failure to fully examine his client's background prejudiced Mr. Smith to the point where he was unable to defend against a death recommendation.

In this regard, trial counsel also failed to investigate Mr. Smith's life leading up to the time period that the homicide occurred.  For at least three years before the homicide, Mr. Smith used drugs on a daily basis (PC-R. 5398).  This included cocaine, acid and marijuana (PC-R. 5398).  Mr. Smith would use half of an eight-ball of cocaine at a time, i.e. 3.5 grams (PC-R. 5419-20).  Mr. Smith's drug

65

usage had increased in early 1983 (PC-R. 5420). Mr. Smith would sometimes go on three or four day cocaine binges (PC-R. 5048). Cocaine would affect Mr. Smith strongly, making him at turns hyper and aggravated (PC-R. 5080, 5097-98). Rodney Jones, a friend of Mr. Smith's, suspected Mr. Smith of also shooting up with a needle (PC-R. 5418).

In early 1983, Mr. Smith's condition deteriorated further. He began having problems with his longtime girlfriend, Sheila (PC-R. 5423-24). He and Sheila had a daughter together (PC-R. 5399). The discord was very distressing for Mr. Smith, as he had become very close to not just Sheila and the baby, but Sheila's family as well (PC-R. 5397, 5424). Mr. Smith turned to drugs (PC-R. 5424). He got fired from his job. Mr. Smith was left homeless.

Charles Hill testified at the evidentiary hearing that he knew Mr. Smith very well, and would often party and do drugs with him (PC-R. 5048). On the weekend of the homicide, Mr. Hill and Mr. Smith got high together (PC-R. 5058). Mr. Smith was using cocaine (PC-R. 5058).

Diane Jenkins testified that she and Charles Hill knew each other - they were in the same circle of friends (PC-R. 5047, 5398-99). Ms. Jenkins saw Mr. Smith on the Sunday that the murder occurred. On that day, they were all

66

getting high and doing drugs together (PC-R. 5400).    Mr.
Smith's mental state, already affected by the drugs, was
exacerbated by a fight he had with his girlfriend:

> Sheila told Derrick that Shaquille wasn't his baby,
> that she was Ricky Brown's baby and she – – he got
> real upset about it.

(PC-R. 5400).  Mr. Smith was very close to his child and
cared about her very much (PC-R. 5401).  He even had a
tattoo bearing his child's name which trial counsel never
noticed or inquired about (PC-R. 5021).

The jury never heard crucial mitigating evidence that
would have rebutted the aggravating factors presented by the
State.  The court found the aggravator of prior violent
felony, based on the armed robbery of a Canadian couple that
took place twelve hours after the death of cab driver
Jeffrey Songer.  The court also found a second aggravator,
that the capital murder was committed while defendant was
engaged in or an accomplice in the commission or an attempt
to commit or flight after committing or attempting to commit
the crime of robbery.

Charles Hill and Diane Jenkins both testified that Mr.
Smith was "high" the weekend of the instant offense.  Mr.
Hill stated that Mr. Smith was using cocaine that weekend
(PC-R. 5058).  Ms. Jenkins saw Mr. Smith doing drugs the

67

Sunday of the offense (PC-R. 5400). In addition, Mr.

Smith's girlfriend Sheila told him devastating news about

their child that weekend (PC-R. 5400). He had also been

recently fired. These factors, along with Mr. Smith's

dysfunctional years in New Jersey, significantly impaired

Mr. Smith's higher-order thought processes. Had Mr. Sanders

presented this information in 1990, he could have knocked

out or at least minimized the weight of the only two

aggravating circumstances found in this case.

Moreover, this same unpresented evidence would have

also established numerous mitigator factors: 1) under the

influence of extreme mental or emotional disturbance; 2)

relative culpability;[37] 3) impaired capacity; 4) poverty; 5)

childhood trauma at finding his mother dead; 6)

dysfunctional familial drug abuse; 7) deprivation of food;

---

[37]The State asserted during the guilt phase that Derrick
Smith, not Derrick Johnson, was the shooter (R2 - 772).
Much of the testimony at the evidentiary hearing cast doubt
on this. The Florida Supreme Court has repeatedly
acknowledged the principle that the relative culpability and
punishment of a codefendant is an important factor to be
considered in determining a capital defendant's sentence.
See, e.g., McDonald v. State, 743 So. 2d 501 (Fla. 1999),
Fernandez v. State, 730 So. 2d 277 (Fla. 1999), Jennings
v. State, 718 So. 2d 144 (Fla. 1998), Howell v. State, 707
So. 2d 674 (Fla. 1998), Gordon v. State, 704 So. 2d 107
(Fla. 1997), Puccio v. State, 701 So. 2d 858 (Fla. 1997),
Cole v. State, 701 So. 2d 845 (Fla. 1997).

68

8) drug abuse; and 9) lack of stability.

This same mitigation would have also been consistent with the paltry mitigation Mr. Sanders presented at the 1990 trial (PC-R. 4993, 5014). It also would have explained to the jury how and why these offenses occurred. Mr. Sanders was very explicit in stating that the New Jersey mitigation would not have conflicted with any strategy:

> Put it this way. The strategy would not have been different. The strategy would have been basically the same. The strategy would have been to try to present to the jury a full picture of what Derrick Smith was and could be in a sense.

(PC-R. 5014).

Furthermore, the drug use mitigation also would not have conflicted with the Defense's strategy. During one exchange with the state attorney, Mr. Sanders made this patently clear:

> Q. Okay. And as a lawyer who is arguing for a particular recommendation, the picture that you painted to the jury was one that was devoid of anything that the jury back in 1990 maybe might perceive as being very bad? And I'm just going to give you one example. Any type of drug uses, drug binge, just crazed out on drugs; correct? That would have been inconsistent with the picture that you painted for this particular jury?
>
> A. No not necessarily. Again, I was not trying to convince the jury that he was and always had been a good guy in the sense that society would define that term. I mean a good, God-fearing, law-abiding person, I don't think I was going to be able

69

to convince them of that.

> I'm in a bit of a vacuum here, because I don't
> know what type of drug binge evidence we're talking
> about, but it would have been - - could have been,
> depending on exactly what type of evidence there
> was, it could have been quite consistent with the
> position I was trying to argue in the penalty phase,
> that he had gotten involved in - - well, some type
> of a drug binge-type thing.

(PC-R. 4993-94).

When considering how close Mr. Smith's death

recommendation was (8-4), and how little was presented in

1990, this substantial mitigation would have tipped the

scales towards life.  As Mr. Sanders remarked at the

evidentiary hearing:

> It was not an overwhelming death penalty case for
> sure.  I mean this was one where to me, there was a
> real good shot if it was presented well that you
> could have gotten a life recommendation out of this.

(PC-R. 4948).  Habeas relief is warranted.

**Exhaustion of Ground III in state courts:**

**1)  Did you raise Ground III in the Florida Supreme Court
on a direct appeal of your conviction?** No.

**2)  After your conviction, did you raise Ground III in the
state circuit court that sentenced you by filing a
motion under Florida Rule of Criminal Procedure 3.850?**
Yes.

> **a)  If your answer is "yes", then state:**
> **I.  Date motion filed:** 4/1/97; amended on 12/3/99,
> 9/18/2000, 4/1/2000 and 9/18/2000.

      **ii. Whether you received an evidentiary hearing**: Yes.

      **iii. Result**: Denied.

      **iv. Date of Result**: 2/10/03.

**b)** **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

    **I.** **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why**: N/A.

    **ii.** **Date appeal filed, result of appeal, date of result**: Notice of appeal filed on 3/13/03. The Florida Supreme Court affirmed the denial of relief. <u>Smith v. State</u>, 2006 Fla. LEXIS 388 (March 9, 2006), rehearing denied 6/8/06, mandate issued 6/26/06.

