# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

DERRICK TYRONE SMITH,

      Petitioner,

v.                                                  Case No. 8:06-cv-01330-T-17MAP

                                                  DEATH PENALTY CASE

SECRETARY, DEPARTMENT OF CORRECTIONS, and

Attorney General, State of Florida,

      Respondents.

_____/

## ORDER

Derrick Tyrone Smith petitions this Court for writ of habeas corpus, pursuant to 28 U.S.C. § 2254. (Dkt. 3). Smith challenges his conviction and death sentence entered by the Sixth Judicial Circuit, Pinellas County, Florida. Because none of the nine grounds raised warrants habeas relief, Smith's petition will be DENIED.

## BACKGROUND

Smith called a taxi from a payphone at the Hogley Wogley Restaurant in St. Petersburg, Florida, in March 1983. He and his co-defendant Derrick Johnson intended to rob the driver, who was Jeffrey Songer. After Songer took Smith and Johnson to the provided address, all three exited the taxi. When Songer realized what was about to happen, he tried to flee from the attempted robbery. Then Smith fatally shot him.

Although the murder weapon was never found, Smith was linked, through lay and expert testimony, to a .38 caliber pistol owned by his uncle. In November 1983, Smith was tried by jury, found guilty, and sentenced to death for murdering Songer. The Florida Supreme Court reversed

Smith's conviction and death sentence on direct appeal and remanded the case for a new trial. *Smith v. State*, 492 So. 2d 1063, 1067 (Fla. 1986) (*Smith I*).

Smith was retried in May 1990. He was again convicted of capital murder and sentenced to death. The Florida Supreme Court affirmed the conviction and sentence. *Smith v. State*, 641 So.2d 1319 (Fla. 1994) (*Smith II*), *cert. denied*, 513 U.S. 1163 (1995). Smith subsequently filed in the Sixth Judicial Circuit an amended motion for postconviction relief, pursuant to Florida Rule of Criminal Procedure 3.850. He claimed that:

(1)-(2) trial counsel was constitutionally ineffective in trial preparation and cross examination, and the State withheld material exculpatory evidence, presented false testimony, and knowingly misled the court;

(3) newly discovered evidence rendered constitutionally unreliable the conviction and sentence;

(4) the death sentence is arbitrary and capricious and violates state, federal, and international law;

(5) postconviction counsel was ineffective;

(6) the State's failure to provide public records violated due process and equal protection;

(7)-(8) because no reliable trial transcript exists, the right to direct appeal was denied;

(9) the prohibitions against interviewing jurors denied him the effective assistance of postconviction counsel;

(10)-(15) retrial counsel was ineffective during voir dire by operating under a conflict of interest and by failing to ensure Smith's presence at critical stages of trial; to object to the State's improper arguments at trial; to obtain an adequate psychiatric evaluation; to conduct an adequate background investigation, and to present available mitigation;

2

(16) the death sentence is fundamentally unfair, and trial counsel was ineffective for failing to object to the State's improper use of non-statutory aggravating factors;

(17) the judge and jury relied on misinformation;

(18) cumulative procedural and substantive errors deprived Smith of a fair trial;

(19) Florida Statute § 119.19 and Florida Rule of Criminal Procedure 3.852 are unconstitutional facially and as applied;

(20) the penalty phase jury instructions unconstitutionally shifted to the defense the burden of proving a death sentence was inappropriate;

(21) the penalty phase jury instructions unconstitutionally diluted the jury's sentencing responsibility;

(22)-(23) the statutory aggravator of murder committed in the course of robbery or its attempt is an unconstitutional automatic aggravator and is unconstitutionally vague;

(24) Florida's capital sentencing statute is unconstitutional on its face and as applied;

(25) due process was violated by the denial of access to the state attorney's investigative notes;

(26) Florida's capital sentencing statute is unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002); and

(27) the death sentence is invalid because the indictment did not charge the elements of the offense.

*Smith v. State*, 931 So. 2d 790, 796 (Fla. 2006) (*Smith III*).

In July 2002, the state trial court denied all of Smith's claims after both a *Huff* hearing[1] and

---

[1]*Huff v. State*, 622 So. 2d 982 (Fla. 1993).

an evidentiary hearing.  Smith appealed the orders denying postconviction relief and petitioned the

Florida Supreme Court for writ of habeas corpus, claiming that:

> (A) the State withheld material and exculpatory evidence and knowingly presented false or misleading evidence;

> (B) the circuit court erred in limiting the scope of the postconviction evidentiary hearing;

> (C) trial counsel provided ineffective assistance during the guilt phase of trial;

> (D) newly discovered evidence proves his innocence; and

> (E) trial counsel provided ineffective assistance during the penalty phase of trial.

*Smith III*, 931 So. 2d at 796.

On March 9, 2006, the Florida Supreme Court affirmed the postconviction court's denial of

relief on Smith's 3.850 motion and denied the state habeas petition.  *Id.* at 807.  Smith now timely

petitions for federal habeas relief pursuant to 28 U.S.C. § 2254.  (Dkt. 3).

### STANDARDS OF REVIEW

#### 28 U.S.C. § 2254

Under 28 U.S.C. § 2254(d) and (e), as amended by the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), this Court's review of the state court's factual findings

must be highly deferential.  The AEDPA "modified a federal habeas court's role in reviewing

state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-

court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685,

693 (2002).   The state court's findings are presumed correct unless rebutted by clear and

convincing evidence.  § 2254(e)(1).  Similarly, the Court must accept the state courts'

4

resolutions of issues of law unless they "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Williams v. Taylor*, 529 U.S. 362, 402 (2000).

"A state court decision is 'contrary to' clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court precedent, or (2) when faced with materially indistinguishable facts, arrived at a conclusion different from that of the Supreme Court. A state court's decision amounts to an 'unreasonable application' of federal law if it identifies the correct legal rule from Supreme Court case law, but applies that rule in an unreasonable manner to the facts of petitioner's case. This could also occur if the state court unreasonably extends, or declines to extend, a governing legal principle (as established by Supreme Court case law) to a new context. An unreasonable application of federal law does not refer to an incorrect or erroneous application, but rather to one that is objectively unreasonable." *Breedlove v. Moore*, 279 F.3d 952, 960-61 (11th Cir. 2002) (citations omitted).

**State Law Claims**

"[A] writ of habeas corpus disturbing a state-court judgment may issue only if it is found that a prisoner is in custody 'in violation of the Constitution or laws or treaties of the United States.' A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (citation omitted). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made. In addition, the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." *Anderson v. Harless*, 459 U.S.

4, 6 (1982) (per curiam).

## Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  Petitioner must first show "that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  Then petitioner "must show that the deficient performance prejudiced the defense."  *Id.* at 687.

To establish prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  If a claim fails to satisfy the prejudice component, the court need not rule on *Strickland*'s performance component.

## DISCUSSION

### Ground One: *Brady* and *Giglio* Claims

Smith claims that the State violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that the State's failure to provide defendant with favorable, material evidence violates due process) and *Giglio v. United States*, 405 U.S. 150 (1972) (holding that a defendant's due process right is violated when the State knowingly allows false, material testimony to be presented at trial).   He contends that the state courts' denials of these claims were based on an unreasonable determination of the facts and application of *Brady* and *Giglio*.

### 1. *Brady Claim*s

Smith alleges that the State violated *Brady* by withholding: (a) information about contact

6

between co-defendant Derrick Johnson and witness Melvin Jones; and (b) several police reports. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice is established if "a reasonable probability [exists] that had the [unpresented] evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

   *a. Contact Between Co-Defendant Derrick Johnson and Witness Melvin Jones*

Melvin Jones encountered Derrick Johnson for about six or seven minutes in a holding cell on July 11, 1983. During that brief encounter, Jones revealed a map of the crime scene and offered to help Johnson at trial. *Smith III*, 931 So. 2d at 797. Tom Hogan, the prosecutor in Smith's first trial, recalled that Johnson was terrified that Jones, someone unfamiliar to him at the time of the encounter in the holding cell, knew details of his case. Johnson thus asked to be removed from the holding cell. (App. D31/5353-5360).[2]

During the 2002 evidentiary hearing on Smith's 3.850 motion, the State conceded that the undisclosed contact between Johnson and Jones was both "exculpatory" and "suppressed." *Strickler*, 527 U.S. at 281-82. But the state trial court found no *Brady* violation because Smith "failed to show that this evidence casts the trial in such a different light as to undermine confidence in the verdict." *Smith III*, 931 So. 2d at 797.

---

   [2]On September 26, 2006, Respondents filed the state court record on September 26, 2006. Citations to the record are made by exhibit or by volume and page number.

Smith contests the trial court's conclusion, arguing that the court erroneously applied "a sufficiency of evidence test" instead of focusing on how defense counsel could have used the information about the undisclosed contact. *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) (finding that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply insufficient evidentiary basis to convict."). *Kyles* does not, however, relieve Smith from the burden of "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. *See also Johnson v. Alabama*, 256 F.3d 1156, 1189 (11th Cir. 2001) (noting that *Brady* "require[s] that the petitioner make a showing of actual prejudice . . . To demonstrate prejudice, the petitioner must convince [the Court] that there is a reasonable probability that the result of the trial would have been different if the [allegedly suppressed items] had been disclosed to the defense") (internal quotation marks omitted).

Contrary to Smith's contention, the Florida Supreme Court did recognize that Smith could have used the evidence to "support a theory of collusion between Johnson and Jones." *Smith III*, 931 So. 2d at 797. But even if the State had disclosed the contact,"the result of the proceeding would [not likely] have been different" because Smith's theory of collusion was inadequately supported. *Bagley*, 473 U.S. at 682. The evidence at retrial and the evidentiary hearing established that Johnson and Jones did not know each other before the murder. *Smith III*, 931 So. 2d at 797. Nor did they discuss the case during their brief encounter in the holding cell. *Id.*

Other testimony further undermined the defense's theory of collusion between Johnson

and Jones.  David McGruder, a restaurant employee, identified Smith as the person who got into

the backseat and Johnson as the person who got into the front seat when the taxi arrived.  (App.

B5/859-860).  McGruder also identified Smith as the person who used the payphone on which

Smith's fingerprint was later found.  (App. B5/855-57, 859-60, 862-63).

 The State also established that Smith had a gun with him in the hours just before the

murder occurred.  Caroline Mathis stated that Smith tried to sell her and Frank Bellamy a gun for

$50.00 on Sunday afternoon, March 20, 1983.  (App. B6/913-916).  Ernest Rouse saw Smith

with a gun around 7:30 to 8:00 P.M. at the Name of the Game Lounge.  While Smith was at the

Lounge, he asked Rouse for permission to place the gun under a turntable while he played

records.  When Smith finished playing records, he retrieved the gun. (App. B5/895-99).

 Priscilla Walker's and James Matthews' testimony confirmed that Smith had a gun with

him after the murder occurred around midnight on March 21, 1983.  Smith took a gun with him

to the residence that Walker and Matthews shared.  Smith told Walker, when he returned to her

residence after the murder, that he had just shot a "cracker cab driver" in the back because the

driver had acted like he did not want to give up his money.  (App. B6/1020-21).

 Smith told Matthews that he might have shot someone. (App. B6/1029).   Smith also

asserted "that he was scared and he needed a place to stay."  (App. B6/1030).

 Moreover, defense counsel had adequate opportunities to impeach Johnson and Jones.