**3)** **Have you raised Ground III in any other petition, application, or motion filed in the state courts of Florida?** No.

### GROUND IV

**APPELLATE COUNSEL FAILED TO RAISE ON APPEAL NUMEROUS MERITORIOUS ISSUES WHICH WARRANT REVERSAL OF MR. SMITH'S CONVICTION AND SENTENCE OF DEATH.**

### A. Presentation of Unreliable Scientific Evidence

In its attempts to link Mr. Smith to a gun, the State presented testimony from three FBI experts.  Defense counsel objected to this testimony, challenging the experts' qualifications, the reliability of their testing and instruments, and the acceptance of the testing within the

71

scientific community. Despite these numerous objections,
appellate counsel raised no issue regarding the FBI experts'
testimony, depriving Mr. Smith of the effective assistance
of direct appeal counsel.

The first of these witnesses was Robert Sibert, an FBI
expert on firearms identification. Sibert testified that if
bullets were placed in the pocket of someone's clothing,
lead from the bullets could rub off on the clothing and
later be detected (R2. 935). Sibert testified that he had
conducted chemical tests on the pockets of Mr. Smith's jeans
to determine whether lead was present on the jeans (R2. 935-
36).

When the State asked Sibert to explain the results of
these tests, defense counsel objected: "[H]e's been
qualified as a firearms identification expert. There's been
no showing he's a chemist, no showing he's qualified to
perform these tests. There's been no showing these tests
are reliable to measure what it is he's supposed to be
measuring" (R2. 936). The State argued, "[W]hen he was
initially tendered as an expert, he explained the firearm
identification, including other things, to determine the
presence of lead gunpowder dealing with components
qualifications" (R2. 936). The court overruled the

objection and allowed the defense a continuing objection to
the testimony (R2. 936).

Sibert then testified that the test he performed on Mr.
Smith's jeans was accepted as reliable in the scientific
community and that he was trained on how to perform it (R2.
937). Sibert found "indication of the presence of lead in
the two front pockets, and there was a stronger
concentration in the left front pocket" (R2. 937). The
State showed Sibert Exhibit 17, which contained two bullets
from a box of bullets taken from Roy Cone, Mr. Smith's uncle
(R2. 937). Sibert testified that it was possible that lead
from those bullets could have left the lead residue he found
in Mr. Smith's pockets because "[a]ny source of lead could
have been transferred by rubbing, physical contact with the
interior of those pockets" (R2. 937-38). Sibert also
testified that the positive reaction for lead he found in
the pockets would be consistent with those bullets being
placed in the pockets (R2. 938). On cross-examination,
Sibert testified that his test did not show how long lead
had been present in Mr. Smith's pockets or where the lead
came from (R2. 940-41).

The second FBI witness was Roger Asbery, an expert in
neutron activation analysis (R2. 1033-34). Asbery used

73

neutron activation analysis to compare the chemical
composition of State Exhibit 11, which was a fragment of
lead found on the victim, with the chemical composition of
State Exhibit 17, the two bullets from Mr. Cone's box of
bullets (R2. 1040-41). Asbery testified that the instrument
he used to make the comparison was in good working order,
that he used the instrument properly and that he used the
proper procedures to perform the test (R2. 1042).

Defense counsel objected that the State had not laid a
predicate showing that the instruments Asbery used "were in
proper working order or properly maintained" because Asbery
had simply stated a conclusion that the instruments were
working properly without providing any basis for that
conclusion (R2. 1042-43). The court overruled the objection
(R2. 1043).

Asbery testified that he examined Exhibits 11 and 17 to
determine the amounts of copper, arsenic and antimony they
contained (R2. 1043). Asbery "found that they matched in
composition. In other words, the amounts of all three of
these characterizing elements were so close that I could not
distinguish between them" (R2. 1044). Asbery concluded that
this "close compositional association" would be consistent
with bullets coming out of the same box (R2. 1045).

74

On cross-examination, Asbery testified that part of his analysis required using a nuclear reactor located in Gaithersburg, Maryland (R2. 1047). Asbery had no personal knowledge that the nuclear reactor was working properly and was not the person who maintained that machine (R2. 1048). Defense counsel renewed his objection to Asbery's testimony and moved to strike the testimony because the State had not shown that the nuclear reactor was in working order (R2. 1052). The court overruled the objection, saying, "since the agent is not knowing at this point, I will assume that the reactor was working" (R2. 1052).

The State's final FBI witness was Donald Havekost, assigned to the FBI's elemental composition unit (R2. 1062). Havekost testified that he was trained to analyze the chemical composition of materials using neutron activation analysis and using another procedure called inductively coupled plasma atomic emissions spectrometry (ICP) (R2. 1062-63). When the State tendered Havekost as an expert, defense counsel objected that the State had not sufficiently established Havekost's expertise (R2. 1065).

Havekost analyzed the same samples Asbery had examined (R2. 1067). Havekost repeated the neutron activation analysis and then conducted the ICP analysis, which detects

75

additional chemical elements (R2. 1068). Havekost testified
that the ICP analysis is generally accepted within the
scientific community, that the instruments used in ICP
analysis are reliable, that the machine he used was working
properly and that he followed the correct procedure in
conducting the analysis (R2. 1070). Havekost testified he
was unable to distinguish between any of the samples he
analyzed, meaning there was no difference in the chemical
composition of the samples (R2. 1071). Havekost concluded
that the samples "originated from a common source" (R2.
1071). After explaining how bullets are manufactured,
Havekost opined that the matching chemical compositions of
the lead fragment in State Exhibit 11 and the bullets in
State Exhibit 17 could not have occurred by chance:

> The more elements you're able to characterize in
> bullet lead, the better you've characterized that
> particular composition. In other words, it becomes
> more and more unlikely that you have two things that
> match just out of chance. And if you're able to --
> well, in the early days, we felt if we could
> characterize three elements that the possibility of
> there being a mistake was very remote. If you can
> quantitate four elements, five elements, in my
> opinion, you've reduced the chance to essentially
> nothing -- that they just match by chance.

(R2. 1083).

As to all of defense counsel's objections to the
experts' qualifications, the reliability of their testing

76

and instruments, and the acceptance of the testing within
the scientific community, the State presented only the
experts' self-serving testimony that they were qualified,
that the testing and instruments were reliable and that
their procedures were accepted within the scientific
community. The trial court erred in not conducting adequate
Frye inquiries and in admitting the experts' testimony.

The erroneous admission of this testimony was not
harmless. The State's case against Mr. Smith had one big
hole: the investigation turned up no gun or spent bullet
which could be directly connected to Mr. Smith. The State
presented two witnesses who testified they had seen Mr.
Smith with a gun in March of 1983 (R2. 896-97; R2. 913-14),
and another witness who testified Mr. Smith had shown her
some bullets (R2. 919-20). Mr. Smith's co-defendant,
Derrick Johnson, testified that Mr. Smith had a .38 caliber
handgun on the evening of the murder (R2. 1119-21). The
State also presented the testimony of Roy Cone, Mr. Smith's
uncle, who testified that he had bought a .38 Smith and
Wesson handgun and a box of bullets in 1972 (R2. 891). Mr.
Cone stored the gun under his mattress (R2. 893-94). Mr.
Cone thought he discovered the gun was missing some time in
March of 1983 and believed he had last seen it the night of

77

December 31, 1982 (R2. 1230, 1231-32). Mr. Cone testified that he had never shown Mr. Smith where the gun was hidden, that Mr. Smith never went into Mr. Cone's bedroom and that Mr. Cone kept the bedroom door locked (R2. 1229). The victim of a robbery which occurred the evening after the murder testified that Mr. Smith had a handgun during the robbery (R2. 1195).