Counsel impeached Jones on his testimony that he did not expect leniency for testifying at

Smith's trial.  (App. B8/1332-43).  Counsel also identified outside the jury's presence two prior

inconsistent statements made by Johnson: (1) that he never had the gun in his hand and (2) that

he was the one who gave the address to the taxi driver.  (App. B7/1168).  Counsel recognized,

however, that "some of the inconsistent statements [Johnson] made in the past are more damaging to Mr. Smith than the statements he's made on the stand." (App. B7/1168). So counsel offered, as a matter of trial strategy, not to cross-examine Johnson about his deal to plead to a reduced charge for testifying against Smith if the court prohibited the State from introducing Johnson's prior consistent statements. (App. B7/1165-73).

<u>Johnson's Prior Statements</u>

Johnson previously told Octavia Jones and Maxine Nelson (Johnson's mother) about the murder and attempted robbery of Songer. (App. B7/1149-54). Octavia Jones testified in her August 5, 1983 deposition that Johnson arrived at her classroom on the day after the shooting, asking for a newspaper. Since she did not have one, she sent him to his mother's classroom at Head Start. Johnson returned to Octavia about twenty minutes later, after reading the newspaper. He told Octavia that he and his friend "Rerun" (Smith) called a taxi the night before, intending to rob the driver. He and Smith directed the driver to stop at Fairfield Avenue and 30th Street. Then Smith shot the driver as the driver was running away. (App. A4/471-78).

Nelson confirmed in her August 8, 1983, deposition that Johnson, her son, came to her classroom on the Monday of the shooting and told her that he was involved in it. Johnson related that he and Smith called a taxi after talking about robbing someone. He mentioned that he sat in the taxi's front seat, while his friend Smith sat with a gun between his legs in the back. When he and Smith arrived at Fairfield Avenue, they exited the taxi, as did the driver. Johnson walked around to Smith, who told Johnson he was going to shoot the driver, who was running away. Johnson heard a gunshot as he too ran away. (App. A4/523-24, 529-33).

The state trial court found that the "major tone" of Johnson's prior statements was that

10

they were consistent and that the inconsistencies in Johnson's statements were immaterial. (App. B7/1164-65).  The court allowed defense counsel to question Johnson about prior inconsistent statements as going to his ability to recall what occurred on the night or early morning of the murder.  (App. B7/1169-70).  Because sufficient evidence undermines Smith's theory of collusion and because defense counsel had the opportunity to impeach both Johnson and Jones, Smith fails to show that the State's failure to disclose the contact between Johnson and Jones was prejudicial under *Brady*.  *Bagley*, 473 U.S. at 682.

### b.  Undisclosed Reports

### 1.  Melvin Jones as an Initial Murder Suspect

The defense was not informed that Melvin Jones was initially a murder suspect  "because he lived within a block of the crime scene and had outstanding warrants for his arrest."  *Smith III*, 931 So. 2d at 798.  However, "[t]he bases for Jones's early listing as a 'possible suspect' were known to Smith, and the jury was informed of them as well.  Failure to disclose this information does not undermine confidence in the outcome of the trial."  *Smith III*, 931 So. 2d at 798.

### 2.  Police Contact with Mellow Jones

Smith argues that the State violated *Brady* by failing to disclose two reports of police contact with Melvin Jones' wife, Mellow.  Smith contends that the reports "constituted valuable impeachment evidence," *id.*, and he disputes the Florida Supreme Court's finding that the claim is procedurally barred because defense counsel mentioned the issue during closing argument.

Even if Smith's claim were not procedurally barred, Smith has failed to allege facts "that would serve as impeachment."  *Id.*  The reports did not contain contradictory information that

could have been used to impeach Mellow Jones.  During the police's first neighborhood canvass,

> Mellow advised that she was half asleep when Melvin came
> home, however, she believes it was 20 minutes to 30 minutes
> prior to receiving a knock at the door.  Mellow answered the
> door and found it to be a St. Petersburg Police Officer who
> advised her that someone had been shot nearby and was asking
> if she had heard anything to which she stated she had not.  After
> the police officer left, Melvin told her that he had seen two guys
> shoot a cab driver.  It should be noted that she was upset at the time
> and did not know that whoever had been shot was dead.  She advised
> that Melvin did not go into any details as to the crime itself, however,
> he did state he was behind a tree when he saw it.

(D-Ex. #5).  The two reports indicated that Mellow Jones was part of the police's neighborhood

canvases shortly after the 12:30 A.M. shooting and again around 8:30 A.M.  Both canvases

yielded negative results.  *Id.*

Mellow testified that Melvin returned home before the police visited in the "late night,

early morning [March 20-21, 1983]."  (App. B6/1014).  She was upset with him at the time

because he forgot her birthday (March 20).  She was asked on direct examination:

> Q.   So when [Melvin] came home that night, you said it was early morning.
>       Do you remember exactly what time it was?
>
> A.   No.
>
> Q.   Did you have a conversation with your husband *when he came home*?
>
> A.   Yes, I did.
>
> Q.   And what did you tell him?
>
> A.   I didn't want to hear it.
>
> Q.   What did he tell you?
>
> A.   That he saw a man get shot.
>
> Q.   Did he try to tell you more?

       A.       Yes, he did.

       Q.       And what did you tell him?

       A.       I didn't want to hear it.

       Q.       Because you were mad at him?

       A.       Yes.

(App. B6/1014-15) (emphasis added).

When Mellow was crossed-examined, defense counsel established that the police came to her door *after* she conversed with Melvin. (App. B6/1015). Counsel confirmed Mellow's testimony that she did not "hear the noise [gunshot]," "realize that [the police] were talking about the same shot that [her] husband had seen," or ask Melvin while the police were at their residence about the shot he heard. (App. B6/1016).

There is arguable inconsistency as to when Melvin first told Mellow that he saw the shooting. Melvin's testimony confirms the undisclosed report's indication that Melvin told Mellow *after* Mellow had a conversation with the police officer that he saw "a cab driver get shot down the road." (App. B6/988). That appears to contradict Mellow's testimony that Melvin tried to tell her *when he came home* about the shooting he saw.

But that apparent inconsistency is neither exculpatory nor impeaching. The undisclosed reports and the Jones' testimony all indicate that Mellow did not know anything about the shooting when the police questioned her shortly after 12:30 AM on March 21, 1983. She neither heard a noise nor wanted to hear, either before or immediately after the police visited, more about the shooting her husband claimed to have witnessed. (App. B6/1015-16). Accordingly, Smith fails to show that the State's failure to disclose the reports of police contact with Mellow

Jones was prejudicial under *Brady*.  *Bagley*, 473 U.S. at 682.

### 3.  Sexual Abuse Allegation Against Melvin Jones

Smith also argues that the State violated *Brady* by failing to disclose a note, handwritten

on August 9, 1989 by the prosecutor in the first trial, with which Melvin Jones could have been

impeached at the second trial.  The note indicates that Melvin contacted the first prosecutor

and said that his daughter accused him of sexual abuse to prevent him from reuniting with his

wife.  Melvin was afraid that he would be arrested and wanted to take a polygraph with his

daughter.

Melvin's fear of arrest in 1989 for allegedly sexually abusing his daughter is not relevant

either to the retrial or to his motivation to testify against Smith in 1990.   The prosecutor's note

provided neither exculpatory evidence or impeaching material.  *Smith III*, 931 So. 2d at 798.

Therefore, the State's failure to disclose the note to the defense was not prejudicial under *Brady*.

*Bagley*, 473 U.S. at 682.

### 4.  Prosecution's Investigation Synopsis of David McGruder

Smith argues that the state trial court erred by determining that a prosecutor's

undisclosed investigation synopsis of David McGruder's testimony was not material.  The

prosecutor's synopsis noted that McGruder could not identify Smith from a photopack.  The

Florida Supreme Court found that the State should have disclosed the synopsis because it was

favorable to the defense.  *Smith III*, 931 So. 2d at 799.  But the synopsis was not material

because

> [w]hen the prosecutor dictated his synopsis, the police
> had not yet shown McGruder a photopack actually containing
> Smith's picture. McGruder did not identify Smith's picture
> until April 8.  That was the first photopack that included

14

> Smith's picture.  Further, at retrial Smith impeached McGruder
> on his tardy photopack identification, and the jury heard
> McGruder's confusing testimony regarding his uncertain
> identification of the photo.

*Id.*

Despite his "tardy photopack identification" and "confusing testimony," McGruder could still identify Smith, the shorter, darker male, as the person who got into the backseat, and Johnson, the taller, lighter-skinned black male, as the person who got into the front seat of the taxi when it arrived at the restaurant.  (App. B5/859-60).  McGruder eventually identified Smith from a photopack as the person who entered the restaurant to call the taxi (App. B5/855-57, 859-60, 862-63).  McGruder's identification of Smith is corroborated by Smith's fingerprint on the telephone receiver.  (App. B5/838, 843; App. B7/1214-16).  Thus, Smith fails to show that the State's failure to disclose the prosecution's synopsis of McGruder's testimony was prejudicial under *Brady*.  *Bagley*, 473 U.S. at 682.

### 5.  Melvin Jones' Polygraph Test

Smith alleges that the State failed to disclose a police report about a polygraph test that Melvin Jones failed.  Smith argues that he could have used the report of the test results for impeachment.  Smith has not rebutted the State's evidence that the report was disclosed.  *Smith III*, 931 So. 2d at 799.  Nor has he demonstrated that the test results would have been admissible for impeachment at trial.  *Id.  See also Sochor v. State*, 883 So. 2d 766, 787 (Fla. 2004) ("As for the polygraph tests, their results would not have been admissible at trial without the consent of both parties.").  Smith accordingly fails to show that the State's failure to disclose the police report about Melvin Jones' polygraph test was prejudicial under *Brady*.  *Bagley*, 473 U.S. at 682.

6.  Investigative Reports of Priscilla Walker and James Matthews

Walker and Matthews testified at trial that they saw Smith with a gun shortly after Songer was shot.  (App. B6/1016-22, 1027-30).  Smith claims that the State's failure to disclose reports of Walker's and Matthews' interviews violated *Brady*.  Walker[3] told a state investigator that

> [s]he has never made any statements to the police about Smith. She indicated the police did come by her residence either before or after the shooting, she is not sure exactly when, but it could have been a week either way, and asked to see Smith, and she advised them that he was not there.  They did not ask her any questions about statements he may have made or any knowledge of the murder.

(D-Ex. #4).  Matthews told a state investigator that

> [on] the following day, which would have been a full 24 to 36 hours after the murder, the police came by his house looking  for Smith. Matthews stated they asked if they could search the house, which he gave them permission to do.  Matthews could not recall whether he lied to the police with regards to the above conversation with Smith or if they failed to ask him anything other than where he was.

(D-Ex. #4).