The only way for the State to connect Mr. Cone's gun to Mr. Smith was through the expert testimony on lead analysis. The prosecutor relied upon this testimony in closing, arguing, "And what did the FBI tell you? That the bullets from the box of Roy Cone's box and this lead fragment found on the victim, Jeffrey Songer, is materially indistinguishable. They're the same" (R2. 1304). The prosecutor continued, "[The FBI witnesses] went into great detail to explain to you how bullets are made. It's a product that's used up all the time and the chances are, ten years later, finding a box that has the same material composition as a box made ten years ago just boggles the mind" (R2. 1304-05). To answer the question of whether Mr. Smith shot the victim, the prosecutor directed the jury to consider the testimony of several witnesses, including the FBI witnesses (R2. 1305). The prosecutor argued that

78

Sibert's testimony about finding lead residue in Mr. Smith's pockets corroborated Derrick Johnson's testimony (R2. 1305-06). In rebuttal closing, the prosecutor returned to the lead analysis evidence, arguing, "the chances, as the FBI agent told you, . . . of that piece of lead [found on the victim] matching those bullets [from Mr. Cone's box] is just one believable 'it can't be done.' Infinitesimal [sic]" (R2. 1348).

In the circumstances of Mr. Smith's case, the State cannot establish beyond a reasonable doubt that the erroneously admitted expert testimony had no effect on the jury's verdict. Appellate counsel was ineffective in failing to raise this issue.

## B. Preclusion on Presenting Defense Witnesses

Before trial, defense counsel moved to withdraw because Mr. Smith wanted him to present some witnesses who counsel believed might not be telling the truth (R2. 353). Counsel's belief was based in part on his recollection of conversations with Mr. Smith and in part on "my basic belief that I don't think they are very credible witnesses" (R2. 353).[38] Counsel informed the court that his and Mr. Smith's

---

[38]These two witness would have testified that they saw Mr. (continued...)

recollections of their conversations differed, and if Mr.
Smith's recollection was correct, counsel's only basis for
disbelieving the witnesses was his own assessment of their
credibility (R2. 353-54). Counsel acknowledged that his own
assessment of the witnesses' credibility should not prevent
him from calling them, particularly since he believed Mr.
Smith would be acquitted if the jury believed the witnesses,
who would provide Mr. Smith with an alibi (R2. 354). Thus,
counsel based his motion to withdraw upon the fact that his
and Mr. Smith's recollections of their conversations
differed and counsel could not reveal the substance of those
conversations (R2. 354-55).

The State argued that defense counsel should not be
allowed to withdraw (R2. 358). The State contended that
under the Rules of Professional Conduct, defense counsel was
required to make the decisions regarding which witnesses to
call regardless of Mr. Smith's wishes (R2. 357-58). The
court denied the motion to withdraw and told defense counsel

---

[38](...continued)
Smith at Norm's Bar when they arrived there around 11:00 PM.
Norm's Bar was across the street from the Hoggley-Woggley.
There was another witness, Dina Watkins, who had testified
in 1983 that she was at Norm's Bar that night and saw Mr.
Smith outside of the bar around midnight (R1. 1959-79).
Inexplicably, Mr. Sanders neither called her, nor sought to
introduce her prior testimony.

he would have to make a decision about calling the witnesses (R2. 358-60).

The issue came up again during trial. Defense counsel reiterated that he could not call the witnesses and asked that they be called as court witnesses or that the court allow Mr. Smith to call them himself (R2. 963). The court said that having Mr. Smith call the witnesses was "not acceptable at all" and suggested the possibility of having the witnesses be sworn and then narrate their testimony without defense counsel questioning them (R2. 964). The court deferred ruling on the issue (R2. 965).

After the State rested its case, the court returned to the issue. The two witnesses were identified as Kahn Campbell and James Hawkins (R2. 1238). Defense counsel reiterated his view that he could not call the witnesses under the rules of professional conduct based upon his personal opinion of their credibility and upon a confidential conversation with Mr. Smith (R2. 1239). Defense counsel and the court agreed that counsel's personal opinion of the witnesses' credibility was not sufficient grounds not to present their testimony (R2. 1239). Defense counsel again asked that the witnesses be called as court witnesses, but the court denied the request (R2. 1240).

Defense counsel suggested allowing Mr. Smith to call the witnesses himself, but the court rejected that suggestion as well (R2. 1240-42). The State refused "to take a position that would preclude a Defense witness from testifying" (R2. 1244). The court ruled that if defense counsel believed his recollection of his confidential conversation with Mr. Smith was correct, then counsel was correct to refuse to present the witnesses (R2. 1246-47).

Mr. Smith addressed the court, reiterating his desire to call the witnesses (R2. 1248-49). Defense counsel proffered that Campbell and Hawkins would testify to what they said at their depositions (R2. 1252).[39] Counsel emphasized, "Mr. Smith does, in fact, want these people to

_____

[39]Khan Campbell and James Hawkins testified in their depositions that they saw Mr. Smith at Norm's Bar, located across the street from the Hogley-Wogley at 11:30 PM on March 20, 1983. They indicated that they remembered the date because earlier in the day (around noon) Hawkins and Campbell had taken Campbell's pregnant girlfriend, Dylan Walters, to a hospital emergency room and left her there. After the depositions, the State disclosed hospital records allegedly demonstrating that the witnesses were in error regarding their recollection of seeing Mr. Smith on the night of the homicide. The hospital record that the State produced showed that Walters was treated in an emergency room at 3:20 PM on March 28, 1983. However, a careful examination of the hospital record demonstrated that on March 28th Campbell was accompanied by her grandmother, Freddie Mae Hampton, not James Hawkins (PC-R. 2251). After receiving the hospital record, Mr. Sanders abandoned the defense and refused to call the witnesses.

82

testimony [sic] for him" (R2. 1252).

The trial court's refusal to allow Mr. Smith to call witnesses denied Mr. Smith his right to present a complete defense, in violation of the sixth, eighth and fourteenth amendments. Appellate counsel provided ineffective assistance in failing to raise this issue on direct appeal.

## C. **Mr. Smith's Involuntary Absences**

Mr. Smith was twice involuntarily absent from the trial court proceedings in his case. Before trial, the court held a hearing on a defense motion in limine (R2. 246). Counsel argued the first point of the motion, which concerned statements Mr. Smith had made to law enforcement (R2. 248-50), and was well into arguing the second point of the motion, which involved the State's intention to present similar fact evidence of an armed robbery (R2. 250-60), when Mr. Smith was finally brought into the courtroom (R2. 260). The court conducted no inquiry of Mr. Smith regarding his absence.

After the State had presented two witnesses in its case, Mr. Smith was also absent from an in-chambers discussion regarding the location of the defense table in the courtroom (R2. 725). The discussion arose when the prosecutor said, "[T]he seating arrangements in the

83

courtroom have become in dispute. It appears that Mr. Smith wants to sit where the prosecution is sitting yesterday so Mr. Smith can stare down witnesses" (R2. 725). Defense counsel clarified, "For the record, it's our position you have a hard time seeing the witnesses from the table where we're sitting" (R2. 725). The court offered to move the defense table "closer to the rail, if you wish, so he may see at a better angle. But once people take tables, that's where they stay through the course of the trial" (R2. 726). The court made no mention of Mr. Smith's absence from this discussion and never asked Mr. Smith about it.

Mr. Smith had a right to be present at the pre-trial motion hearing and at a discussion of whether he could see the witnesses from his seat in the courtroom. Appellate counsel provided ineffective assistance in failing to raise this issue.

**D.    Conclusion**

The failure of appellate counsel to raise these issues clearly undermined confidence in the outcome of the direct appeal. Habeas relief is warranted.