The investigative reports of Walker and Matthews are not material.  Other evidence

---

[3]Smith also alleges that the defense was unaware that Walker had criminal charges pending against her when a state investigator contacted her in 1988.  (Dkt. 3 at 35).  Walker was charged in 1985 with welfare fraud and arrested in June 1988 for obstruction of justice.  (Dkt. 3 at 35).  Then she was charged twice in July 1988 and later in February 1990 for violating probation.  (Dkt. 3 at 35-36).  She pled not guilty on May 8, 1990, just two days before she testified against Smith at retrial on May 10, 1990.  (Dkt. 3 at 36).  Her bond was reduced on May 11, 1990, just after she testified.  (Dkt. 3 at 36).  The State's failure to disclose Walker's criminal charges was not prejudicial under *Brady* because other evidence and testimony linked Smith to the murder weapon. *See* Ground One, *infra*, at 17.

presented at trial linked Smith to the gun used to murder Songer.  The gun's description matched

that of the gun Roy Cone, Smith's uncle, testified was missing.  The metal composition of the

fragment discovered in Songer was consistent with the metal composition of the bullets that

Cone bought for the gun.  (App. B6/1043-46).  Smith fails to show that the State's failure to

disclose the investigative reports of Walker and Matthews was prejudicial under *Brady*.  *Bagley*,

473 U.S. at 682.

### 7.  Police Report Regarding the Questioning of Smith

Before his first trial, Smith was *Mirandized*,[4] but, through allegedly improper

questioning, told a detective, "I'm in a lot of trouble, and I want to talk to a lawyer."  *Smith I*,

492 So. 2d at 1066.  The Florida Supreme Court found that the trial court erred by admitting that

statement despite Smith's explicit exercise of his right to counsel and to remain silent.  *Id.*

Smith now claims that because the report remained undisclosed, the defense did not learn

how the police used allegedly improperly obtained information in its investigation.  Smith argues

that with the information he provided, the State talked to his family, including Roy Cone, and

obtained Cone's box of bullets.  (Dkt. 3 at 37).  At trial, the State used Cone's bullets to link

Cone's missing gun, the alleged murder weapon, to Smith.  Smith claims that the State's failure

to disclose the report shows the fruits of unconstitutionally obtained, prejudicial statements.  But

since Smith did not raise this claim on direct appeal after his second trial, the claim is

procedurally barred.  *See Atwater v. Crosby*, 451 F.3d 799, 810 (11th Cir. 2006) (holding that

"[i]t is well-settled that 'if the petitioner failed to exhaust state remedies and the court to which

the petitioner would be required to present his claims in order to meet the exhaustion

---

[4]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

requirement would now find the claims procedurally barred . . .[,] there is a procedural default for purposes of federal habeas . . . .'" (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991))**.**

### 2.  *Giglio* **Claims**

Smith claims that the State violated *Giglio* (1) by knowingly allowing Johnson and Melvin Jones to present false testimony about their encounter in the holding cell; and (2) by deceiving defense counsel as to the consideration that Jones received in 1983 for his testimony at the first trial.  "To establish a *Giglio* violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." *Guzman v. State*, 868 So. 2d 498, 505 (2003).  False evidence is material under *Giglio* "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Smith presented at the evidentiary hearing after the second trial documents obtained from the State.  These documents included prosecutor Hogan's investigative memo, dated September 12, 1983, containing his directive to investigate the contact between Melvin Jones and Johnson. (D-Ex. #8).  Hogan noted that "D.J. [Derrick Johnson] says 1st time he ever saw Melvin Jones 7-11-83 in holding cell before prelim - Melvin Jones showed D.J. map and said he would help D.J. at trial."  (D-Ex. #8).  According to Smith, Hogan's note indicates that: (1) Johnson and Jones encountered each other in a holding cell; (2) both gave false testimony at the first trial; and (3) the State knew that their testimony was false, but failed to correct it.  *Smith III*, 931 So. 2d at 799.

But this is not a case in which a witness knowingly gave false testimony known by the

prosecutor to be false and material.  *See Guzman,* 868 So. 2d at 505.  Johnson did not describe Songer's murder to Jones or provide information to him, except when Jones asked whether Johnson planned to testify.  (App. D31/5379, 5385).  Johnson learned that inmates would ask questions to help themselves, so he avoided talking to them about his case.  (App. D31/5379).  Johnson had no police reports with him in jail or any records other than the original charge sheet.  (App. D31/5359).  And Johnson consistently testified that he was being truthful in his trial testimony when asked if he had ever discussed the case with Melvin Jones.  (App. D31/5383).

The testimony given at the evidentiary hearing established that neither Johnson nor Jones presented any perjurious statements material to the outcome of Smith's retrial.  Smith's counsel at the first trial confirmed that the defense was aware just before trial of some contact Johnson had in a holding cell with an inmate. (App. D31/5391; App. A11/1693-15).  Retrial defense counsel read the transcript of the first proceeding.  The transcript indicated that Johnson consistently denied providing any information about the murder to Jones.  (App. D31/5357-59, 5379).  Finally, neither Johnson nor Jones was questioned at retrial about the possibility that they colluded about their testimony.  *Smith III*, 931 So. 2d at 799.  Thus, Smith has failed to rebut with "clear and convincing evidence" that Johnson's and Jones' retrial testimony was false and that the State failed to correct it.  28 U.S.C. § 2254(e)(1).

Smith's second *Giglio* claim is that the State deceived defense counsel as to the consideration that Jones received in 1983 for his testimony at the first trial.  After Smith's first trial, Jones received a three-year suspended sentence, followed by two years of probation.  Thus, Jones could suggest to the retrial jury that he really did not get much of a deal because he was imprisoned for three years.  (App. B6/998, 1000).

19

Smith failed, however, to plead sufficiently his second *Giglio* claim.  *Smith III*, 931 So.

2d at 800.  Smith did not establish "that the State gave Jones a deal regarding his unrelated

felony charges to obtain his trial testimony, and [that] any of Jones' testimony [is] false."  *Id.*

Smith has not shown that the Florida state courts' decisions were either "contrary to" or an

"unreasonable application of" *Giglio*.  *Breedlove*, 279 F.3d at 960-61.

<div align="center">*Cumulative Error*</div>

The state courts' disposition of Smith's cumulative error argument is reasonable.  None

of the alleged errors under *Brady* or *Giglio* warrant any relief, standing alone or taken together.

There is no semblance of an argument that the state court's rulings were contrary to or

unreasonably applied any clearly established Supreme Court precedent.  *Cf. Hodges v. Sec'y,*

*Dep't of Corr.*, 8:03-cv-01591-SCB-TGW, 2007 WL 604982, at *22 (M.D. Fla. Feb. 22, 2007);

*Henyard v. Crosby*, 5:04-cv-621-Oc-10GRJ, 2006 WL 1862694, at *7 (M.D. Fla. Aug. 1, 2005).

Ground One does not warrant federal habeas relief.

## Ground Two: Ineffective Assistance of Counsel - Guilt Phase

Smith claims that trial counsel rendered ineffective assistance during the guilt phase by

failing (1) to discover witness Vincent (Ventura) Gibson, (2) to challenge an expert witness'

bullet lead analysis, (3) to challenge for cause some unnamed jurors, (4) to object to allegedly

improper prosecutor comments, and (5) to investigate adequately two potential alibi witnesses.

Smith also claims (6) that trial counsel was "laboring under a conflict of interest when he refused

to present [the] alibi witnesses at trial."  *Smith III*, 931 So. 2d at 802.  Smith further claims that

when these deficiencies are considered cumulatively, confidence in the outcome is undermined.

*See Strickland*, 466 U.S. at 702 (finding that the petitioner must show that counsel's deficiency

<div align="center">20</div>

undermines "the fairness and reliability of the proceeding").

### 1. Failure to Discover Witness Vincent (Ventura) Gibson

Although the trial court ruled that defense counsel was deficient in failing to locate Gibson, the court found no resulting prejudice. *Smith III*, 931 So. 2d at 801.   On postconviction appeal, the Florida Supreme Court affirmed, finding neither deficiency of counsel nor prejudice under *Strickland*.  *Id.*  Smith claims that the Florida Supreme Court erred by failing to consider how Gibson's testimony that he never gave Melvin Jones a car ride would undermine both Jones' credibility and the State's overall investigation.

Melvin Jones testified at both of Smith's trials that Smith shot Songer.  Jones was arrested on June 13, 1983, about three months after the shooting, on outstanding warrants.  He contacted the police through his attorney, indicating that he had information about the shooting.

Jones provided inconsistent accounts of how he arrived at the murder scene.  He wrote to the prosecutor that he witnessed the shooting on his way home.  Jones testified in a later deposition that, on the night Songer was shot, Gibson gave him a ride home and dropped him off near the murder scene (App. A5/787-88).

At trial, Jones testified that he saw Smith shoot Songer.  He described the direction both Smith and Johnson ran after the shooting, what they were wearing, and what the gun looked like. Jones' trial testimony mirrored his deposition.  (App. A11/1671-73; App. B6/973-75).

Smith presented Gibson's testimony at the evidentiary hearing in 2002.  Gibson testified at the evidentiary hearing that he knew Jones because they had shared work space in the past, but they were not friends.   (App. D27/4903).  Gibson was asked:

21

Q.      [D]o you remember at some point in 1983 do you remember a cab driver being shot and killed on Fairfield Avenue?

A.      I read it in the paper.

Q.      You read it in the paper after it happened?

A.      Yes.

Q.      The following day?

A.      The following day.

Q.      Now, we already established that you know Melvin; correct?

A.      Yes.

Q.      That would be Melvin Jones, for the record, your Honor.  Was Melvin Jones over at your house or your brother's house on 27th Street and 18th Avenue?

A.      No.

Q.      Do you recall ever taking Melvin Jones from 27th Street and 18th Avenue over to Fairfield Avenue South?

A.      No, I can not.

Q.      Do you ever recall taking Melvin Jones – or driving him anywhere?

A.      No.

(App. D27/4904-05).

Gibson testified on cross examination:

Q.      And just so the record is clear, your testimony today is you do not recall

22

> whether or not you gave Melvin Jones a ride in March of 1983; isn't that your testimony today?
>
> A.    Yes, I did not give him a ride.
>
> Q.    No, sir.  I'm asking you on direct examination didn't you say you do not recall?
>
> A.    I do not recall giving him a ride; no.
>
> Q.    You could have, but you don't recall?
>
> A.    No, I did not give him a ride.

(App. D27/4908-09).

Smith argues that because Gibson lived his entire life in St. Petersburg, Florida, Gibson would have been easy to find.  Smith believes that if counsel found Gibson, the defense could have exposed Jones' false story at trial.  Smith characterizes Jones' testimony as "the tie-breaker" between Smith's and Johnson's accounts.  (Dkt. 3 at 51).  Law enforcement did not know whom to believe until Jones reinforced Johnson's allegations.

Indeed, a trial witness' credibility is perpetually at issue.  But Gibson's testimony, as set forth above, does not prove that Jones did not see the shooting.  Rather, Gibson's testimony would have, at best, impeached Jones on the collateral issue of how Jones arrived at the scene. *Smith III*, 931 So. 2d at 801.  Any impeachment as to how Jones arrived at the scene is immaterial to his being there.  Jones' eyewitness testimony would not have been altered by such impeachment evidence because a plethora of evidence implicated Smith in the shooting.  *Smith I*, 492 So. 2d at 1069-70.

First, McGruder could distinguish Johnson from Smith.  McGruder identified Smith, the shorter, darker male, as the person who got into the backseat, and Johnson, the taller, lighter-skinned black male, as the person who got into the front seat of the taxi when it arrived at the Hogley Wogley.  (App. B5/859-60).  Second, Smith confessed to Walker and Matthews that he shot a taxi driver and even took the gun to their residence.  (App. B6/1016-30).  Third, the gun described at trial was consistent with the gun missing from the Cone residence.  The metal composition of the fragment discovered on the victim was consistent with that of the bullets that Smith's uncle bought for the gun.  (App. B6/1043-46).  Accordingly, the Court's confidence in the verdict is not undermined by defense counsel's failure to discover Gibson.