**Exhaustion of Ground IV in state courts:**

**1)    Did you raise Ground IV in the Florida Supreme Court on a direct appeal of your conviction?** No.

2)  **After your conviction, did you raise Ground IV in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No.

   a)  **If your answer is "yes", then state:**

      I.  **Date motion filed:** N/A.

      ii.  **Whether you received an evidentiary hearing:** N/A.

      iii.  **Result:** N/A.

      iv.  **Date of Result:** N/A.

   b)  **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A.

      I.  **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

      ii.  **Date appeal filed, result of appeal, date of result:** N/A.

3)  **Have you raised Ground IV in any other petition, application, or motion filed in the state courts of Florida?** Yes, Ground IV was raised in Mr. Smith's state habeas petition as ineffective assistance of appellate counsel.  It was denied by the Florida Supreme Court on March 9, 2006. Smith v. State, 2006 Fla. LEXIS 388 (March 9, 2006), rehearing denied 6/8/06, mandate issued 6/26/06.

### GROUND V

**THE TRIAL COURT VIOLATED MR. SMITH'S CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO SELF-REPRESENTATION BY FAILING TO INQUIRE INTO THE BASIS FOR MR. SMITH'S *PRO SE* REQUEST TO DISCHARGE COURT-APPOINTED COUNSEL.**

During the course of Mr. Smith's case, defense counsel moved to withdraw on the basis that Mr. Smith wanted him to present testimony which counsel believed to be false (R2. 86, 353-56).  The court heard and denied this motion on November 6, 1989, six months before the commencement of Mr. Smith's trial (R2. 95, 351, 358-59, 375).  Mr. Smith was present for this hearing (R2. 353), but he did not address the court, and neither the court nor counsel directed any inquiry to Mr. Smith (R2. 353-63).

Later on the same day, Mr. Smith wrote a letter to the court asking the court to discharge defense counsel:

> Richard Sanders and myself don't see eye-to-eye on many matters pertaining to the case. . . . I'm on trial for my life and I feel its only right that I be afforded the opportunity to be able to fight on equal terms. . . . **Richard Sanders told me my case was the first murder case he's handled. He's outclassed and it shows more and more as time passes.  I don't want Richard Sanders representing me** on this particular case and it's obvious that he and I have a conflict of interest. I relayed to you in my earlier letter that I don't want to be like a lamb lead [sic] to slaughter and that's how I feel with Richard Sanders representing me. I feel that a trial with him representing me is a mere formality. I ask that you reconsider your decision to deny his motion to withdraw.

(R2. 92-93)(emphasis added).

This letter, particularly the statement, "I don't want

86

Richard Sanders representing me," was a very definite and
unequivocal request to discharge defense counsel. Moreover,
the letter raised grounds for discharge which were not
addressed in the hearing on defense counsel's motion to
withdraw, including counsel's lack of experience and an
alleged conflict of interest. Yet the court's only response
to Mr. Smith's request was a letter stating:

> Please be advised that I am unable to be of any
> assistance to you regarding the above-mentioned
> case. **Any, and all, correspondence to me must be
> done through your attorney, and a copy of your
> letter, along with a copy of my response, is being
> sent to him.**

(R2. 94)(emphasis added).

The court's response to Mr. Smith's request to
discharge defense counsel, directing that Mr. Smith submit
his request to the same attorney he wanted discharged, was
erroneous. This constituted an abdication of the court's
duty to inquire into the basis for the request to determine
whether there were sufficient grounds to discharge counsel
and either to appoint substitute counsel or to allow Mr.
Smith to exercise his right of self-representation.

Moreover, even if the court had conducted an inquiry
and determined that there were no reasonable grounds to
discharge counsel and appoint a substitute, the trial court

87

was also obligated to inform Mr. Smith of his right to self-representation and to determine whether he knowingly and intelligently chose to waive his right to counsel and exercise his right to represent himself. The trial court's violation of these rights requires reversal of the conviction and sentence and entitles Mr. Smith to a new trial.

**Exhaustion of Ground V in the state courts:**

1) **Did you raise Ground V in the Florida Supreme Court on a direct appeal of your conviction?** Yes. The Florida Supreme Court affirmed the conviction and sentence. Smith v. State, 641 So. 2d 1319 (Fla. 1994).

2) **After your conviction, did you raise Ground V in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No.

   a) **If your answer is "yes", then state:**

      I. **Date motion filed:** N/A.

      ii. **Whether you received an evidentiary hearing:** N/A.

      iii. **Result:** N/A.

      iv. **Date of Result:** N/A.

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A.

      I. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

88

      **ii.  Date appeal filed, result of appeal, date of result:** N/A.

**3)  Have you raised Ground V in any other petition, application, or motion filed in the state courts of Florida?** No.

### GROUND VI

**THE STATE COURT'S DISPOSITION OF MR. SMITH'S DIRECT APPEAL CLAIM REGARDING HIS REQUEST TO DISPENSE WITH COUNSEL RESTS UPON AN ERROR OF FACT.**

As noted in Ground V, on direct appeal Mr. Smith challenged the trial court's failure to conduct an adequate inquiry into his request to discharge his trial counsel.  In denying relief, the state court determined that "Smith expressed dissatisfaction with Sanders, but did not question his competence." Smith, 641 So. 2d at 1321 (Fla. 1994). This finding was an error of fact.

The hearing described in the court's opinion occurred on November 6, 1989 (R2. 351).  The letter referenced in the court's opinion is also dated November 6, 1989 (R2. 92). However, this is not the only letter which Mr. Smith wrote to the trial court regarding Mr. Sanders, as is evident from the November 6, 1989, letter itself.  That letter states: "I wrote to you in March of this year explaining my discomfort with Richard Sanders representing me, that uneasiness has

89

only greatened" (R2. 92).

Unfortunately, Mr. Smith's previous letter was misfiled
by the circuit court clerk and was not contained in the
record of his first-degree murder trial. During
postconviction, Mr. Smith's counsel discovered the earlier
letter in the record of another case which was pending
against Mr. Smith in the same time period as the first-
degree murder case. The letter is dated March 23, 1989, but
its content makes clear that although Mr. Smith may have
begun writing the letter on that date, he did not finish and
mail the letter until May 1989 (Smith v. State, 2nd DCA #90-
3188, Record On Appeal, page 11). The index to the record
in the Second DCA case indicates that the letter was filed
on May 30, 1989 (Id.). The letter is to Judge Luten, the
judge in the first-degree murder case (Id.).[40]  The letter
states:

> Dear Judge Luten,
>
> I'm in despair over the events that are
> occurring in my case which is a capital offense on
> re-trial. The situation has me so distaught [sic]
> that I'm using my last resort in writing to you, the
> presiding judge, with the elated hope that your
> intervention will get those involved to realize that
> a life is at stake and the situation is very

---

[40]The judge in the other case was Mark R. McGarry, Jr.
(Id.).

SERIOUS!  Ma'am I'm not highly educated neither do I profess a profound knowledge of law's intricate workings.  But I do have common sense and **I know that something isn't quite right with the way my present attorney, Mr. Richard Sanders, is handling my defense.**  Personally, he's one of the best human beings I've ever encountered and will probably evolve into a splendid attorney but it bothers me that he's "cutting his teeth" on my case.  By his admission he has not previously handled a murder case.