### 2.  Failure to Challenge an Expert Witness' Bullet Lead Analysis

Smith contends that defense counsel was unprepared to challenge FBI Chemist Donald Havekost, a State expert witness, on his bullet lead analysis.  Smith claims that because counsel did not expose the alleged absence of scientific support for Havekost's conclusions, counsel enabled Havekost to mislead the jury.  Smith further claims that Havekost's testimony could have been easily refuted if counsel sought a metallurgist to advise counsel about bullet-lead analysis.

Havekost testified as an expert witness in neutron activation analysis and inductively coupled plasma atomic emissions spectrometry.  He testified that he analyzed a lead fragment found in Songer, presumably part of the bullet that killed him, and two bullets that the police had collected from the Cone residence.  Havekost concluded that the quantity of the various elements in the bullets and the lead fragments matched and, thus, "originated from a common source." (App. B6/1071).  He testified on direct examination:

> The more elements you're able to characterize in bullet lead, the better you've characterized that particular composition. In other words, it becomes more and more unlikely that you have two things that match just out of chance. And if you are able to–well, in the early days, we felt if we could characterize three elements that the possibility of there being a mistake was very remote. If you can quantitate [sic] four elements, five elements, in my opinion, you've reduced the chance to essentially nothing–that they match by chance.

(App. B6/1083). Indeed, defense counsel did not challenge Havekost's conclusion that there was "essentially no[]" chance that there were other boxes with materially indistinguishable levels of the elements that Havekost tested. (App. D31/5347).

Nonetheless, counsel was not deficient in failing to challenge more thoroughly Havekost's testimony since, contrary to Smith's claim, counsel did consult experts. State Exhibits 23 and 24, respectively, confirm that defense counsel hired a firearms expert and "sought costs for 'experts on ballistics and fingerprinting to aid in trial preparation.'" (App. D22/4103). Counsel even conducted his own research at Stetson University College of Law to familiarize himself with neutron activation analysis. Counsel testified that he "just wanted to see if there was any way – if [his expert] saw any way [he] could challenge what they did or the conclusions they reached, at the very least with respect to that lead analysis testimony they gave." (App. D22/4103). Counsel also testified that he

> sent [F.B.I. reports on lead comparison tests as furnished in discovery] to [his expert] and asked him–explained to him what the case was about and asked him whether he saw any problems with what the F.B.I. expert had done and what he had concluded. And [the expert] called [him] back sometime later . . . and said something to the effect that he didn't see any problem with it.

(App. D22/4103).

25

At the evidentiary hearing, Smith presented the testimony of metallurgist Erik Randich. Randich testified that "these bullets could have come from a common, single source of lead.  But saying that they did is a totally unfounded statement."  (App. D30/5223).  Randich further explained the lack of scientific basis for Havekost's conclusion.  (App. D30/5228-30).

Essentially, Randich's testimony qualified Havekost's opinion to indicate that the samples originated from a common source only if that source were unique.  Randich did not exclude the possibility that the samples *could have* come from the same source.

Havekost, in fact, addressed this very issue on direct examination at trial.  He explained that the chances of finding a box that was purchased or manufactured a year before with the same composition make-up would be, in his opinion, "very unlikely."  (App. B6/1082). Havekost's testimony was consistent with Cone's, which established that the unfired cartridges that compromised one of the two samples, the other being the bullet fragment found in Songer, were at least eleven years old.  (App. B5/891).  Ultimately, Smith fails to establish ineffective assistance of counsel because Randich himself "admitted at the postconviction hearing that no research, including his own, was available to challenge the FBI evidence at the time of retrial." *Smith III*, 931 So. 2d at 801.

### 3.  Failure to Challenge for Cause Some Unnamed Jurors

Smith claims that trial counsel rendered ineffective assistance by failing to strike for cause some unnamed jurors.  The Florida Supreme Court affirmed denial of this claim because "Smith has presented neither facts nor argument to support the [claim]."  *Smith*, 931 So. 2d at 801.  The claim does not merit federal habeas relief.

26

#### 4.  Failure to Object to Allegedly Improper Prosecutor Comments

Smith claims that trial counsel rendered ineffective assistance by failing to object to allegedly improper comments made by the prosecutor during closing arguments.  The Florida Supreme Court found that this claim was conclusory, as Smith failed to offer facts or argument to support it.  *Smith*, 931 So. 2d at 801.  This claim does not merit federal habeas relief.

#### 5.  Failure To Investigate Adequately Potential Alibi Witnesses

Smith alleges that trial counsel failed to investigate adequately two potential alibi witnesses, Kahn Campbell and James Hawkins.  Trial counsel did not call these witnesses because he had a "'feeling' that they would commit perjury."  *Smith III*, 931 So. 2d at 801-02. Since the

Florida Supreme Court found that this claim was not preserved for appellate review, *id*. at 802, it is procedurally barred from this Court's consideration.  *Atwater*, 451 F.3d at 810.

#### 6.  Conflict of Interest

Smith alleges that trial counsel "labor[ed] under a conflict of interest when he refused to present [Campbell and Hawkins as] alibi witnesses at trial."  *Smith III*, 931 So. 2d at 802 (internal quotation marks omitted).  Smith raised this claim in his post-conviction motion, which the trial court denied because "the issue could and should have been raised on direct appeal."  *Id.*  The postconviction court further found "that the evidence demonstrated counsel's decision not to call the witness was strategic in nature and that counsel acted pursuant to a court ruling."  *Id.*  Rule 4-3.3 of the Rules Regulating the Florida Bar prevented counsel from calling Campbell and

Hawkins because counsel  "reasonably believe[d]" that their testimony would be false.   Smith has failed to show that this claim merits federal habeas relief.

<p align="center">*Cumulative Error*</p>

The Court must consider all of the evidence in determining whether each of these acts of allegedly ineffective assistance undermine the reliability of the verdict.  *See Strickland*, 466 U.S. at 696 (holding that the Court must consider Smith's ineffectiveness claim against "the totality of the evidence before the . . . jury").  The state courts' disposition of Smith's cumulative error argument is reasonable.  None of the alleged errors in Ground Two warrant federal habeas relief, standing alone or taken together.  There is no semblance of an argument that the state courts' rulings were contrary to or unreasonably applied any clearly established Supreme Court precedent. *Cf. Hodges*, 2007 WL 604982, at *22; *Henyard*, 2006 WL 1862694, at *7.

<p align="center">**Ground Three: Ineffective Assistance of Counsel - Penalty Phase**</p>

Smith claims that trial counsel rendered ineffective assistance at the penalty phase.  Smith argues that if counsel had investigated more thoroughly, counsel would have found the following mitigating factors: extreme mental or emotional disturbance; relative culpability; impaired capacity; poverty; childhood trauma; dysfunctional familial drug abuse; deprivation of food; drug abuse; and lack of stability.  (Dkt. 3 at 68-69).

Smith relies on *Wiggins v. Smith*, 539 U.S. 510 (2003), to support his claim of ineffective assistance of counsel at the penalty phase.  In *Wiggins*, defense counsel minimally investigated the background of his client, a capital defendant.  Counsel reviewed only the results of psychiatric tests, the PSI report, and DSS records.  *Id.* at 523.  The Supreme Court found that "[c]ounsel's

<p align="center">28</p>

decision not to expand [the] investigation beyond the PSI and the DSS records fell short of [prevailing] professional standards." *Id.* at 524.  The Court further found that counsel "should [have made] efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* (internal quotation marks and citation omitted) (emphasis in original).

But *Wiggins* emphasizes that *Strickland* "does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.  Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Id.* at 533.  Rather, "[a] decision not to investigate [further] 'must be directly assessed for reasonableness in all the circumstances.'" *Id.* (citing *Strickland*, 466 U.S. at 691).  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

Smith spent his early childhood years in New Jersey.  He and his six siblings lived in a filthy house with their drug-addicted mother Beatrice.  (App. D32/5496).  The children were unkempt and reeked of urine.  (App. D32/5492).  They could not be well cared for by their mother because her drug addiction consumed her time and resources.  (App. D32/5488-90).  Ruby McClary, a family friend from New Jersey, reported that

> After [Beatrice] got on drugs, she didn't provide for [her children].
> Most of the time, Derrick [Smith] was there to watch the kids.  So if
> they didn't have food, she would send Derrick–tell him to go to the
> store and get a loaf of bread, just take it and come on out, run with it.
>
> And he would go to the store and get bread and Kool-Aid and

29

> sugar and stuff.  And that was the only way the kids got something to eat.
> He would, you know, go out and steal it, because when she got her
> money from the public assistance, she would use it up on drugs.

(App. D32/5469).

When Smith was eleven years old, he witnessed his mother die of a heroin overdose (App. D32/5490-91).  He and his siblings then moved to St. Petersburg, Florida, to live with their aunt and uncle, the Cones.  Smith was unhappy about the move and periodically ran away back to New Jersey.  (App. D32/5505-06).  He daily used drugs, including cocaine, acid, and marijuana, for at least three years before he shot Songer in March 1983.  (App. D31/5398).

In early 1983, Smith's drug use increased.  (App. D31/5420).  Smith sometimes went on three or four-day cocaine binges, which aggravated him.  (App. D29/5097-98).  He also began having problems with Sheila, his longtime girlfriend and the mother of his baby.  (App. D31/5423-24).  He had become very close to Sheila, Sheila's family, and Shaquille, the baby. (App. D31/5397, 5424).

Charles Hill and Diane Jenkins Bryan, two of Smith's friends, testified at the evidentiary hearing about Smith's drug use.  Hill testified that he and Smith "got high" together on the weekend of the homicide.  He also testified that Smith was using cocaine that weekend.  (App. D29/5058).  Jenkins testified that she and Smith were "getting high" and doing drugs together just hours before the murder.  (App. D31/5400).  Jenkins also testified that "Sheila told [Smith] that Shaquille wasn't his baby, that she was Ricky Brown's baby and she–he got real [sic] upset about it."  (App. D31/5400).

The trial court sentenced Smith to death after finding two aggravating factors (murder committed while attempting robbery and a prior violent felony conviction) and one mitigating factor (no significant criminal history). *Smith III*, 931 So. 2d at 803. Smith claims that counsel's admission during the postconviction hearing that he "should have looked harder" for mitigating evidence indicates deficient representation. *Smith III*, 931 So. 2d at 803. Smith also claims that if counsel presented during the penalty phase the above facts about his childhood, the aggravating factors would have been "knocked out." *Id.* at 804. The Florida Supreme Court found, however,

> that witnesses, including Smith, testified on each of the subjects; thus, any additional evidence would have been cumulative. Other facts not presented, such as Smith's recent breakup with his girlfriend at the time of the murder, would have carried little, if any, weight. Finally, defense counsel testified that he specifically decided not to use the negative report of his mental health expert because it contradicted his strategy for presenting a positive picture of Smith. This was a strategic decision.