Ma'am I'm scheduled to go to trial July 11, 1989 for my life.  That's less than 2 months from now and I'm 300 miles plus away from those that are representing me.  **On or about March 15, 1989 my aunt contacted Mr. Sanders inquiring as to the lack of communication between us.**  I myself contacted Mr. Sanders by way of mail requesting that a motion be filed for a court order getting me transported to Pinellas County.  Mr. Sanders visited me here at the prison on April 3, 1989 and assured me that he'd have me back in Pinellas as soon as possible.  That was almost 2 months ago and I've still heard nothing.  **I wrote to Mr. Sanders again on May 14, 1989 to no avail.  By not being able to communicate with my lawyer is in violation of the due process clause in the Constitution.**  And any attorney who can't even get me back to the county jail can hardly represent me in a capital case.  **My correspondence goes unanswered and the state prison doesn't allow phone calls.  This isn't the effective assistance of counsel the law entitles me to.**

Judge Luten, I don't mean to sound obnoxious and I certainly am not intentionally insulted anyone but anyone who accepts a capital case for a measely [sic] 3 or 4 thousand dollars (which is peanuts for a lawyer[)] isn't highly skilled nor very experienced if not both.  **I don't feel Mr. Sanders is being very diligently [sic] in matters concerning my case which is in essence my life.**  Economically I don't and can't fault Mr. Sanders for not giving his all in all in such a time consuming, tiresome,

complicated capital case such as mine but I've been
given the ultimate sentence once already for this
same case and **without adequate legal aid I'll be in
the same position again.**  Thus I can not consciously
just accept any kind of 2 dollar lawyer without
voicing my objection.  I was 20 years old when this
nightmare first began, totally ignorant of law and
too terrified to say anything, it almost cost me my
life.  I'm a little older and wiser now and being
blunt, **I refuse to be lead to slaughter like some
meek little lamb.  This letter is an objection to
the representation I've had thus far in my legal
battle.  Incompetent legal aid isn't something I can
accept,** my very life is at stake.  Thank you for
your time and consideration!

> Sincerely,
>
> [signed]
>
> Derrick Tyrone
> Smith

(Id. at 11-12) (Attachment A to state habeas petition, Smith
v. State, Fla. Sup. Ct. Case # SC05-100)(emphasis added).

Through no fault of Mr. Smith, this letter was not
filed in the record of his capital case.  The letter was
addressed to Judge Luten, the judge in the first-degree
murder case, and its first sentence referred to "my case
which is a capital offense on re-trial."  At the top of the
letter, next to Mr. Smith's notation of the date, a
handwriting which is not Mr. Smith's wrote the case number
of the non-capital case and then wrote, "To the Court,
file[,] copy to R. Sanders" (Attachment A).

Mr. Smith's March 1989 letter clearly shows that he questioned his trial counsel's competence.  The court made no inquiry of Mr. Smith regarding his complaints about trial counsel and did not determine whether or not there was reasonable cause to believe that the court appointed counsel was not rendering effective assistance to the defendant. Mr. Smith specifically alleged that he was receiving ineffective assistance of counsel: "This letter is an objection to the representation I've had thus far in my legal battle."  Mr. Smith raised specific complaints regarding counsel's performance, complaining of a lack of communication with counsel, counsel's failure to have Mr. Smith brought to Pinellas County, counsel's failure to answer letters and counsel's lack of diligence.  An inquiry was clearly warranted based upon Mr. Smith's complaints.

Because the March 1989 letter was not filed in the record of Mr. Smith's first-degree murder case, the Florida Supreme Court relied upon erroneous facts in deciding Mr. Smith's direct appeal claim.  To the extent this issue was not adequately presented on direct appeal, appellate counsel's performance was deficient, and Mr. Smith was prejudiced.  Appellate counsel recognized the significant issue raised by trial counsel's motion to withdraw because

93

appellate counsel presented the issue.  Mr. Smith's November

1989 letter referred to the March 1989 letter, but appellate

counsel made no effort to locate that letter.  There can be

no strategic reason for the deficiencies in counsel's

presentation.  Mr. Smith was prejudiced by these

deficiencies.

**Exhaustion of Ground VI in state courts:**

1)  **Did you raise Ground VI in the Florida Supreme Court on a direct appeal of your conviction?** No.

2)  **After your conviction, did you raise Ground VI in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No.

    a)  **If your answer is "yes", then state:**

        I.  **Date motion filed:** N/A.

        ii. **Whether you received an evidentiary hearing:** N/A.

        iii. **Result:** N/A.

        iv. **Date of Result:** N/A.

    b)  **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A.

        I.  **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

        ii. **Date appeal filed, result of appeal, date of result:** N/A.

3)  **Have you raised Ground VI in any other petition,**

**application, or motion filed in the state courts of Florida?** Yes, Ground VI was raised in Mr. Smith's state habeas petition.  It was denied by the Florida Supreme Court on March 9, 2006. <u>Smith v. State</u>, 2006 Fla. LEXIS 388 (March 9, 2006), rehearing denied 6/8/06, mandate issued 6/26/06.

### GROUND VII

**THE TRIAL COURT VIOLATED MR. SMITH'S CONSTITUTIONAL RIGHT TO CONFRONT AND CROSS-EXAMINE THE WITNESSES AGAINST HIM WHEN IT ALLOWED THE STATE TO CONCEAL THE TERMS OF MELVIN JONES' PRIOR SENTENCING AGREEMENT WITH THE STATE.**

In the present case, Melvin Jones was a crucial State witness.  He was one of two purported eyewitnesses to the shooting of Mr. Songer (R2. 978-87; 993-97).  The other eyewitness was co-defendant Derrick Johnson (R2. 1142-44), whose bias and self-interest in placing the blame for the shooting on Mr. Smith is self evident, especially in light of his admission that he, and not Mr. Smith, was the originator of the plan to rob Songer (R2. 1123, 1127-28, 1179).  Also, defense witness Larry Martin testified that Johnson told him that Mr. Smith was not the one who shot Songer (R2. 1257-59).  Thus, Jones' corroboration of Johnson's testimony that Mr. Smith was the one who shot Songer was vital to the State's case against Mr. Smith.

On cross-examination, Jones testified that after his arrest on the outstanding warrants, he wrote a letter to the

95

State Attorney's Office and the Public Defender telling them what he had seen (R2. 991-92). Jones denied that the purpose of the letter was to "cut a deal" for himself. His purpose was to inform the State Attorney and Public Defender "who actually done it." He was not expecting any personal benefit (R2. 992). Jones denied that he tried to bargain with the State for a reduction in his own sentence in return for his testimony (R2. 992-93). Yet Jones admitted that he was facing 17 to 18 felony charges for which he "did" only three years (R2. 998). When defense counsel attempted to ask how much time he actually served, the court sustained the State's objection. Jones then admitted that the prosecutor testified on his behalf at sentencing, but he persisted in denying that he got a break on his sentence (R2. 1000).

Defense counsel next asked whether Jones had testified for the State in another murder case (R2. 1000). When the prosecutor objected, defense counsel explained that Jones had in fact testified as an important State witness in another murder case about a year later and that he had more pending charges at the time. Counsel argued that this information was relevant to Jones' credibility (R2. 1000-01). The prosecutor responded, "Your Honor, he was

96

sentenced after he testified in Smith and Clinton Jackson.
So whatever deal he got was based on both." (R2. 1001).[41]
This constituted an admission by the State that Jones had in
fact received some sort of deal in exchange for his
testimony against Mr. Smith at his original trial and for
his testimony against Clinton Jackson in another murder
trial. Yet the court refused to permit defense counsel's
inquiry and directed him to proffer the testimony (R2.
1001).

Defense counsel resumed his cross-examination of Jones
before the jury and elicited his admission that he had told
Detective San Marco an inaccurate account of what he had
seen when Songer was shot (R2. 1002-04). This occurred
after he tried to make a deal with San Marco, but the only
thing he was offered was to serve his sentence in a prison
for convicted police officers (R2. 1003-05).

_____

[41]Of course as set out in Ground I, this statement by the
prosecuting attorney simply was not true. The court file in
Jones' case was introduced in collateral proceedings and
clearly shows that Jones was sentenced to probation
following Mr. Smith's conviction. Thereafter when he was
charged with a violation of his probation and additional
criminal charges, he claimed to have witnessed the murder in
the Jackson case and testified for the State against
Jackson. Following that testimony, Jones received the
sentence that the prosecutor claimed was for his testimony
in both cases.