*Id.* (citing *Occhicone v. State*, 768 So. 2d 1037, 1048 (2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.")). The Florida Supreme Court accordingly affirmed the postconviction court's denial of relief on that issue. *Id.*

Smith contests the postconviction court's ruling because counsel stated that presenting the mitigating evidence about Smith's life in New Jersey would not have been inconsistent with his strategy. Counsel testified, "The strategy would have been to try to present to the jury a full picture of what Derrick Smith was and could be in a sense." (App. D28/5014). Counsel was asked:

31

Q.      Okay.  And as a lawyer who is arguing for a particular recommendation, the picture that you painted to the jury was one that was devoid of anything that the jury back in 1990 maybe might perceive as being very bad?  And I'm just going to give you one example.  Any type of drug uses, drug binge, just crazed out on drugs; correct?  That would have been inconsistent with the picture that you painted for this particular jury?

A.      No[,] not necessarily.  Again, I was not trying to convince the jury that he was and always had been a good guy in the sense that society would define that term.  I mean a good, God-fearing, law-abiding person, I don't think I was going to be able to convince them of that.

I'm in a bit of a vacuum here, because I don't know what type of drug binge evidence we're talking about, but it would have been–could have been, depending on exactly what type of evidence there was, it could have been quite consistent with the position I was trying to argue in the penalty phase, that he had gotten involved in–well, some type of a drug binge-type thing.

(App. D28/4993-94).

Counsel's response is unsurprising because Smith did not tell counsel that he had been on a drug binge at the time of the murder.  (App. D28/4979-81).  Although Smith testified during the penalty phase that he began "smoking dope" at age thirteen or fourteen and did cocaine on a "fairly regular basis" at age nineteen, he said nothing about a binge just before the murder.  (App. B9/1444-45).  Counsel's strategy was to raise the *possibility* that Smith was on a drug binge. That strategy involved presenting Smith in a positive light.  From there, counsel could emphasize the contrast between Smith's otherwise nonaggressive attributes and his aggressive, murderous intent to kill the driver.  Counsel could then suggest that Smith was on a drug binge when Smith murdered Songer.  The Florida Supreme Court's rejection of Smith's *Strickland* claim as to defense counsel's use of drug use mitigation evidence was not unreasonable.  Ground Three does not warrant federal habeas relief.

32

## Ground Four: Ineffective Assistance of Appellate Counsel

### *Presentation of Allegedly Unreliable Scientific Evidence*

The trial court admitted, over defense counsel's objections, allegedly unreliable scientific evidence provided by FBI expert witnesses Robert Sibert, Roger Asbery, and Donald Havekost. Smith claims that appellate counsel should have argued that the trial court erred by not conducting adequate *Frye* inquiries into the experts' scientific evidence. *Smith III*, 931 So. 2d 790, 806 n.10 (Fla. 2006) (noting that "[u]nder Florida law, courts conduct a *Frye* hearing to determine whether expert scientific opinion evidence is admissible").

*Frye* requires that the proponent of the scientific evidence prove that the underlying principle, theory, or methodology is generally accepted by the relevant scientific community. *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923) (holding that to "admit[] expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs"). Smith argues that the trial court's admission of the three experts' testimony was not harmless error because the State failed to find the murder weapon or a spent bullet that could be directly connected to him. He further argues that the only way that the State could have tied him to Cone's gun, the alleged murder weapon, was through the experts' testimony.

Robert Sibert was tendered as an expert in firearms identification. Sibert testified that if bullets were placed in the pocket of someone's clothing, lead from those bullets could rub off on the clothing and later be detected. (App. B6/935). He said that he conducted chemical tests on the pockets of Smith's jeans to determine whether lead was present on them. (App. B6/935-36).

33

When the prosecutor asked Sibert to explain the results of the tests, defense counsel objected, "[H]e's been qualified as a firearms identification expert.  There's been no showing he's a chemist, no showing he's qualified to perform these tests.  There's been no showing these tests are reliable to measure what it is he's supposed to be measuring."  (App. B6/936).  The prosecutor replied, "[W]hen he was initially tendered as an expert, he explained the firearm identification, including other things, to determine the presence of lead gunpowder dealing with component qualifications."  (App. B6/936).  The court overruled the objection, but allowed the defense a continuing objection to Sibert's testimony.  (App. B6/936).

Sibert testified that the test he performed on Smith's jeans was accepted as reliable in the scientific community and that he was trained in how to perform that test.  (App. B6/937).  He testified that he found "indication of the presence of lead in the two front pockets, and there was a stronger concentration in the left front pocket."  (App. B6/937).  Then he was shown State's Exhibit 17, which contained two bullets originally found in a box belonging to Smith's uncle, Roy Cone.  (App. B6/937).  Sibert testified that the lead from those bullets could have left the lead residue in Smith's pockets because "[a]ny source of lead could have been transferred by rubbing, physical contact with the interior of those pockets . . . ." (App. B6/938).  Sibert also testified that the positive test for lead in Smith's pockets would be consistent with those bullets being placed in those pockets.  (App. B6/938).  He admitted on cross examination that his test did not reveal where the lead came from or how long it had been in there.  (App. B6/940-41).

Roger Asbery testified as an expert in neutron activation analysis.  Asbery testified that he used neutron activation analysis to compare the chemical composition of State Exhibit 11, a fragment of lead found in Songer, with the chemical composition of State Exhibit 17, the two

34

bullets taken from Cone's box.  (App. B6/1040-41).  Asbery testified that the instruments he used to compare the samples of lead were in good working order, that he used the instruments properly, and that he used the proper procedures to perform the test.  (App. B6/1042).

Defense counsel objected to Asbery's testimony, arguing that the State had not shown that the instruments Asbery used "were in proper working order or properly maintained."  (App. B6/1042-43).  Defense counsel argued that Asbery simply concluded that the instruments were working properly without providing any basis for that conclusion.  The court overruled the objection, finding that a  "sufficient predicate" had been laid for the introduction of Asbery's testimony  (App. B6/1043).

Asbery then testified that he "found that [State Exhibits 11 and 17] matched in composition."  (App. B6/1043).  They "were so close that [he] could not distinguish between them."  (App. B6/1044).  Asbery concluded that the "close compositional association" would be consistent with bullets coming from the same box.  (App. B6/1045).

When Asbery was cross examined, he testified that part of his analysis required using a nuclear reactor located in Gaithersburg, Maryland.  (App. B6/1047).  He testified that he lacked personal knowledge that the nuclear reactor was working properly, as he was not the person who maintained the machine.  (App. B6/1048).  Defense counsel renewed his objection to Asbery's testimony and moved to strike it because the State had not shown that the nuclear reactor was in working order.  (App. B6/1052).  The court overruled the objection: "[S]ince the agent is not knowing [sic] at this point, I will assume that the reactor was working . . . .We'd reach a point where we have to accept it."  (App. B6/1052).

35

Over defense counsel's objection that the State had not sufficiently established his expertise (App. B6/1065), Donald Havekost testified (1) that inductively coupled plasma analysis is generally accepted in the scientific community; (2) that the instruments used for the analysis are reliable; (3) that the machine he used was working properly; and (4) that he followed proper procedures in conducting the analysis.  (App. B6/1070-71).  His testimony confirmed Asbery's conclusion that there was no difference in the chemical composition of State's Exhibits 11 and 17. (App. B6/1071).

Trial counsel did not object to the experts' testimony based on *Frye* because counsel did not raise at any point an inquiry into the "general acceptance" of any technique employed.  *Frye*, 293 F. at 1014; *see also Smith III*, 931 So. 2d at 806.   Instead, trial counsel objected to (1) Sibert's *competence* to testify about the lead content in Smith's jeans (App. B6/936); (2) Asbery's *lack of knowledge* as to whether the nuclear reactor in Maryland was working properly (App. B6/1042-43); and (3) the extent of Havekost's *expertise* (App. B6/1065).  Since trial counsel did not preserve for review any *Frye* claims, they are procedurally barred for appeal under Florida law.  *Washington v. State*, 835 So. 2d 1083, 1087 (Fla. 2002).  Appellate counsel is not ineffective for failing to raise unpreserved claims.  *Diaz v. Sec'y for the Dep't of Corr.*, 402 F.3d 1136, 1142 (11th Cir. 2005) ("Under Florida law, an error that passed without objection cannot be raised on appeal.").  *See also Rutherford v. Moore*, 774 So. 2d 637, 643 (Fla. 2000).

### Preclusion on Presenting Alibi Witnesses

Smith claims that appellate counsel should have argued on appeal that the state trial court committed reversible error by precluding the defense from presenting Campbell and Hawkins as alibi witnesses.  *Smith III*, 931 So. 2d at 802.  Smith argues that the trial court committed

reversible error because Campbell and Hawkins' testimony that they saw Smith outside of

Norm's Bar after 12:30 A.M. on the day of Songer's murder would have been more than

"plausibly relevant to the defense." *Coxwell v. State*, 361 So. 2d 148, 152 (Fla. 1978) (holding

that a trial judge may commit reversible error by curtailing "inquir[y] [into] key prosecution

witness regarding matters [that] are both germane to that witness' testimony on direct

examination and plausibly relevant to the defense").

Smith's claim is meritless because Smith has no due process right to have defense

"counsel . . . assist[] [him] in presenting false evidence." *Nix v. Whiteside*, 475 U.S. 157, 166

(1986).  Before Smith's second trial, defense counsel filed a pre-trial motion to withdraw because

Smith wanted counsel "to []present testimony that counsel believe[d] to be perjurious." (App.

B1/86).  The state trial court then had Smith and defense counsel separately submit sealed

versions of their discussions about Campbell and Hawkins testifying as alibi witnesses.  Defense

counsel's version of the alibi discussions with Smith was later unsealed and revealed that Smith

admitted to counsel that Campbell and Hawkins were lying.  *Smith III*, 931 So. 2d at 807.

"[A]ppellate counsel cannot be ineffective for failing to raise a meritless claim." *Sweet v. Moore*,

822 So. 2d 1269, 1274 (Fla. 2002).

### *Smith's Involuntary Absences*

Smith claims that appellate counsel rendered ineffective assistance by failing to raise as

fundamental error Smith's involuntary absences in two proceedings: (1) a portion of a hearing on

the defense's pre-trial motions (App. B2/248-60) and (2) an in-chambers discussion of seating

arrangements in the courtroom.  (App. B5/75).  A criminal defendant has the Sixth Amendment

right to be present at "proceedings that constitute *critical stages* of the trial." *Proffitt v. Wainwright*, 685 F.2d 1227, 1252 (11th Cir. 1982) (emphasis added). "[T]he right 'does not confer upon the defendant the right to be present at every conference at which a matter pertinent to the case is discussed, or even at every conference with the trial judge at which a matter relative to the case is discussed.'" *Orme v. State*, 896 So. 2d 725, 738 (Fla. 2005) (citing *United States v. Vasquez*, 732 F.2d 846, 848 (11th Cir. 1984)). Since Smith failed to object to his involuntary absences, the issue is unpreserved for appeal. *Diaz*, 402 F.3d at 1142. Even if Smith's claims were properly preserved for appeal, the claims are meritless because Smith was not involuntarily absent from "critical stages of the trial." *Proffitt*, 685 F.2d at 1252.

<u>Hearing on Pre-trial Motions</u>

Smith was absent from part of the hearing on the defense's pre-trial motions in the second trial. Smith was absent from the parties' arguments on the defense's motion in limine regarding alleged *Miranda*[5] violations, which the trial court resolved Smith's favor. (App. B2/250). Smith was also absent when the parties began to discuss *Williams* rule evidence[6] concerning a motel robbery that Smith committed shortly after the murder. (App. B2/250). Smith was, however, brought into the courtroom while the prosecutor was away from the courtroom to get case law. (App. B2/260). Smith was present when the parties resumed their discussion and when the court ruled on the *Williams* evidence. He remained present for the rest of the pre-trial hearing.