97

On redirect examination, the prosecutor elicited Jones'
testimony that he wrote the letter to the State attorney
because he heard a rumor that Mr. Smith was trying to put
all the blame on Johnson, and he thought that was "totally
wrong." (R2. 1008).[42] Thus, the prosecutor was able to
reinforce Jones' claim that he was motivated to testify by
his own sense of justice and fair play rather than by any
deals he made for a reduced sentence.

Defense counsel later proffered Jones' testimony about
his role as a witness in the other murder case. In the
proffer, Jones testified that in 1984 he was a State witness
in the trial of Clinton Jackson for the robbery and murder
of the owner of a hardware store.[43] Jones and Jackson were
working together when Jackson told him he was going to rob
the store. Jones also saw Jackson going toward the store
and then coming away from it at the time of the shooting
(R2. 1053-1056). Jones claimed he could not remember

---

[42]But of course as discussed in Ground I, the reality was
that the letter was written after Jones met with Johnson on
July 11th.

[43]When this proffer was made, Mr. Smith did not have the
benefit of Jones' undisclosed statement to prosecutor Martin
regarding his testimony in the Jackson case and his
dissatisfaction with the consideration that he received.
See Ground I.

whether he had any charges or violations of probation

pending when he testified against Jackson, but he agreed

that it was possible (R2. 1056). After Jackson's conviction

was reversed on appeal, Jones refused to respond to a

subpoena to testify at Jackson's retrial in 1987 (R2. 1057).

Jones claimed that he did not know whether there were any

pending charges or warrants against him at that time (R2.

1057-58).

Defense counsel argued that this testimony was relevant

to Jones' credibility and his claim that he did not expect

any benefit from testifying against Mr. Smith (R2. 1058-59).

The prosecutor responded that no promises had been made to

Jones for his testimony at Mr. Smith's retrial and that

Jones had already testified that he got a deal or a break

after Mr. Smith's first trial: "He's gotten out the point

that is appropriate. He got a deal for his testimony and

that's before the jury." (R2. 1060). The court did not

allow defense counsel to present the proffered testimony to

the jury (R2. 1061).

The trial court's refusal to allow defense counsel to

cross-examine Jones about his prior dealings with the State

as a witness in another case coupled with the prosecutor's

concealment of the terms of Jones' deal to testify against

Mr. Smith at his first trial violated Mr. Smith's right to confront and cross-examine the witnesses against him.

**Exhaustion of Ground VII in the state courts:**

1) **Did you raise Ground VII in the Florida Supreme Court on a direct appeal of your conviction?** Yes.  The Florida Supreme Court affirmed the conviction and sentence. <u>Smith v. State</u>, 641 So. 2d 1319 (Fla. 1994).

2) **After your conviction, did you raise Ground VII in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No.

   a) **If your answer is "yes", then state:**

      I. **Date motion filed:** N/A.

      ii. **Whether you received an evidentiary**

          **hearing:** N/A.

      iii. **Result:** N/A.

      iv. **Date of Result:** N/A.

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A.

      I. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

      ii. **Date appeal filed, result of appeal, date of result:** N/A.

3) **Have you raised Ground VII in any other petition, application, or motion filed in the state courts of Florida?** No.

**GROUND VIII**

> **DURING THE DIRECT APPEAL, THE STATE OF
> FLORIDA FAILED TO DISCLOSE PERTINENT FACTS
> WHICH WERE NECESSARY TO THE FLORIDA SUPREME
> COURT'S CONSIDERATION OF THE ISSUES RAISED
> BY MR. SMITH, AND AS A RESULT, THE DIRECT
> APPEAL DID NOT COMPORT WITH THE SIXTH,
> EIGHTH AND FOURTEENTH AMENDMENTS TO THE
> UNITED STATES CONSTITUTION.**

## A.   Richardson Violation

In his second argument during the direct appeal, Mr.
Smith alleged that the trial court erred in failing to
conduct an adequate inquiry pursuant to Richardson v. State,
246 So. 2d 771 (Fla. 1971). Specifically, Mr. Smith argued
that a discovery violation occurred when the State failed to
disclose felony judgments for Larry Martin, a defense
witness, that the State intended to use.

Larry Martin was the only defense witness during the
guilt phase of the trial (R2. 1235-1269). He testified that
co-defendant Derrick Johnson told him that Mr. Smith was not
the person who shot the cab driver (R2. 1257-59). This
evidence was inherently crucial to the defense.

During direct examination, defense counsel asked Martin
how many time he had been convicted of a felony. Martin
replied, "A couple times, I think. I'm not sure." (R2.
1260). The prosecutor requested a bench conference and
informed the court that he had judgments and sentences

101

showing eight felony convictions which he intended to use to
impeach Martin (R2. 1260-61). Defense counsel objected that
he had not been notified of the prosecutor's intended use of
the judgments through discovery (R2. 1261, 1263).[44]   The
trial court overruled the objection and the State was
allowed to impeach the witness.

Had the prosecutor disclosed the judgments in
discovery, as he was required to do, defense counsel could
have prepared Martin to truthfully and accurately answer the
question. Because the prosecutor failed to disclose the
judgments, Martin was not prepared to answer the question
accurately. As a result, the prosecutor was allowed to
impeach his original answer and to elicit Martin's admission
to eight prior convictions (R2. 2165-66). This in turn
diminished the credibility of the only defense witness in
the eyes of the jury and resulted in substantive prejudice
to the defense.

On appeal, the Florida Supreme Court denied the claim
saying that "the defense has the initial burden of trying to
discover impeachment evidence, and the state is not required

---

[44]Upon being asked by the court if he was aware of the
felony convictions, defense counsel answered, "I didn't know
how many he had. He didn't know either." (R2. 1264).

to prepare the defense's case." Smith v. State, 641 So. 2d
at 1322, quoting Medina v. State, 466 So. 2d 1046, 1049
(Fla. 1985). As will be demonstrated in Mr. Smith's
memorandum of law, the state court's finding is contrary to
and an unreasonable application of clearly established
federal law as the United States Supreme Court has
specifically rejected such a contention.

Moreover, at the time of the direct appeal, the State
was still sitting upon much more undisclosed evidence that
was favorable to Mr. Smith. As explained in Ground I, the
State had not disclosed that: 1) Melvin Jones had met with
Derrick Johnson on July 11, 1983, and promised to help him
at trial, contrary to the testimony of both Jones and
Johnson; 2) Melvin Jones was an original suspect in the
homicide; 3) police visited the Jones' residence on two
occasions during neighborhood canvassing, not once as Melvin
and Mellow Jones had testified; 4) Melvin Jones had received
a suspended sentence on his seventeen pending felonies after
he came forward and gave evidence against Mr. Smith,
contrary to his testimony that he served three years and
didn't receive much of a deal; 5) at the time of Mr. Smith's
retrial, Melvin Jones was afraid that he was going to be
arrested on charges of sexually abusing his step-daughter;

6) David McGruder had been unable to identify a photograph of Derrick Smith as one of the two men that he saw get into a cab, contrary to his trial testimony; and, 7) McGruder's estimate of the weight of the individual (purported to be Mr. Smith) was 30 to 70 pounds less than Mr. Smith's weight. Thus, the State kept from the court the true scope of the discovery violations when Mr. Smith raised the matter. Without being apprised by the State of the significant favorable evidence that was still being withheld, the state court could not properly analyze Mr. Smith's Richardson claim.

## B. Evidence of Other Robbery

Mr. Smith raised on direct appeal the State's introduction of an unrelated robbery allegedly committed by Mr. Smith about twelve hours after the Songer homicide. The description of the gun used in the robbery was similar to the one described by Melvin Jones.

At trial, defense counsel moved to exclude evidence of the robbery from the guilt phase on the grounds that it was not sufficiently similar to the charged offense[45] and was

---

[45]Mr. Songer was a cab driver who was shot in the back on a city street in the middle of the night when he ran away from his cab during a confrontation with the suspects after
(continued...)