---

[5]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[6]*Williams v. State*, 110 So. 2d 654 (Fla. 1959) (holding that evidence of collateral crimes is admissible if it does not go to prove the defendant's bad character or propensity, but is used to show motive, intent, knowledge, modus operandi, or lack of mistake).

<u>In-chambers Discussion of Seating Arrangements</u>

Smith was absent when the court held an in-chambers discussion of the seating arrangements in the courtroom.  Smith "want[ed] to sit where the prosecution [was] sitting . . . so [he could] stare down the witnesses."  (App. B5/725).  The trial court announced, "We will be happy to slide your [defense] table further–closer to the rail, if you wish, so [Smith] may see at a better angle.  But once people take tables, that's where they stay through the course of the trial." (App. B5/726).

Neither of these two proceedings is a critical stage of Smith's trial.  Ground Four does not warrant federal habeas relief.

## Ground Five: *Faretta* Claim

Smith claims that the trial court violated his constitutional right to self-representation by failing to inquire into the basis of his request to discharge Richard Sanders, his court-appointed retrial counsel.  *Faretta v. California*, 422 U.S. 806 (1975).  Smith's *Faretta* claim is meritless. Smith did not, at any time, attempt to represent himself at trial.  However, when the accused moves to discharge his court-appointed counsel, claiming ineffective assistance,

> the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the court should make a finding to that effect on the record and appoint a substitute attorney who should be allowed adequate time to prepare the defense. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute.

*Hardwick* v. State, 521 So. 2d 1071, 1074-75 (Fla. 1988) (citation omitted).  *Hardwick* further holds:

> when one such as appellant attempts to dismiss his court-appointed
> counsel, it is presumed that he is exercising his right to self-
> representation.  However, it nevertheless is incumbent upon the court
> to determine whether the accused is knowingly and intelligently waiving
> his right to court-appointed counsel, and the court commits reversible
> error if it fails to do so.  This particularly is true where . . . . the accused
> indicates that his actual desire is to obtain different court-appointed
> counsel, which is not his constitutional right.

*Id.* at 1074 (citations omitted).

But before a Florida court "determine[s] whether the accused is knowingly and

intelligently waiving his right to court-appointed counsel," *id.*, the accused must provide "a clear

and unequivocal statement . . . that he wishes to discharge counsel."  *Logan v. State*, 846 So. 2d

472, 477 (Fla. 2003).  *See also Faretta*, 422 U.S. at 835.  "[A] trial court does not err in failing to

conduct a[n] . . . inquiry where the defendant makes such general complaints and is not clearly

alleging [attorney] incompetence."  *Logan*, 846 So. 2d at 478.

Florida law determines whether a Florida trial court has complied with state procedures

relating to a motion to discharge appointed counsel.  Federal habeas relief is available to correct

only constitutional injury.  *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1981) ("'mere error of state

law' is not a denial of due process") (citation omitted).  That limitation on federal habeas review

applies equally when a petition that actually involves state issues of law is couched in terms of

due process.  *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Carrizales v.

Wainwright*, 699 F.2d 1053, 1054-55 (11th Cir. 1983).

### *Violation of State Law*

Smith argues that the state courts' conclusion that Smith did not question defense

counsel's competence, *Smith II*, 641 So. 2d at 1321, is rebutted by clear and convincing

evidence.  Counsel moved to withdraw during the course of the case because Smith wanted to

40

present testimony that counsel believed to be false.  (App. B1/86).  The court heard and denied

counsel's motion on November 6, 1989, about six months before the second trial began.  (App.

B1/95; B2/351, 358-59).  Smith attended the hearing, but did not address the court.  Nor did the

court or counsel direct any inquiry to Smith.  (App. B2/353-63).

      After the hearing, Smith wrote a letter to the court:

> Dear Judge Luten,
>
>     I don't know how to file legal motions so all I can do is
> address you in a manner that I do and that's straightforward.  Today
> you denied a motion which my lawyer filed to withdraw from my case.
> I can't understand all that was said but I do know that something
> isn't quite right. Richard Sanders and myself don't see eye-to-eye
> on many matters pertaining to this case.  He used as a reason for
> withdrawing our different views on the matter of 2 witnesses.
> Judge Luten the state has offered a plea bargain that if I don't
> except [sic] will leave me in the position of going back on
> "Death Row" if found guilty.  I know it's not justice to be threatened
> with dying on the strength that I choose to exercise my right to go to
> trial and not agree to a plea bargain that's not really feasible.
>
>     I wrote to you in March of this year explaining my discomfort
> with Richard Sanders representing me, that uneasiness has only
> greatened. I'm on trial for my life and I feel it's only right that I be
> afforded the opportunity to be able to fight on equal terms. What
> I'm saying is Glen Martin and Mary McKeown [the prosecutors]
> are experienced trial lawyers.  Richard Sanders told me my case
> was the first murder case he's handled, he's outclassed and it shows
> more and more as time passes.  I don't want Richard Sanders
> representing me on this particular case and it's obvious that he
> and I have a conflict of interest.  I relayed to you in my earlier letter
> that I don't want to be like a lamb lead [sic] to slaughter and that's
> how I feel with Richard Sanders representing me.  I feel that a trial
> with him representing me is a mere formality.  I ask that you reconsider
> your decision to deny his motion to withdraw.  Thank-you!

(App. B1/92-93).  The trial court replied to Smith:

> Please be advised that I am unable to be of any assistance to you
> regarding the above-mentioned case.  Any, and all, correspondence

> to me must be done through your attorney, and a copy of your letter,
> along with a copy of my response, is being sent to him.

(App. B1/94).

Smith argues that his statement "I don't want Richard Sanders representing me" was an unequivocal request for discharge. His argument has already been rejected by the Florida Supreme Court, which found that "Smith's statements [could] be best characterized as generalized complaints that are simply insufficient to warrant any inquiry." *Smith III*, 931 So. 2d at 804 (citation omitted). Although Smith asked the court to "reconsider [its] decision to deny [counsel's] motion to withdraw" (App. B1/93), he did not "clearly and unequivocally declare[] to the trial judge that he wanted to represent himself and did not want counsel." *Faretta*, 422 U.S. at 835. Since "Smith's letter did not contain an explicit assertion of his right to self-representation, . . . a *Faretta* inquiry was not required." *Smith II*, 641 So. 2d at 1320-21.

*Violation of Federal Law*

Smith claims that he was "denied his constitutional right of meaningful access to the courts" because the trial court directed him "to submit his request [for discharge] to the same attorney he wanted discharged." (Dkt. 12 at 43). *See Bounds v. Smith*, 430 U.S. 817, 817-18 (1977) (reaffirming *Younger v. Gilmore*, 404 U.S. 15 (1971)), which held that the Constitution requires the States to protect the right of prisoners to access law libraries and other sources of legal information)). Smith's meaningful access sub-claim under *Bounds* was never raised in state court. Accordingly, the *Bounds* claim is procedurally barred. *Atwater*, 451 F.3d at 810. Ground Five does not warrant habeas relief.

**Ground Six: Error of Fact on Direct Appeal**

42

Smith disputes the Florida Supreme Court's conclusion that he "expressed dissatisfaction with [trial counsel], but did not question his competence." *Smith II*, 641 So. 2d at 1321. He also argues that appellate counsel was ineffective to the extent that this issue was not adequately presented on direct appeal.

Smith alleges that his November 6, 1989 letter (*see* in Ground Five, *supra*, at 41-42) was not the only letter he wrote to the state trial court about his dissatisfaction with trial counsel. The November 1989 letter references a letter that Smith previously wrote to the judge: "I wrote to you in March of this year explaining my discomfort with Richard Sanders representing me." (App. B1/92).

Smith's March letter was dated March 23, 1989, although he likely did not finish and mail the letter until May 1989. In the March 1989 letter, Smith wrote:

> Dear Judge Luten,
>
> I'm in despair over the events that are occurring in my case which is a capital offense on re-trial. The situation has me so distaught [sic] that I'm using my last resort in writing to you, the presiding judge, with the elated hope that your intervention will get those involved to realize that a life is at stake and the situation is very SERIOUS!
>
> Ma'am I'm not highly educated neither do I profess a profound knowledge of law's intricate workings. But I do have common sense and I know that something isn't quite right with the way my present attorney, Mr. Richard Sanders, is handling my defense. Personally, he's one of the best human beings I've ever encountered and will probably evolve into a splendid attorney but it bothers me that he's "cutting his teeth" on my case. By his admission he has not previously handled a murder case.
>
> Ma'am I'm scheduled to go to trial July 11, 1989 for my life. That's less than 2 months from now and I'm 300 miles plus away from those that are representing me. On or about March 15, 1989, my aunt contacted Mr. Sanders inquiring as to the lack of communication

> between us.  I myself contacted Mr. Sanders by way of mail requesting
> that a motion be filed for a court order getting me transported to
> Pinellas County . . . . I wrote to Mr. Sanders again on May 14, 1989
> to no avail.  By [sic] not being able to communicate with my lawyer is in
> violation of the due process clause in the Constitution . . . . My
> correspondence goes unanswered and the state prison doesn't allow
> phone calls.  This isn't the effective assistance of counsel the law
> entitles me to.
>
> Judge Luten, I don't mean to sound obnoxious . . . . I don't
> feel Mr. Sanders is being very diligently [sic] in matters concerning
> my case which is in essence my life . . . . This letter is an objection
> to the representation I've had thus far in my legal battle . . . .

(Attachment A to state habeas petition, *Smith v. State*, Fla. Sup. Ct. Case # SC05-100).  Smith

contends that the Florida Supreme Court's decision was based on an error of fact because the

newly found letter renders the appellate record incomplete.  *Smith III*, 931 So. 2d at 804.

The Florida Supreme Court found, however, that "[a]ny claim regarding this newly

discovered letter is separate from the issue of the November 1989 letter and has no effect on [the

court's] holding regarding [that November 1989 letter]."  *Id.*  And because the newly found letter

of March 1989 was not properly preserved as a claim during the trial court proceedings, the

claim is procedurally barred from consideration now.  *See Rutherford v. Moore*, 774 So. 2d 637,

643 (Fla. 2000).  "[A]ppellate counsel cannot be deemed ineffective for failing to raise [this

claim] on appeal."  *Smith III*, 931 So. 2d at 804 (citing *Rutherford*, 774 So. 2d at 643).

Finally, the Florida Supreme Court properly concluded that even if the newly found letter

of March 1989 were genuine, Smith's claim should be denied.  *Id.* (citing *Logan v. State*, 846,

So. 2d 472, 477 (Fla. 2003)).  The March 1989 letter is similar to the November 1989 letter to

the extent that it expresses Smith's *general* "dissatisfaction with his attorney."  *Logan*, 846 So.

2d at 477.  The March 1989 letter fails to provide "a clear and unequivocal statement . . . that

44

[Smith] wishe[d] to discharge counsel," *id.*, or "that he wanted to represent himself." *Faretta*, 422 U.S. at 835.  Ground Six does not merit habeas relief.