104

not relevant to any issue other than Mr. Smith's bad
character and propensity (R2. 40-42, 63, 251-52, 262-67,
389, 1191-93). The court denied defense counsel's motion
and admitted evidence of the robbery (R2. 64, 292, 1191-93).
The court instructed the jury to consider the evidence only
insofar as it was relevant to show motive and possession of
a gun (R2. 1194). On direct appeal, the Florida Supreme
Court affirmed, stating that the evidence was "relevant in
proving Smith's motive to obtain money and to proving that
he possessed the same gun in both offenses." Smith, 641 So.
2d at 1322.

However, in denying Mr. Smith's appeal, the state court
did not know, because the State withheld the fact, that
Jones' testimony regarding the description of the gun used
to shoot the cab driver resulted after a meeting between
Jones and Johnson in which Jones promised to help Johnson at
the trial (See Ground I). The State withheld this critical

---

[45](...continued)
giving them a ride and attempting to collect the fare (R2.
1140-45). Mr. Songer's money was not taken (R2. 754-55,
767-68, 801-02). In contrast, the victims in the subsequent
robbery were an older tourist couple who were robbed of
their money and jewelry inside their motel room in the
middle of the day. No shots were fired. The male victim
was struck in the face with the perpetrator's hand (R2.
1194-03).

information which should have led to a reversal and a remand
for a new trial.

## C.   Limitation of Cross-Examination of Jones

In his direct appeal, Mr. Smith challenged the trial
court's limitation of his cross-examination of Melvin
Jones.[46] (See Ground VII).  In the State's answer brief, the
State asserted:

> The gist of appellant's complaint revolves
> around the incorrect notion that defense counsel was
> unable to adequately cross examine Melvin Jones
> concerning the "deal" he had with the state vis-a-
> vis his testimony in the instant case.  * * *  Thus,
> the record reveals that the only "deal" which Mr.
> Jones obtained that the state attorney was to speak

---

[46]Jones was arrested on unrelated charges on June 13, 1983,
nearly three months after the shooting of Mr. Songer, the
cab driver.  Jones faced seventeen felony charges (R2. 998).
Four days later, he met with the State to bargain for a deal
in exchange for his testimony against Mr. Smith.  At the
meeting, Jones gave what he later claimed was a false
account of what he had said he witnessed at Fairfield and
30th St. the night Mr. Songer was shot.  Weeks after the
June 17th meeting, Jones wrote an undated letter to the
attention of Tom Hogan at the State Attorney's Office,
giving a new account that was now generally consistent with
Johnson's version of the shooting.  Included with this
letter was a map of the crime scene.

Following his testimony against Mr. Smith in 1983,
Jones was sentenced in his pending cases to concurrent
three-year suspended sentences followed by two years
probation (D-Ex. 16, 12/1/83 Sentence).  However, Mr.
Smith's jury never learned that Jones had received a
suspended three-year sentence.  Instead, the prosecutor
represented and Jones testified that he received three years
incarceration after testifying against Mr. Smith and against
Clinton Jackson.

in his behalf at his sentencing subsequent to the testimony rendered in the first Derrick Tyrone Smith case. Indeed, **the record reflects that no "deal" was given to Melvin Jones for his testimony at the trial which is the subject of the instant appeal,** and he would not appear without benefit of a subpoena (R 1060).

In the instant case, the record reveals the "deal" and there is simply no evidence to show that any other "deal" existed. Appellant on appeal is merely speculating that there must have been some other "deal" which simply has not been revealed. Yet, **the record reflects no attempt to obtain disclosure of that deal** because, indeed, defense counsel was well aware of the facts surrounding the testimony of Melvin Jones. The record also reveals that although the state attorney spoke in his behalf, Melvin Jones did not believe that he got a deal. Thus, from the witness' perspective, he was undoubtedly disappointed at the result of his sentencing, but this in no way indicates that any further consideration was given to Mr. Jones in exchange for his testimony.

\* \* \*

Nor is the fact that the trial judge prevented cross examination concerning Melvin Jones' testimony in the Clinton Lamar Jackson case cause for reversal of the instant conviction. **Defense counsel was attempting to engage in a "fishing expedition"** merely because Melvin Jones happened to offer testimony in another capital case. During the proffered examination, defense counsel questioned Mr. Jones on facts of which defense counsel was certainly aware (Mr. Sanders did the appeal for Clinton Jackson; R 1059) and Melvin Jones was an eyewitness in that case. **As the prosecutor noted in the instant case, Melvin Jones was sentenced after his testimony in both the first Smith and the Clarence [sic] Jackson trial** and the state attorney did, in fact, appear on behalf of Mr. Jones. **This is the only "deal" which was made and it was presented for the jury's consideration with respect to the credibility of Melvin Jones.** Appellate reversal cannot be predicated upon speculation of a

107

> more inclusive deal where there is no evidence to
> indicate that one ever existed. [Citation].
>     Your appellee respectfully submits that the
> facts as adduced at trial do not support appellant's
> claim.  The "deal" received by Melvin Jones was
> heard by the jury and they were able to adequately
> evaluate the credibility of the witness.

(Answer Brief of Appellee, Case No. 76,491, 20-23)(emphasis
added).

    In this argument, the State presented to the Florida

Supreme Court a number of falsehoods as fact and deceived

the court.  First, the State incongruously argued both that

Mr. Smith's counsel made "no attempt to obtain disclosure of

that deal" and that Mr. Smith's counsel "was attempting to

engage in a 'fishing expedition.'"  However, the burden is

upon the State to affirmatively disclose evidence in its

possession which could be used to impeach a State's witness;

the burden is not upon the defense to find that which the

State has hidden.  Second, the State falsely asserted,

"Melvin Jones was sentenced after his testimony in both the

first Smith and the Clarence [sic] Jackson trial."[47]  In

---

[47]Subsequent to his testimony against Mr. Smith in 1983,
Jones was sentenced in his pending cases to concurrent
three-year suspended sentences followed by two years
probation (D-Ex. 16, 12/1/83 Sentence).  On January 17,
1984, Jones was not in custody and claimed to have witnessed
Clinton and Nathaniel Jackson on their way to rob a hardware
store.  Jackson v. State, 575 So. 2d 181 (Fla. 1991).  By
(continued...)

108

fact, as evidence introduced during the 3.850 hearing
demonstrates, Melvin Jones was sentenced after he testified
against Mr. Smith - he was given a suspended sentence and
released from incarceration.[48]  Third, the State deceptively
argued to the Florida Supreme Court that Jones received "no

---

[47](...continued)
December 19, 1984, Jones was back in custody in the same
case numbers seeking a bond reduction (D-Ex. 16, 12/19/84
Motion for Bond Reduction).  His bond was revoked and he was
arrested on a capias on April 23, 1985 (D-Ex. 16).   On
August 25, 1985, Jones was sentenced to three years of
incarceration followed by two years of probation (D-Ex. 16,
8/25/85 Order).

In his 1990 testimony, Jones was asked during cross how
much time he got on all the seventeen felony charges he was
facing in 1983.  Jones replied, "I did three years" (R2.
998).  When defense counsel tried to pursue the matter the
State objected.  At side bar, counsel explained, "I think
it's a reasonable inference that can be drawn from the
evidence that he's facing seventeen or eighteen years and he
only gets three years that he did, in fact, get a break in
exchange for his testimony (R2. 999).  The prosecutor,
Martin, responded, "after the Smith trial he has got four
and a half to five and a half, and he was sentenced to three
plus two, one below the guidelines" (R2. 999).  The judge
then permitted additional questioning.  Jones then was asked
"you did, in fact, get a break on your sentence", and he
replied, "I don't think so, but you can say so" (R2. 1000).