### Ground Seven: Confrontation Clause Violation

Smith claims that the trial court violated his right to cross-examine state witness Melvin Jones, and that the State concealed Jones' "deal" about his sentencing.  Smith contends that the Florida Supreme Court's finding that "defense counsel did get to cross-examine [Jones] about his negotiations with the State and that the proffer of the testimony about the Clinton Jackson murder trial[7] was not relevant to Smith's trial," is objectively unreasonable.  *Smith II*, 641 So. 2d at 1322.  Smith further contends "that the cross-examination that was permitted defense counsel was [in]adequate to develop the issue of bias properly to the jury."  *Davis v. Alaska*, 415 U.S. 308, 318 (1974).

"The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'  This right is secured for defendants in state as well as federal criminal proceedings . . . .  Confrontation means more than being allowed to confront the witness physically.  'Our cases construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination.'"  *Id.* at 315 (internal citations omitted).

Jones was a crucial witness in Smith's trial because he was one of the two purported eyewitnesses to the shooting.  Jones testified on cross examination, that after his arrest on

---

[7]*See* Ground Eight, *infra*, at 49-53.

other charges, he wrote to the State Attorney and Public Defender, telling them what he saw on the day of the murder.  (App. B6/992).  He denied that he sought any personal benefit in writing to them.  (App. B6/992).  Yet, he admitted on cross-examination that he was facing seventeen or eighteen felony charges for which he "did" only three years.  (App. B6/998).  When defense counsel asked him how much time he actually served, the prosecutor objected.  The court sustained the objection.  Then Jones admitted that the prosecutor testified on his behalf at his sentencing, but Jones continued to deny that he got a break on his sentence:

> Q.   And you did, in fact, get a break on your sentence as a result of the State Attorney's actions, is that correct?
>
> A.   Well, from my side, I don't think so, but you can say so.

(App. B6/1000).

Defense counsel next asked Jones whether he had testified for the State in another murder case.  (App. B6/1000).  After the prosecutor objected to the question, the attorneys approached the bench for a sidebar.  Defense counsel explained at sidebar that Jones testified as a state witness in Clinton Jackson's murder case and that Jones had more pending charges at that time. Defense counsel argued that information about the charges pending against Jones when Jones testified against Jackson was relevant to Jones' credibility and to his claim that he did not expect any benefit from testifying against Smith at the second trial.  (App. B6/1000-01).

The prosecutor responded at sidebar, "Your Honor, he was sentenced after he testified in [the] Smith and Clinton Jackson [trials]. So whatever deal he got was based on both."  (App. B6/1001).  The trial court prohibited defense counsel's question of whether Jones testified at Jackson's murder trial and directed defense counsel to proffer the testimony.  (App. B6/1001).

After the sidebar, defense counsel resumed his cross-examination of Jones and elicited Jones' admission that he provided an inaccurate account of what he had seen when Songer was shot.  (App. B6/1002-05).  On redirect examination, the prosecutor elicited Jones' testimony that Jones wrote to the State Attorney because he heard a rumor that Smith was trying to put all the blame on Johnson–something that Jones considered "totally wrong."  (App. B6/1008).

Later, defense counsel proffered Jones' testimony about his role as a witness in Jackson's murder trial in 1984.  The proffer included the following information:  Jones and Jackson were coworkers when Jackson told Jones that he was going to rob a hardware store.  Jones said that he saw Jackson going toward the store and then coming away from it when the shooting occurred.  (App. B6/1053-56).  Jones claimed that he could not remember whether he had any pending charges or probation violations when he testified against Jackson, but he admitted that it was possible.  (App. B6/1056).

The trial court's refusal to allow cross-examination of Jones about his testimony in the Jackson case did not violate Smith's Sixth Amendment rights.  Defense counsel questioned Jones during the proffer on facts of which counsel was well aware because counsel handled Jackson's appeal:

> Q.   I know you testified at Clinton's trial, didn't you?
>
> A.   I don't remember that.  I don't know if I did or didn't.  I know one of them I didn't know, I know.
>
> Q.   You did testify at Clinton's.  You may not have testified at Nathaniel's, but I know you testified at Clinton's because I did the appeal.
>
> A.   I could have.

> Q.      Okay.  Well, are you willing to accept my statement that you did, in fact, testify at Clinton's trial?
>
> A.      Yes, I am.
>
> Q.      To what–to basically what you testified to what I testified to?
>
> A.      Yes.

(App. B6/1055-56).

Furthermore, the record of Smith's second trial shows that Jones was sentenced after testifying at both Smith's first trial in 1983 and Jackson's trial in 1984.  (App. B6/991-93, 997-1001, 1053-61).  The record also shows that defense counsel recalled reviewing Jones' court file before the second trial began.   (App. D27/4942).  Extensive cross-examination revealed that Jones had contact with law enforcement and the State Attorney's office before he testified at Smith's first trial.  (App. B6/991-993, 997-1000, 1002-06).  Thus, the jury in Smith's retrial had the opportunity to hear about the "deal" Jones received and to consider that as a factor in determining Jones' credibility.  Smith's claim that the trial court violated his right to cross-examine Jones is meritless.  Ground Seven does not warrant habeas relief.

### Ground Eight: Failure to Disclose Pertinent Facts

Smith claims that the State failed to disclose pertinent facts that were necessary to the Florida Supreme Court's consideration of the issues he raised on direct appeal.  He argues that because the Florida Supreme Court did not consider those alleged facts, his direct appeal did not comport with the Sixth, Eighth, and Fourteenth Amendments.

Smith's three claims in Ground Eight were expressly found procedurally barred in state court. *Smith III*, 931 So. 2d at 805-06.  But even if they were not procedurally barred, they are meritless.

<u>*Richardson* Violation</u>

Smith claims that the trial court erred by failing to conduct an adequate *Richardson* inquiry into the prejudicial effect of the State's failure to disclose the felony judgments that the State intended to use against Larry Martin, the defense's only witness during the guilt phase. *Richardson v. State*, 246 So. 2d 771, 772 (Fla. 1971) ("requir[ing]  the prosecution, upon written request filed in the cause by the defendant, to furnish to the defendant a list of all witnesses known to the prosecuting attorney to have information which may be relevant to the offense charged, and to any defense of the person charged with respect thereto").  Martin testified that Johnson told him that "Smith was not the individual that did the shooting."  (App. B7/1258).  He was asked on direct examination how many times he had been convicted of a felony.  He replied, "A couple times, I think.  I'm not sure."  (App. B7/1260).

The prosecutor requested a sidebar and informed the judge that Martin had eight felony convictions and that the State intended to use those convictions for impeachment.  (App. B7/1260-61).  Defense counsel objected, asserting that he had not been informed about the prosecutor's intended use of Martin's convictions.  The court overruled defense counsel's objection and allowed the State to proceed.  (App. B7/1261).

Smith claims that if the State had disclosed in discovery the judgments against Martin, defense counsel could have prepared Martin to testify accurately as to how many felony

convictions Martin actually had.  Instead, the prosecutor impeached Martin and elicited Martin's admission to eight prior felony convictions.  (App. B7/1265-66).

"The defense has the initial burden of trying to discover impeachment evidence, and the state is not required to prepare the defense's case.  This is especially true when the evidence is as accessible to the defense as to the state." *Hansbrough v. State*, 509 So. 2d 1081, 1084 (Fla. 1987).  Smith submits that *Banks v. Dretke*, 540 U.S. 668 (2004), rejected the Florida Supreme Court's reasoning in *Hansbrough. Banks* holds that "[w]hen police or prosecutors *conceal* significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." *Id.* at 675 (emphasis added).

The *Richardson* claim is not subject to this Court's review because Smith raised it on direct appeal as a matter of state law.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).  To the extent that Smith has raised a federal question, the *Banks* claim has not yet been "fairly presented" in state court.  *Baldwin v. Reese*, 541 U.S. 27, 30 (2004) (finding that a state inmate's claim of ineffective assistance did not exhaust the federal issue of adequate counsel when the federal nature of the claim was not apparent from the face of the state court pleading).

Nevertheless, the Florida Supreme Court distinguished *Smith III* from *Banks*.  Smith's "defense counsel knew Martin had prior convictions; he just did not know how many." *Smith III*, 931 So. 2d at 806 n.9.  Smith has "never contended that the information about [Martin] was not readily available to him." *Id.* at 806.  Martin's information was, in fact, "a matter of public record," so "the State did not 'conceal' Martin's prior convictions." *Id.  See also Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2005) ("Our case law is clear that 'where defendants, prior to trial, had within their knowledge the information by which they

50

could have ascertained the alleged *Brady* material, there is no suppression by the government.'") (citation omitted). Thus, Smith's *Richardson* claim is meritless.

*Evidence of Robbery After the Murder*

Smith also claims that the trial court erred by admitting, over defense counsel's objection, evidence of a robbery Smith committed nearly twelve hours after the murder. Smith argues that the admission of evidence of the robbery was unfairly prejudicial because the robbery charge was relevant only to show his bad character and propensity. (App. B1/40-42, 63; App. B2/251-52, 262-67, 389; App. B7/1191-93).

Under Florida law,

> Evidence of "other crimes" is not limited to other crimes with similar facts. So-called similar fact crimes are merely a special application of the general rule that all relevant evidence is admissible unless specifically excluded by a rule of evidence. The requirement that similar fact crimes contain similar facts to the charged crime is based on the requirement to show relevancy. This does not bar the introduction of evidence of other crimes which are factually dissimilar to the charged crime if the evidence of other crimes is relevant.

*Bryan v. State*, 533 So. 2d 744, 746 (Fla. 1988) (citation omitted). "Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity." FLA. STAT. § 90.404(2) (a).

The court instructed the jury to consider the evidence of the robbery to the extent that the evidence was "relevant to proving Smith's motive to obtain money and to proving that he possessed the same gun in both offenses." *Smith II*, 641 So. 2d at 1322. The court's limiting

instruction was consistent with the permissible uses of "evidence of other crimes" under Florida

law.  FLA. STAT. § 90.404(2)(a).  Thus, Smith's claim is meritless.

*Limited Cross Examination*

Smith challenged on direct appeal the state trial court's limitation of his cross-

examination of Melvin Jones.[8]  The record is clear, however, that defense counsel had an

adequate opportunity to cross-examine him:

> [Jones] testified that he saw Smith shoot the cab driver.
> He further acknowledged that he had twenty-four prior felonies.
> On cross-examination, Jones testified that after he was arrested
> on outstanding warrants for various offenses, he wrote to the State
> Attorney and the Public Defender about who shot the cab driver.
> Jones testified that he did not receive a deal for his testimony,
> but that the prosecutor testified for him at sentencing.  Jones said
> he did not think the prosecutor's testimony had helped very much.
> The record reveals that defense counsel had adequate opportunity
> to cross-examine Jones about the prosecutor testifying for him.
>
> Smith's attorney also tried to cross-examine Jones about his
> testimony in another murder case.  Upon objection by the State, the
> trial court directed defense counsel to proffer the testimony he sought
> to introduce.  On the proffer, Jones testified that he was a State witness
> in the trial of Clinton Jackson for the robbery and murder of a hardware
> store owner. Jones and Jackson were working together when Jackson told
> him he was going to rob the store.  Jones also saw Jackson go toward the
> store and then come away from it at the time of the shooting.  Jones
> testified that he could not remember if he had any charges or violations of
> probation pending when he testified against Jackson, but that it was
> possible.  After Jackson's conviction was reversed on appeal, Jones
> refused to respond to a subpoena to testify at Jackson's retrial.  Jones
> testified that he did not know whether there were any pending
> charges or warrants against him at that time.
>
> It is clear from the proffer that testimony about the Jackson
> trial was not relevant to Smith's trial. The trial court correctly sustained
> objection to the testimony. The record also clearly reflects that defense
> counsel had adequate opportunity and did cross-examine Jones about
> any negotiations with the State as to his testimony in Smith's trial.
> The trial court did not err. In any case, any error would have been
> harmless beyond a reasonable doubt.