However, defense counsel was precluded from asking
Jones about testifying for the State as an eyewitness in the
murder case against Clinton Jackson in 1984.  The
prosecutor, Martin, argued that "he was sentenced after he
testified in Smith and Clinton Jackson.  So whatever deal he
got was based on both" (R2. 1001).

[48]It was only because he had been given a suspended sentence
and released from custody that Jones could claim that in
January of 1984 he was at work with Clinton Jackson and was
told of Jackson's plan to commit a robbery.

109

deal" other than that the prosecutor would testify at the
sentencing that occurred after his testimony against
Jackson.   This deceived the court in regards to Jones'
suspended sentence in December of 1983 after his testimony
at Mr. Smith's first trial, and as to Jones' fear expressed
to the State in 1989 that he was going to be arrested on
sexual abuse charges arising from allegations made by his
step-daughter.

On direct appeal, the state court accepted the State's
false representations and concluded:

> It is clear from the proffer that testimony about
> the Jackson trial was not relevant to Smith's trial.
> The trial court correctly sustained objection to the
> testimony.   The record also clearly reflects that
> defense counsel had adequate opportunity and did
> cross-examine Jones about any negotiations with the
> State as to his testimony in Smith's trial

Smith v. State, 641 So. 2d at 1322.  However, the State's
deception prejudiced Mr. Smith's right to a full and fair
direct appeal before the court.  The limitation on Mr.
Smith's ability to cross-examine Melvin Jones precluded the
defense from discovering, the jury from knowing and the
state court from understanding that Jones' testimony and the
prosecutor's representations were false as to the sentence
Jones received in December of 1983 after his testimony
against Mr. Smith.

110

Had Mr. Smith been permitted to fully cross-examine Melvin Jones perhaps he would have had a chance to discover the State's deception. Exploring Jones' testimony against Clinton Jackson would have forced Jones to acknowledged that in January of 1984 he had been released from jail because he had received a suspended sentence on his 17 pending felony charges after he testified against Mr. Smith. The State was aware of the sentence Jones had received and when he had received it. But, the prosecutor in circuit court and the assistant attorney general on appeal affirmatively misled the defense, the courts, and the jury regarding Jones' suspended sentence. It just simply disappeared; according to the State, it did not happen - Jones was not sentenced until after his testimony against Clinton Jackson.

Similarly, the limitation of cross-examination and the State's deception precluded the jury from learning of Jones' fear that he was going to be charged with sexual abuse. Such a fear is precisely the kind of motivator (the need to curry favor with the State) that a criminal defendant is entitled to explore in cross-examination. Through deception, the State precluded the state court from recognizing the merit to Mr. Smith's sixth amendment challenge to the limitations upon his ability to cross-

111

examine Melvin Jones.

**Exhaustion of Ground VIII in state courts:**

1) **Did you raise Ground VIII in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground VIII in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No.

    a) **If your answer is "yes", then state:**

        I.  **Date motion filed:** N/A.

        ii. **Whether you received an evidentiary hearing:** N/A.

        iii. **Result:** N/A.

        iv. **Date of Result:** N/A.

    b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A.

        I.  **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

        ii. **Date appeal filed, result of appeal, date of result:** N/A.

3) **Have you raised Ground VIII in any other petition, application, or motion filed in the state courts of Florida?** Yes, Ground VIII was raised in Mr. Smith's state habeas petition. It was denied by the Florida Supreme Court on March 9, 2006. <u>Smith v. State</u>, 2006 Fla. LEXIS 388 (March 9, 2006), rehearing denied 6/8/06, mandate issued 6/26/06.

### GROUND IX

**FLORIDA'S CAPITAL SENTENCING PROCEDURE DEPRIVED MR. SMITH OF HIS SIXTH AMENDMENT RIGHTS TO NOTICE AND TO A JURY TRIAL AND OF HIS RIGHT TO DUE PROCESS.**

Mr. Smith's death sentence is unconstitutional because the judge, not the jury, made the factfindings which rendered Mr. Smith eligible for the death penalty. Moreover, the judge and jury improperly considered an aggravating factor that occurred after the crime had been committed. Further, there was no unanimous vote by the jury regarding the existence of an aggravating circumstance, regarding whether "sufficient" aggravating circumstances existed, or regarding whether mitigating circumstances existed which outweighed the aggravating circumstances. Finally, the jury was erroneously told that the "final decision" was the judge's and that the jury provides a "recommendation" or "advisory sentence". Mr. Smith is entitled to relief.

**Exhaustion of Ground IX in state courts:**

1) **Did you raise Ground IX in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground IX in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No.

113

      a)   If your answer is "yes", then state:

I.  Date motion filed: N/A.

ii. Whether you received an evidentiary
     hearing: N/A.

iii. Result: N/A.

iv. Date of Result: N/A.

    b)   If your Rule 3.850 Motion was denied, did you file
       an appeal of that denial with the Supreme Court of
       Florida? N/A.

      I.   If you failed to appeal the denial of your
          Rule 3.850 motion, explain briefly why: N/A.

      ii.  Date appeal filed, result of appeal, date of
          result: N/A.

3)    Have you raised Ground IX in any other petition,
     application, or motion filed in the state courts of
     Florida? Yes, Ground IX was raised in Mr. Smith's state
     habeas petition.  It was denied by the Florida Supreme
     Court on March 9, 2006. Smith v. State, 2006 Fla. LEXIS
     388 (March 9, 2006), rehearing denied 6/8/06, mandate
     issued 6/26/06.
                  . . . .

16.  Have you previously filed any petitions, applications,
    or motions with respect to your judgment and conviction
    in any federal court?  No.

17.  If your answer to 16 was "yes," give the following
    information: 1) Name of court; 2) Nature of proceedings
    and date action filed; 3) Grounds raised.  N/A.

18.  Do you have any petition or appeal now pending in any
    court, either state or federal, as to the judgment
    under attack? No.

19.  If you have previously filed a petition for writ of

habeas corpus related to this conviction and sentence
in federal court, you must first move in the
appropriate court of appeal for an order authorizing
the federal district court to consider the application.
Have you filed such a motion?  N/A.

20. Give the name and address, if known, of each attorney
who represented you in the following stages of judgment
attacked herein:

a) At preliminary hearing:

Richard Smith and Thomas Donnelly.

b) At arraignment and plea:

Same.

c) At trial:

Richard Sanders.

d) At sentencing:

Same.

e) On appeal:

Pul Helm, Assistant Public Defender, Tenth
Judicial Circuit.

f) In any postconviction proceeding:

Capital Collateral Representative kna/ Capital
Collateral Regional Counsel; Martin McClain,
Registry counsel.

g) On appeal from any adverse ruling in
postconviction proceeding:

Capital Collateral Representative kna/ Capital
Collateral Regional Counsel; Martin McClain,
Registry counsel.

115

21. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?  No.

22. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?  No, death.

    a)    If so, give name and location of court which imposed sentence to be served in the future: N/A.

    b)    Date and length of sentence to be served in the future: N/A.

    c)    Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?  N/A.

116

## CONCLUSION

For the reasons stated herein, the judgements and sentences of Mr. Smith should be reversed.

Respectfully submitted,

MARTIN J. MCCLAIN
Fla. Bar No. 0754773
McClain & McDermott, P.A.
Attorneys at Law

141 N.E. 30th Street
Wilton Manors, Florida 33334
Telephone: (305) 984-8344
FAX: (954)564-5412

Attorney for Petitioner
DERRICK SMITH

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing

Petition has been furnished by U.S. Mail to Katherine

Blanco, Assistant Attorney General, Office of the Attorney

General, 3507 East Frontage Rd, Suite 200, Tampa, FL 33607-

7013, on this $\frac{18^{th}}{}$ day of July, 2006.

MARTIN J. MCCLAIN

117