[8]*See* Ground Seven, *supra*, at 45-49.

*Smith II*, 641 So. 2d at 1322 (citation omitted).  Ground Eight does not warrant federal habeas relief.

### Ground Nine: *Ring* Claim

Smith claims that Florida's death penalty sentencing scheme violates *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (holding that the Sixth Amendment requires "the jury to find an aggravating circumstance necessary for imposition of the death penalty").  He raised this claim in his state petition for writ of habeas corpus, which the Florida Supreme Court denied.  *Smith III*, 931 So. 2d at 807.

The Florida Supreme Court has rejected numerous *Ring* challenges, consistently finding that Florida's sentencing scheme comports with the Sixth Amendment.  *See*, *e.g.*, *Bottoson v. Moore*, 833 So. 2d 693 (Fla.), *cert. denied*, 537 U.S. 1070 (2002); *King v. Moore*, 831 So. 2d 143 (Fla.), *cert. denied*, 537 U.S. 1067 (2002); *Kormondy v. State*, 845 So. 2d 41, 54 (Fla. 2003) (noting that *Ring* does not encompass Florida procedures or require either notice of the aggravating factors that the State will present at sentencing or a special verdict form indicating the aggravating factors found by the jury).

Smith's reliance on *Ring* is barred by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989).  *See Schriro v. Summerlin*, 542 U.S. 348 (2004) (holding that *Ring*, which extended application of *Apprendi v. New Jersey*, 530 U.S. 446 (2000), to facts increasing a defendant's sentence from life imprisonment to death, is not retroactive to cases on collateral review).  *See also Sibley v. Culliver*, 377 F.3d 1196, 1207-1208 (11th Cir. 2004) (rejecting habeas petitioner's *Ring* claim "out of hand" and reiterating that, under "*Summerlin*, a petitioner may not appeal a conviction or bring a habeas attack based on *Ring* violations that occurred

before *Ring* was handed down"); *Johnson v. State*, 904 So. 2d 400, 412 (Fla. 2005) (holding

"that *Ring* does not apply retroactively in Florida").  Ground Nine does not warrant federal

habeas relief.

### MOTIONS TO AMEND PETITION AND TO HOLD PROCEEDINGS IN ABEYANCE DENIED

On July 9, 2007, Smith filed two motions before this Court.  First, Smith moved for leave

to amend his petition.  (Dkt. 33).  He seeks to add the claim that, in light of Angel Diaz's

execution on December 13, 2006, Florida's lethal injection protocol violates the Eighth

Amendment's prohibition against cruel punishment.  (Dkt. 33).

Second, Smith moved to hold proceedings in abeyance.  (Dkt. 34).  He filed in the Circuit

Court for the Sixth Judicial Circuit, Pinellas County, Florida, a Rule 3.851 motion to vacate his

conviction and death sentence based on facts that could not have been discovered previously.

The state court is now considering Smith's Rule 3.851 motion on the following: (1) a new

*Brady*/*Giglio* claim involving Priscilla Walker's criminal history allegedly unknown previously

to the defense; (2) a new lethal injection claim; and (3) a new *Furman* claim predicated on an

American Bar Association report published last year.[9]  Smith requests that this Court stay the

present proceedings while he exhausts his federal constitutional claims in state court.  (Dkt. 34).

### Standards of Review

#### *Motion To Amend Federal Habeas Petition*

A federal habeas petitioner's motion to amend is governed by Federal Rule of Civil

Procedure 15(c) ("Relation Back of Amendments").  *See Mayle v. Felix*, 545 U.S. 644, 654-44

---

[9]*Furman v. Georgia*, 408 U.S. 238 (1972).

(2005) (applying Rule 15(c) to determine whether the request to the amend habeas petition

should be granted); *see also Pruitt v. United States*, 274 F.3d 1315, 1317 (11th Cir. 2001) (even

when the habeas petition was filed before AEDPA was enacted, the question whether leave to

amend should be granted is determined by applying Rule 15(c)).  An amendment "relates back"

to the date of the original pleading when "the claim or defense asserted in the amended pleading

arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the

original pleading." FED. R. CIV. P. 15(c)(2).  Rule 15(c) is not meant to be "so broad as to allow

an amended pleading to add an entirely new claim based on a different set of facts." *Dean v.*

*United States*, 278 F.3d 1218, 1221 (11th Cir. 2002).

### Motion To Hold Federal Habeas Proceedings in Abeyance

"[I]t likely would be an abuse of discretion for a district court to deny a stay and to

dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his

unexhausted claims are potentially meritorious, and there is no indication that the petitioner

engaged in intentionally dilatory litigation tactics.  In such circumstances, the district court

should stay, rather than dismiss, the mixed petition." *Rhines v. Weber*, 544 U.S. 269, 278

(2005).

## Discussion

### Eighth Amendment Claim

Smith claims that since he filed his federal habeas corpus petition on July 18, 2006, new

information has emerged that provide previously unknown factual bases for constitutional

challenges to his conviction and death sentence.  He cites several news reports of former Florida

death row inmate Angel Diaz's execution on December 13, 2006.  (Dkt. 3 at 2-7).  One of those

news reports indicates:

> Gov. Jeb Bush has once again suspended all executions
> in Florida after an autopsy showed needles tore through an inmate's
> veins Wednesday night, causing chemicals to severely burn his flesh.
>     Angel Diaz took 34 minutes to die, an unusually long time,
> because the drugs weren't circulating in his blood.
>     Corrections officials initially attributed Diaz's slow death to
> liver disease, but the preliminary autopsy results showed no outward
> signs of damage to the organ.
>     The problems prompted Bush to form a four-person team to
> investigate the execution.  On Friday, Bush ordered the assembly of
> a second team to study whether the lethal injection protocols used in
> Florida should be revised.

Chris Tisch, *Governor Bush Halts Executions*, ST. PETERSBURG TIMES, Dec. 16, 2006, at A1.

Smith claims that, in light of Diaz's execution, Florida's lethal injection protocol "is cruel within

the meaning of the Eight Amendment[10] because of the risk of wanton and unnecessary pain."

(Dkt. 33 at 14 ¶ 19).  Smith claims that he should be granted leave to add his Eighth Amendment

challenge to Florida's lethal injection statute because the factual basis for the challenge did not

yet exist when he filed his federal habeas petition on July 18, 2006.  Smith relies on *Panetti v.*

*Quarterman*, 127 S. Ct. 2842 (2007), to support his claim that he should be granted leave to

amend.  The *Panetti* Court found that "[p]rior findings of competency do not foreclose a prisoner

from proving he is incompetent to be executed because of his present mental condition."  *Id.* at

2848.  Smith claims that *Panetti* requires that he be granted leave to amend because he could not

---

[10]If Smith's Eighth Amendment challenge were successful, the challenge "would not
necessarily prevent the State from executing him by lethal injection."  *Hill v. McDonough*, 126 S.
Ct. 2096, 2102 (2006) (noting that challenges to the State's method of execution does not implicate
the propriety of the death sentence itself).

have raised his Eighth Amendment challenge to Florida's lethal injection statute until after Diaz's execution on December 13, 2006.

Smith's Eighth Amendment claim is entirely new and does not relate back to any other claim he has previously raised.  Additionally, Diaz's execution has been under investigation to determine whether the Department of Corrections properly followed existing procedures, *not* to reconsider the constitutionality of Florida's lethal injection protocol.  The constitutionality of Florida's lethal injection protocol is clearly established.  *See Diaz v. State*, 945 So. 2d 1136, 1144 (Fla. 2006); *Sims v. State*, 754 So. 2d 657 (Fla. 2000).  The protocol has been in effect for about seven years as of the date of this Order.  *See* FLA. STAT. § 922.105(1) (as amended by 2000 Fla. Sess. Law Serv. Ch. 00-2 (S.B. No. 10A § 2)).  *See also Sims,* 754 So. 2d at 663 n.11.  Smith's Eighth Amendment challenge to the State's protocol, raised for the first time in 2007, is neither "potentially meritorious,"[11] *Rhines,* 544 U.S. at 278, nor timely.  FLA. R. CRIM. P. 3.851(d)(1) ("Any motion to vacate judgment of conviction and sentence of death shall be filed by the prisoner within 1 year after the judgment and sentence become final.").  Smith's Eighth Amendment claim is meritless.

*Lightbourne*/*Suggs Claim*s

Smith supports his motion to hold proceedings in abeyance by pointing to the State's actions in two pending proceedings, *State v. Lightbourne*, Case No. 81-170-CF-A-01 (5th Jud. Cir. Marion County), and *Suggs v. McDonough*, 3:06-cv-111-RH/WCS.  In *Lightbourne*, the

---

[11]Because Smith's constitutional challenge is not "potentially meritorious," the Court need not determine whether Smith "had good cause for his failure to exhaust [his Eighth Amendment claim] or whether he engaged "in intentionally dilatory litigation tactics."  *Rhines*, 544 U.S. at 278.

State conceded that an evidentiary hearing was warranted on Petitioner's method-of-execution claim.  In *Suggs*, the State moved to hold in abeyance Petitioner's lethal injection claims.

Smith's reliance on these cases is misplaced.  Smith cannot credibly claim that he is entitled to an amendment and abeyance in this case simply because the State exercised a cautionary stance in *Lightbourne*.  And, unlike Suggs, Smith did not challenge Florida's lethal injection statute in his original habeas petition.  Smith's *Lightbourne* and *Suggs* claims are meritless.

### *Satisfaction of the Exhaustion Requirement*

None of Smith's new claims warrants granting his motion to hold his federal proceedings in abeyance.  *See Rhines*, 544 U.S. at 278.  Smith currently has claims pursuant to Rule 3.851 pending in state trial court.  If Smith receives an adverse ruling from the trial court, he may appeal that ruling to the Florida Supreme Court.  *See, e.g., Zeigler v. State*, ___ So. 2d ____, 2007 WL 1836942 (Fla. June 28, 2007).  Exhaustion requires that Smith first litigate his claims before the Florida Supreme Court.  The failure to argue a claim on postconviction appeal bars Smith from having it considered in a federal habeas petition. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Turner v. Crosby*, 339 F.3d 1247, 1281 (11th Cir. 2003).

### CONCLUSION

For the foregoing reasons, the Court orders that:

1.  Smith's petition for writ of habeas corpus is DENIED.

2.  Smith's motion to amend petition is DENIED.

3.  Smith's motion to hold proceedings in abeyance is DENIED.

58

4.  The Clerk shall enter judgment against Smith and close this case.

**CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED**

The Court further orders that Smith is not entitled to a certificate of appealability (COA). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue COA.  § 2253(c)(1).  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  § 2253(c)(2).  To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), "or that the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (citation omitted).  Smith has not made the requisite showing in these circumstances.  Because Smith is not entitled to a certificate of appealability, he is also not entitled to appeal in forma pauperis.

**DONE** and **ORDERED** in Chambers in Tampa, Florida this 7th day of August 2007.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record