UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DERRICK TYRONE SMITH,

               Petitioner,

v.                              Case No. 8:06-cv-1330-T-17MAP

SECRETARY, DEPARTMENT OF
CORRECTIONS,

               Respondent.

_____

<u>O R D E R</u>

      This cause is on remand from the United States Court of Appeals for the Eleventh Circuit. (See Doc. No. 59).

      Pursuant to the mandate, the district court must "conduct for those six claims [the six *Brady* claims enumerated at page 49 of the remand order and discussed in Part V.B. of the remand order] a cumulative prejudice analysis as required by the *Kyles* decision" [*Kyles v. Whitley*, 514 U.S. 419, 434] and the remand opinion.

**THE SIX BRADY CLAIMS ON REMAND**

      In *Smith v. Secretary, Dept. of Corrections*, 572 F.3d 1327, 1348 (11th Cir. 2009), the Eleventh Circuit summarized the six Brady claims on remand as follows:

      (1) Melvin Jones sought help from the prosecutor with the probation violation and grand theft charges against him;

      (2) Melvin Jones, fearing arrest, sought help from the prosecutor in regard to the sexual abuse allegations his daughter was making against him;

      (3) one or more police reports indicated that Melvin Jones had initially been

considered as a suspect in 1983;

(4) a prosecutor's synopsis of an interview of David McGruder and some police reports cast doubt on McGruder's identification of Smith;

(5) a prosecutor's note indicated that Jones and Johnson had met briefly in a holding cell before the 1983 trial; and

(6) several reports showed that Priscilla Walker's statement to the police about when Smith was at her house conflicted with statements by others about where he was during that time.

*Smith*, 572 F.3d at 1348

## STANDARD OF REVIEW

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that the prosecutor's suppression of material exculpatory evidence violates due process.[1] To establish a *Brady* violation, a criminal defendant must make the following showing: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

---

[1] In *Brady*, the prosecution failed to disclose a confession obtained from the defendant's accomplice after the defendant requested the accomplice's extra-judicial statements. 373 U.S. at 84. On certiorari, the Supreme Court announced its now-famous holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. 83, 87. In *Brady*, the evidence suppressed would have been admissible only on the issue of punishment and not on the issue of guilt; and therefore, the Supreme Court affirmed the state court's restriction of Brady's new trial to the issue of punishment.

*Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).[2]

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).[3]

To establish materiality, the defendant must show a " reasonable probability of a different result." *Banks v. Dretke*, 540 U.S. 668, 699 (2004)(citing *Kyles v. Whitley*, 514 U.S. 419, 434-435, 115 S.Ct. 1555, 1566 (1995). In *Kyles*, the Supreme Court emphasized that a determination of the materiality of withheld evidence must be made "collectively, not item-by-item." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence,

---

[2] In *Strickler*, the Supreme Court found that the death-sentenced petitioner failed to show materiality under *Brady*. As the Supreme Court explained, "[n]otwithstanding the obvious significance of Stoltzfus' testimony, petitioner has not convinced us that there is a reasonable probability that the jury would have returned a different verdict if her testimony had been either severely impeached or excluded entirely." *Strickler*, 527 U.S. at 296. Admittedly, "Stoltzfus provided the only disinterested, narrative account of what transpired on January 5, 1990. However, Stoltzfus' vivid description of the events at the mall was not the only evidence that the jury had before it. Two other eyewitnesses, the security guard and Henderson's friend, placed petitioner and Henderson at the Harrisonburg Valley Shopping Mall on the afternoon of Whitlock's murder. One eyewitness later saw petitioner driving Dean's car near the scene of the murder. The record provides strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death, even if Stoltzfus had been severely impeached." *Strickler,* 527 U.S. 263, 293-294.

[3] The duty to disclose also extends to evidence that may be used for impeachment. *Bagley*, 473 U.S. at 676. In *Bagley*, the government did not disclose that it had promised payment to its two principal witnesses. The Supreme Court reversed the Court of Appeals' holding requiring automatic reversal. Instead, the Supreme Court remanded the case for a determination of whether there was a reasonable probability that, had the inducement been disclosed to the defense, the result of the trial would have been different.

but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555.

### First Examine Each Piece Standing Alone

In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995), the Supreme Court emphasized that a "reasonable probability" of a different result exists when the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict. *Kyles*, 514 U.S. at 434, 436-37 n. 10. However, as the Eleventh Circuit reiterated in this case, "the only way to evaluate the cumulative effect is to first examine each piece standing alone." *Smith,* 572 F.3d at 1346(citing *Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1310 (11th Cir. 2005) (the appropriate methodology [involves] considering each Brady item individually, and only then making a determination about the cumulative impact). *Smith* at 1346.

### Claim 1

**Melvin Jones sought help from the prosecutor with the probation violation and grand theft charges against him.**

In *Smith*, 572 F.3d at 1342, the Eleventh Circuit summarized this first *Brady* claim as follows:

> Smith claims that the State failed to disclose evidence that Melvin Jones talked to a prosecutor on April 19, 1989 and made statements that the defense could have used to impeach him. Not content with what he had received for his testimony at the 1983 trial, *Jones told the prosecutor that in exchange for testifying again at the 1990 trial he wanted help with some probation violations and a grand theft charge he had pending. . .*

*Smith*, 572 F.3d at 1342 (e.s.).

On post-conviction appeal, *Smith v. State*, SC03-454, Smith's initial brief included the following footnote:

[fn 69] Also undisclosed was a Synopsis prepared by Glen Martin on April 20, 1989, that detailed Jones' sworn statement to him on April 19, 1989. In this statement, Jones indicated that he had several violations of probation currently pending with the State Attorney's Office, and a "GT" (D-Ex. #7). He indicated that he "was somewhat disappointed in [the prior assistance provided] and [had] hoped that the State could have done a little bit more for him." According to the Synopsis, "Melvin Jones indicated that he is hopeful that the State will speak in his behalf, however, he indicated that the State has made no specific promises to him whatsoever re[garding] how these case [sic] will be disposed.". . . .

fn. 69, Initial Brief, SC03-454, at page 70.

It is appropriate to place this claim within the context of the entire synopsis. The full

synopsis of April 20, 1989 (emphasis added) states:

NOTE TO FILE:

On 2/24/89 Circuit Judge Robert Beach granted the Defendant's Motion to re-depose state witness Melvin Jones re the following:

a. If he anticipated any leniency towards his pending charges at the time he testified in *State v. Smith* and *State v. Jackson*.

b. His discussions, if any, with the State of Florida after he testified in *State v. Smith* and *State v. Jackson* re leniency towards his then pending cases.

c. His reason for providing testimony in the case of *State v. Jackson*.

d. His reason for not appearing and testifying [in the] re-trial of *State v. Jackson*.

e. Whether or not [he] currently has cases pending in this jurisdiction, and if so, what is the status of those cases.

f. If he has cases pending in this jurisdiction, what promises, if any, have been made by the State of Florida re[garding] disposition of those cases.

On April 19, 1989, Melvin Jones appeared at the SAO and provided the following information to ASA Glenn Martin re[garding] the anticipated questions that will be propounded to him by the defense attorney of Derrick Tyrone Smith.

Melvin Jones stated that prior to testifying in State v. Smith and State

v. Jackson, he had no discussions with the State of Florida re[garding] how his pending cases would be disposed. Melvin Jones stated that he hoped that the State would do something for him, but did not know exactly what the State would do. Melvin Jones indicated that after the trials of Smith and Jackson that then ASA Larry Sandefer did speak on his behalf at his sentencing.

Melvin Jones indicated that he received 3 yrs. DOC, followed by 2 yrs. probation for the then pending charges. Melvin Jones stated that he was somewhat disappointed in this sentence and hoped that the State could have done a little bit more for him. Melvin Jones stated that he has completed his 3 yrs. in the DOC and is currently on probation.

Melvin Jones went on to explain that his probation has been violated and that these violation of probations are currently pending within our office. Melvin Jones further indicated that he has a GT which is pending in our office. Melvin Jones explained that the violation of probation is for failure to make restitution as indicated by the probation officers. Melvin Jones stated that it was his understanding that the court ordered him to pay $1500 in total restitution, however, the probation officer says that he has to pay $4700.

Melvin Jones explained that the VOP cases, along with the new GT case, are currently pending in our office. Further that in re[gard] to these cases, he has had no discussions with the SAO as to how these cases will be disposed. Again, Melvin Jones indicated that he is hopeful that the State will speak in his behalf, however, he indicated that the State has made no specific promises to him whatsoever re[garding] how these cases will be disposed.

Melvin Jones stated that he knew the victim in the Clinton Jackson case. That the victim was "a nice guy." Melvin Jones stated that when he learned that the police were looking for a black truck that was normally in his possession as being the suspect vehicle in this case, that he did contact the SPPD and inform the PD as to the names of the [individuals] who were in possession of his black pick—up truck at the time of the homicide.

Melvin Jones stated that he provided this information to the police as a "good citizen" and because the victim was a "good guy."

Melvin Jones stated that he did not testify in the trial of Clinton Jackson because of threats made to him by [individuals] on the street. Melvin Jones would not indicate who these [individuals] were, however indicated that these [individuals] accused him of being a snitch, stating that he would be unable to find work in the SP area if he testified at trial. Melvin Jones further explained that some of these [individuals] indicated to him that he would be

killed if he testified.

> Melvin Jones stated that he took these threats seriously and that for a 2-year period he did work only in the Hillsborough County/Tampa area instead of the city of SP. Melvin Jones remembers that during the time period of the Clinton Jackson trial that someone from the SAO "beeped him." That he returned the call and spoke to someone in our office, however could not remember who that [individual] was. This [individual] informed him that if he did not show up at trial, that the State would have to read his prior testimony during the course of the trial. Melvin Jones stated that he then decided since the State had the benefit of his testimony already, that there was no reason for him to show up at trial. Melvin Jones stated that he was the one that decided not to show up at trial because of the threats made against him and because the State already had access to his testimony through deposition.

(D. Ex. 7)

With regard to the pending VOP and "GT" in 1989, the prosecutor's synopsis of April 20, 1989 (D-Ex. 7) noted, ". . . in re[gard] to these cases, he [Jones] has had no discussions with the SAO as to how these cases will be disposed. Again, Melvin Jones indicated that he is hopeful that the State will speak in his behalf, however, he indicated that the State has made no specific promises to him whatsoever re[garding] how these cases will be disposed." In other words, no promises were made to Jones regarding the disposition of his cases, Smith has never shown anything to the contrary, and Jones' multiple criminal cases and his sentencing dispositions were then, and now, a matter of public record.

Furthermore, as addressed in further detail within the "cumulative analysis" below, Melvin Jones was subject to extensive impeachment at trial. The jury knew that (1) Jones was no stranger to the inmate side of the criminal justice system; (2) Jones had 24 felony convictions; (3) Jones had arrest warrants out for him at the time of the shooting;, (4) Jones was facing criminal charges at that point; (5) Jones was eventually arrested on the

warrants; (6) after Jones was arrested, he wrote a letter to the State Attorney's Office and to the Public Defender's Office, telling them what he'd seen: (7) Jones denied writing the letter in order to try and "cut a deal" for himself; (8) when Jones came forward to the police, he had "seventeen or eighteen" charges pending against him; (9) Jones "first thought [the information] was worth something"; (10) Jones admitted that his attorney took the information to Detective San Marco and "tried to cut a deal" in "exchange for the information"; (11) Detective San Marco informed Jones that he could do his time where [ex] policemen do their time, (12) Jones altered his story and stopped answering the Detective's questions; (13) Jones eventually came back and told the truth; and (14) Jones wrote the letter to the State and Public Defender because

> . . . around the jail house, everybody was saying Derrick Smith is the one that said Derrick Johnson was the one that actually shot the cab driver, taking it all the way under from himself, putting it on the other guy. And I thought then it was totally wrong for two people to go down when only one should go down.

(App B6/1008).

Under *Brady*, the prosecutor is not required to deliver his entire file to defense counsel, but "only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley*, 473 U.S. 667, 675. In light of the extensive impeachment already before the jury, the prosecutor's synopsis of April 20, 1989 -- reflecting that (1) Jones had no discussions with the SAO as to how the VOP and GT case will be disposed, and (2) although Jones was hopeful that the State would speak in his behalf, the State made no specific promises to Jones whatsoever regarding how these cases will be disposed -- is not material, individually or cumulatively, under *Brady*. *See, Knox v. Johnson*, 224 F.3d 470, 482 (5th Cir. 2000) (witness's subjective hope the State

would recognize his assistance did not establish the State had even subtly offered him a deal for his testimony), *cert. denied*, 532 U.S. 975, 121 S.Ct. 1610, 149 L.Ed.2d 475 (2001); *Hill v. Johnson*, 210 F.3d 481, 486 (5th Cir.2000) (subjective beliefs of witnesses regarding the possibility of future favorable treatment are insufficient to trigger the State's duty to disclose under *Brady*), *cert. denied*, 532 U.S. 1039, 121 S.Ct. 2001, 149 L.Ed.2d 1004 15 of 5916 (2001); *Goodwin v. Johnson*, 132 F.3d 162, 187 (5th Cir. 1997) ("a nebulous expectation of help from the state" is not *Brady* material). There is no reason to believe that disclosure of Jones' speculative hope would have so altered the jury's assessment of Jones' already impeached credibility as to give rise to a reasonable probability that the outcome of the trial would have been different.

### Claim 2

**Melvin Jones, fearing arrest, sought help from the prosecutor in regard to the sexual abuse allegations his daughter was making against him.**

On Smith's habeas appeal, *Smith*, 572 F.3d at 1342, the Eleventh Circuit summarized this claim as follows:

> Smith claims that the State failed to disclose an August 9, 1989 note written by the prosecutor who had represented the State at Smith's 1983 trial. The note states that Melvin Jones called the prosecutor because he was concerned that his daughter was going to accuse him of sexual abuse committed while she was a minor. Jones said the accusations were false and designed to prevent him from reuniting with his wife. He wanted the prosecutor's office to give him and his daughter polygraph examinations. *Smith*, 931 So.2d at 798. Jones was worried about being arrested. In her note the prosecutor described Jones' state of mind this way: "He's afraid he'll be arrested." Smith argues that Jones' fear of arrest based on those accusations motivated him to testify at the 1990 trial and that the information in the note could have been used to show Jones was testifying again to curry favor with the State in order to help himself out of his own legal troubles.

The Florida Supreme Court held that "[t]he note does not provide

exculpatory or impeachment material. The note was not relevant either to the retrial or to Jones' motivation to provide testimony." *Id.* The United States Supreme Court has clearly held, however, that evidence that could be useful in impeaching prosecution witnesses must be disclosed under *Brady*. *See Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380. And the Court has held that evidence of motivation to testify, especially for key prosecution witnesses, is impeachment evidence that must be disclosed. *See Giglio*, 405 U.S. at 154-55, 92 S.Ct. at 767 ("Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."); *Kyles*, 514 U.S. at 442 n. 13, 115 S.Ct. at 1569 n. 13 (evidence showing the motive for an important government witness to come forward is impeachment evidence covered by the *Brady* rule); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

Melvin Jones was an important State witness. He was the only eyewitness to the crime who was not involved in the robbery and murder. Both sides recognized that his credibility was important, and the defense cross-examined him intensely about his motivation to testify at the 1983 trial and about the sentencing break he got for that testimony. At the 1990 trial, however, the defense had nothing to show that Jones had a motive for testifying against Smith again since the charges he had faced in 1983 were long gone. The State failed to disclose that Jones did have a new reason to curry favor with the prosecution -- that he feared he would be charged with a serious crime, that he was looking for help from the prosecutor if his fears were realized, and that he had talked with the prosecutor about it before he testified at the 1990 trial.

For these reasons, we conclude that the Florida Supreme Court's decision was unreasonable insofar as it determined that the prosecutor's 1989 note about Melvin Jones' fears that he would be facing charges that he had sexually abused his daughter was not impeachment evidence under *Brady*. The note could have served to impeach an important prosecution witness, and it is undisputed that the note was not disclosed. The evidence about the note is due to be considered at the materiality stage. *See Kyles*, 514 U.S. at 450, 115 S.Ct. at 1573 ("[I]t would have had some value as exculpation and impeachment, and it counts accordingly in determining whether ... materiality is satisfied.").

*Smith*, 572 F.3d at 1343.

Jones' disclosure of his teenage daughter's retaliatory criminal accusation and Jones' request to take a polygraph would not be admissible at trial. *See, Gilliam v. Secretary for Dept. of Corrections*, 480 F.3d 1027, 1033 (11th Cir. 2007)(citing *Wood v. Bartholomew*, 516 U.S. 1, 5-6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (inadmissible polygraph test was not "evidence". and therefore was not material); *Breedlove v. Moore*, 279 F.3d 952, 964 (11th Cir. 2002) (upholding denial of *Brady* claim based on inadmissibility of allegedly suppressed evidence and noting that "[i]nadmissible evidence could only rarely meet [*Brady*'s materiality] standard - indeed no Supreme Court case ... has found inadmissible evidence was material for Brady purposes").

Even if Jones' call to the prosecutor might be deemed impeachment under a speculative theory that Jones' telephone call was an arguable attempt to "curry favor" in some uncharged future case -- a theory that requires stacking inference upon inference based on Jones being the first to notify the state of his stepdaughter's retaliatory accusation of sexual misconduct -- it still fails to establish materiality, individually or cumulatively, under *Brady*. In addressing the issue of impeachment based on a witness' "motivation to testify," the Eleventh Circuit cited to *Giglio*, 405 U.S. at 154-55, 92 S.Ct. at 767 ("Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."). Notably, in *Giglio*, the focus was on evidence of any understanding or agreement as to a future prosecution and there is no evidence of any understanding or agreement as to future prosecution in this case. Moreover, even after two trials, two direct appeals, extensive evidentiary hearings, and years of protracted post-conviction litigation, Smith has never established that any of Jones' critical testimony was

false. *See, Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."). Jones' critical testimony --that (1) ) Jones saw Smith get out of the cab's back seat and Johnson get out of the front seat, (2) Smith had a gun, and (3) when the cab driver ran, Jones saw Smith shoot him -- remains undiminished by time or circumstance.

## Claim 3

**One or more police reports indicated that Melvin Jones had initially been considered as a suspect in 1983.**

In *Smith*, 572 F.3d at 1344, the Eleventh Circuit summarized this claim as follows:

> Smith claims that the State failed to disclose police reports indicating that Melvin Jones was initially listed as a suspect in the murder. The only reason Jones was a suspect is that he lived within a block of the crime scene and had outstanding warrants for his arrest. *Smith*, 931 So.2d at 798. Smith argues that, although the defense knew about the facts that caused the police to suspect Jones, the additional fact that the police noted in a report that he was considered a suspect is itself exculpatory evidence. The Florida Supreme Court determined that the police report listing Jones as a suspect was not, alone, material. Smith, 931 So.2d at 798.

> The Florida Supreme Court's determination that the police report listing Melvin Jones as a suspect was not material by itself is a reasonable application of federal law. There is no evidence that Jones knew, or even believed, that he was a suspect in the Songer murder, and it is unclear how a police report that Jones was entirely unaware of could possibly have motivated him to do anything. In *Kyles,* however, the Supreme Court suggested that Beanie, a witness who also did not know whether he was a suspect, still might have worried about his own criminal liability. 514 U.S. at 442 n. 13, 115 S.Ct. at 1569 n. 13. The Court held that the fact that Beanie was considered a suspect was impeachment evidence against him. *Id.* Importantly, in *Kyles* the undisclosed Brady material kept the defense from knowing the factual basis for Beanie's concern that he might be a suspect.

In this case, by contrast, the defense was well aware that Melvin Jones lived very close to the murder scene and had arrest warrants for a number of felonies. Unlike in *Kyles*, here the defense had all the facts it needed to assert that Jones may have come forward in part to dodge suspicion that he was the shooter. Smith's counsel argued to the jury that Jones may have been involved in the murder; as a result, we agree with the Florida Supreme Court that the additional impact of a preliminary police report listing Jones as a suspect, especially when Jones had no idea that the report existed, is not material by itself. But the report was favorable to Smith, although barely, and it was undisclosed. Therefore, the evidence of it should be considered in the cumulative materiality analysis, even though it will not help Smith much.

*Smith*, 572 F.3d at 1344.

As the Eleventh Circuit noted, the defense was "well aware that Melvin Jones lived very close to the murder scene and had arrest warrants for a number of felonies." Unlike *Kyles*, the defense in this case had all the facts they needed to assert suspicion of Jones' involvement. "Failure to disclose this information does not undermine confidence in the outcome of the trial." *Smith*, 931 So. 2d at 798.

The disclosure that Melvin Jones, and others, were initially mentioned as possible suspects on the first day of the police investigation does not constitute information that was material under *Brady* where, as here, one of the co-defendants confessed at a later time, and the person [Smith] who used the pay phone at the Hogley Wogley and whose fingerprint was on that phone, was identified as the same man who got into the back seat of the taxicab. The defense was aware of Jones' past convictions, the proximity of Jones' residence, and Jones' pending charges. (App. A5/773). As the Florida Supreme Court found, "even if it should have been disclosed, it was not material under the *Strickler*. The bases for Jones's early listing as a 'possible suspect' were known to Smith, and the jury was informed of them as well. Failure to disclose this information does not undermine

confidence in the outcome of the trial." *Smith*, 931 So. 2d at 798.

In *United States v. Griggs*, 713 F.2d 672 (11th Cir. 1983) the Eleventh Circuit adopted the rule that, "[w]here defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged *Brady* material, there is no suppression by the government." *Id.* at 674. In this case, the preliminary police report listing Jones as a suspect, when Jones had no idea that the report existed, is not material. However, because the Eleventh Circuit concluded that the undisclosed report was favorable to Smith, "although barely," it will be addressed cumulatively below.

### Claim 4

**A prosecutor's synopsis of an interview of David McGruder and some police reports cast doubt on McGruder's identification of Smith.**

In summarizing this fourth Brady claim, the Eleventh Circuit stated:

> Smith claims that the State failed to disclose documents relating to David McGruder, the cook at the Hogley Wogley BBQ, that contained information favorable to the defense. Those documents are the prosecutor's synopsis of his sworn interview with McGruder and three police reports from March and April 1983. The prosecutor's synopsis notes that the description McGruder gave of the two men he saw outside the Hogley Wogley fit Smith and Johnson except that his weight estimate for Smith was off by thirty pounds. The synopsis was dated April 4, 1983. [FN10]

> > [FN10] The April 4 synopsis also indicates that McGruder had been "unable to pick either of the defendants out of a photopak." That part of the synopsis was not evidence favorable to the defense, however, because Smith's photograph was not among those that had been shown to McGruder up to that point. *Smith*, 931 So.2d at 799. When Smith's picture was included in the photopack on April 8, McGruder did identify it.

> The information in the police reports shows that Smith was actually as much as seventy-five pounds heavier than the man McGruder described to police. The police report dated April 8 also shows that after he had identified

Smith in a photopak on that date, McGruder remained "not positive" of the identification. Smith argues that the undisclosed police reports and synopsis cast doubt on McGruder's identification of Smith as the man he saw get into the cab on the night of the murder.

The Florida Supreme Court found that the synopsis should have been disclosed but held that it was not material under *Brady*. It pointed out that at the 1990 trial Smith's counsel cross-examined McGruder in depth about his identification of Smith. That cross-examination exposed inconsistencies in McGruder's testimony about the date on which he had identified Smith, Smith's hair style and appearance in the photopack picture, and just how sure McGruder was about the identification. *See Smith*, 931 So. 2d at 799. The court's point was that the jury was aware McGruder was somewhat confused and unsure of the identification. Additionally, the fingerprint from the phone at the Hogley Wogley - a piece of evidence untainted by any allegation of impropriety - supports McGruder's identification. In light of these facts, the Florida Supreme Court's determination that the synopsis was not by itself enough to be material - not enough to undermine our confidence in the guilty verdict - is reasonable. Nonetheless, because the synopsis was somewhat favorable to Smith and was not disclosed, it is due to be considered in the cumulative materiality analysis.

The evidence in the police reports about the seventy-five pound weight difference and McGruder not being positive of his identification of Smith is also due to be considered in that analysis. *Smith*, 572 F.3d at 1344- 1345.

As the Eleventh Circuit emphasized, the jury was aware that McGruder was somewhat confused and unsure of the identification. In addition, "the fingerprint from the phone at the Hogley Wogley - a piece of evidence untainted by any allegation of impropriety - supports McGruder's identification." *Smith*, 572 F.3d at 1344-1345. At trial, Mr. McGruder testified:

[Prosecutor] Q. And did you pick out anybody that looked like either of the two member [sic] you saw that night from any of the other photopacks?

[Mr. McGruder] A. Yes.

Q. And which detective would have showed you that; do you remember?

A. San Marco.

Q. Now, the photopack – the photograph that you picked out, the one that you just seen here again today, when you saw that photograph back in 1983, was there any doubt in your mind that that man in that picture was the shorter guy who got in the cab?

A. Yes.

Q. There was a doubt?

A. Yes.

Q. Did you tell Detective San Marco that?

A. Yes.

Q. Why did you sign the back of the photograph then?

A. Because that's the one I picked that I seen.

Q. Because that's the one you picked -- I didn't hear the rest of what you said.

A. That's the one I remember seeing that night.

Q. Sir, I don't think you're quite understanding the question. Why did you sign the back of that one picture that you signed the back of?

A. That's the one I picked out.

Q. Is that the guy you saw get in the cab that night?

A. Yes.

Q. Are you sure about that?

A. I'm not sure.

Q. Were you sure then?

A. Yes.

Q. Is it now, seven years later, you're not sure?

A. No.

Q. Well, then, you're going to have to explain. Why aren't you sure?

A. It's been seven years that -- I don't know -- you know, remember.

Q. I'm not asking you if you recognize from seven years ago the pictures we just showed you. I'm asking, do you remember back seven years ago when you looked at the pictures?

A. Uh-huh.

Q. And you told Detective San Marco which one you thought got in the cab?

A. (Witness nods).

Q. Were you sure then?

A. Yes.

(App. B14/2541-2543).

Thereafter, defense counsel inquired further:

[BY MR. SANDERS]: Q. Did I understand you correctly that there was some doubt in your mind back in 1983 as to whether or not that was right guy or not?

A. Excuse me?

Q. Was there -- did I understand you to say on redirect just a minute ago that there was some doubt in your mind when you picked this picture out in 1983?

A. Yes.

MR. SANDERS: Thank you.

(App. B14/2544).

In rejecting Smith's claim based on McGruder's interview at the State Attorney's office (D. Ex. 10), the trial court found that "the record indicates that the jury heard the inconsistencies in McGruder's testimony," McGruder conceded at trial that he was shown several photopaks on several occasions, McGruder testified at trial that he was not sure

that the man in photograph A was the "shorter guy" who got into the cab that night; and, "[g]iven the doubt McGruder expressed, and the inconsistencies in his testimony, which the jury heard, the court cannot find that the undisclosed evidence -- def. Ex. 10 -- undermined confidence in the guilty verdict." (Doc. 20/App. D22/4097). Despite the discrepancies in McGruder's estimate of Smith (and Johnson's) weight, McGruder correctly placed Smith as the shorter of the two men and his vacillating identification is not material, individually or cumulatively, under *Brady*.

## Claim 5

**A prosecutor's note indicated that Jones and Johnson had met briefly in a holding cell before the 1983 trial.**

The Eleventh Circuit summarized this Brady claim as follows:

> Smith claims that the State failed to disclose that witnesses Melvin Jones and Derrick Johnson, who did not otherwise know each other, had met in jail before the 1983 trial. Smith argues that the prosecutor had learned in September 1983 that on July 11 of that year Melvin Jones approached Johnson in a holding cell, showed him a map of the crime scene, and offered to help him in connection with the case. The prosecutor's brief note about that encounter was not disclosed to the defense. At the Florida trial court hearing during the collateral proceeding, the State conceded that this evidence met the first two prongs of Brady because it was favorable and was not disclosed to Smith. *Id.* at 797.

> The Florida Supreme Court held that the evidence of Jones and Johnson's encounter was not, alone, material. *Id.* That conclusion was reasonable. As the court noted, Smith's defense at the trial was that he was not in the taxi on the night of the murder and that Jones and Johnson must have colluded to frame him. Jones and Johnson did not know each other at the time of the murder. In addition, the defense's theory was that Johnson got Jones to lie for him, but the undisclosed information shows that Jones approached Johnson, not the other way around. It also shows that Jones' approach unsettled Johnson. Johnson was so unnerved that he had been approached by a stranger who knew details about the crime that he immediately called the guards and asked to be removed from the holding cell. *Id.* Thus, during their brief encounter Jones and Johnson did not actually

discuss the facts of the case. *Smith*, 931 So.2d at 797.

In view of the circumstances, it is reasonable for the Florida Supreme Court to have found that the brief encounter between Jones and Johnson, initiated by Jones in a holding cell months after the crime, was too thin a basis to construct a strong argument that the two cooked up the entire story to frame Smith. Considered by itself, evidence that Jones and Johnson met briefly in a holding cell considered is not enough to undermine our confidence in the guilty verdict. It is, however, evidence that is due to be considered for whatever it is worth in the cumulative materiality analysis.

*Smith*, 572 F.3d at 1346.

In previously addressing the brief encounter between Jones and Johnson in the holding cell, this Court painstakingly reviewed the state court record and found:

Contrary to Smith's contention, the Florida Supreme Court did recognize that Smith could have used the evidence to "support a theory of collusion between Johnson and Jones." *Smith III*, 931 So.2d at 797. But even if the State had disclosed the contact, "the result of the proceeding would [not likely] have been different" because Smith's theory of collusion was inadequately supported. *Bagley*, 473 U.S. at 682. The evidence at retrial and the evidentiary hearing established that Johnson and Jones did not know each other before the murder. *Smith III*, 931 So.2d at 797. Nor did they discuss the case during their brief encounter in the holding cell. *Id.*

Other testimony further undermined the defense's theory of collusion between Johnson and Jones. David McGruder, a restaurant employee, identified Smith as the person who got into the backseat and Johnson as the person who got into the front seat when the taxi arrived. (App.B5/859-860). McGruder also identified Smith as the person who used the payphone on which Smith's fingerprint was later found. (App.B5/855-57, 859-60, 862-63).

The State also established that Smith had a gun with him in the hours just before the murder occurred. Caroline Mathis stated that Smith tried to sell her and Frank Bellamy a gun for $50.00 on Sunday afternoon, March 20, 1983. (App.B6/913-916). Ernest Rouse saw Smith with a gun around 7:30 to 8:00 P.M. at the Name of the Game Lounge. While Smith was at the Lounge, he asked Rouse for permission to place the gun under a turntable while he played records. When Smith finished playing records, he retrieved the gun. (App.B5/895-99).

Priscilla Walker's and James Matthews' testimony confirmed that Smith had a gun with him after the murder occurred around midnight on

March 21, 1983. Smith took a gun with him to the residence that Walker and Matthews shared. Smith told Walker, when he returned to her residence after the murder, that he had just shot a "cracker cab driver" in the back because the driver had acted like he did not want to give up his money. (App.B6/1020-21).

Smith told Matthews that he might have shot someone. (App.B6/1029). Smith also asserted "that he was scared and he needed a place to stay." (App.B6/1030).

Moreover, defense counsel had adequate opportunities to impeach Johnson and Jones. Counsel impeached Jones on his testimony that he did not expect leniency for testifying at Smith's trial. (App.B8/1332-43). Counsel also identified outside the jury's presence two prior inconsistent statements made by Johnson: (1) that he never had the gun in his hand and (2) that he was the one who gave the address to the taxi driver. (App.B7/1168). Counsel recognized, however, that "some of the inconsistent statements [Johnson] made in the past are more damaging to Mr. Smith than the statements he's made on the stand." (App.B7/1168). So counsel offered, as a matter of trial strategy, not to cross-examine Johnson about his deal to plead to a reduced charge for testifying against Smith if the court prohibited the State from introducing Johnson's prior consistent statements. (App.B7/1165-73).

Johnson's Prior Statements

Johnson previously told Octavia Jones and Maxine Nelson (Johnson's mother) about the murder and attempted robbery of Songer. (App.B7/1149-54). Octavia Jones testified in her August 5, 1983 deposition that Johnson arrived at her classroom on the day after the shooting, asking for a newspaper. Since she did not have one, she sent him to his mother's classroom at Head Start. Johnson returned to Octavia about twenty minutes later, after reading the newspaper. He told Octavia that he and his friend "Rerun" (Smith) called a taxi the night before, intending to rob the driver. He and Smith directed the driver to stop at Fairfield Avenue and 30th Street. Then Smith shot the driver as the driver was running away. (App.A4/471-78).

Nelson confirmed in her August 8, 1983, deposition that Johnson, her son, came to her classroom on the Monday of the shooting and told her that he was involved in it. Johnson related that he and Smith called a taxi after talking about robbing someone. He mentioned that he sat in the taxi's front seat, while his friend Smith sat with a gun between his legs in the back. When he and Smith arrived at Fairfield Avenue, they exited the taxi, as did the driver. Johnson walked around to Smith, who told Johnson he was going to shoot the driver, who was running away. Johnson heard a gunshot as he too ran away. (App.A4/523-24, 529-33).

The state trial court found that the "major tone" of Johnson's prior statements was that they were consistent and that the inconsistencies in Johnson's statements were immaterial. (App.B7/1164-65). The court allowed defense counsel to question Johnson about prior inconsistent statements as going to his ability to recall what occurred on the night or early morning of the murder. (App.B7/1169-70). Because sufficient evidence undermines Smith's theory of collusion and because defense counsel had the opportunity to impeach both Johnson and Jones, Smith fails to show that the State's failure to disclose the contact between Johnson and Jones was prejudicial under *Brady. Bagley*, 473 U.S. at 682.

*Smith v. Secretary, Dept. of Corrections,* 2007 WL 2302207, 5-6 (M.D. Fla. 2007).

As this Court found, and as the Eleventh Circuit agreed, the brief encounter between Jones and Johnson, initiated by Jones in a holding cell months after the crime, was an insufficient basis to conclude that they acted in collusion and collaborated to frame Smith. Evidence that Jones and Johnson met briefly in a holding cell does not undermine confidence in the guilty verdict.

### Claim 6

**Several reports showed that Priscilla Walker's statement to the police about when Smith was at her house conflicted with statements by others about where he was during that time.**

In *Smith*, 572 F.3d at 1346, the Eleventh Circuit summarized this *Brady* sub-claim as follows:

> Finally, Smith claims that several police reports contain impeachment evidence against Priscilla Walker. One of those reports indicates that Walker told police in 1988 that on the night of the murder, Smith had returned to her house around 1:00 a.m. and remained there until 5:00 a.m. That statement conflicts with undisclosed statements made by other people who stated that Smith was elsewhere by around 1:30 a.m. that morning. This evidence is due to be considered at the cumulative materiality stage. [FN 11]

> > FN11. Smith also claims that another report, one by Officer Kewin dated March 23, 1983, indicates that when Walker and James Matthews were first interviewed "they gave no info" to police. Walker explained, however, that she gave no

> information about Smith because she was not asked. Because her explanation is uncontradicted, the information in that police report is not favorable to Smith.

Smith, 572 F.3d at 1346.

The victim, Jeffrey Songer, was shot at approximately 12:43 a.m. At trial, when Walker was asked what time Smith came back to her house, she replied "between twelve and one." (AppB6/1020). Smith told Priscilla Walker that he "shot a cracker in the back." (App B6/1020). James Matthews testified at trial that he arrived back at the house between twelve and two, no later than two. (App B6/1028; 1031). Matthews was "not for sure about the time." (App B6/1031). Smith was standing in the doorway, talking to Priscilla. (App B6/1029). Smith said that he "might have shot someone" and "he was scared and he needed a place to stay." (App B6/1029-1030). Although Smith spent the night, Matthews did not see Smith the next morning. (App B6/1030).

According to D-Ex. 4, the SAO investigator's report, "[s]ometime after midnight, Priscilla was awaken[ed] by Derrick Smith. She is not sure of the time, however, she believes it was between midnight and 1:00 a.m." Priscilla Walker also stated that "Smith stayed at their house for several hours and [she] believes he left around five in the morning." (D-Ex. 4).

According to Nellie Mae Dixon, Smith was standing outside her residence at 1:20 a.m., looking for her daughter, Angela (D-Ex. 10). Linda Lanier heard Smith talking to Ms. Dixon "between 1:15 and 1:20 on Monday morning, the day Jeffrey Songer was shot." (Def. Ex. #10) Smith obviously knew of his own whereabouts after the murder. In *Jennings v. McDonough*, 490 F.3d 1230, 1238-1239 (11th Cir. 2007), the Eleventh Court reiterated that where a criminal defendant was plainly aware of a potential witness and could have talked

with the witness himself, there was no "suppression" by the government. See also, *Maharaj,* 432 F.3d at 1315, n.4 (rejecting *Brady* claim where the defendant had "equal access" to the evidence).

Finally, although Walker apparently thought that Smith remained at her house for several hours and left at 5:00 a.m., Smith, instead, went looking for Angela and Smith woke up Ms. Dixon around 1:15 --1:20 a.m. This undisclosed conclusion - that Smith did not remain continuously at Walker's residence after 1:00 a.m. - is insignificant under the facts of this case and fails to establish any materiality individually, or cumulatively, under *Brady*.

### Cumulative Analysis

It is the petitioner's burden to establish a reasonable probability of a different result. *Strickler v. Greene*, 527 U.S. 263, 291, 119 S.Ct. 1936, 1953 (1999)(citing *Kyles*, 514 U.S. at 434). In this case, the Eleventh Circuit emphasized that "the collective impact of all of the suppressed evidence must be considered against the totality of the circumstances.". *Smith*, 572 F.3d at 1346 (citing *Brown v. Head*, 272 F.3d 1308, 1316 (11th Cir. 2001), (quoting *Kyles*, 514 U.S. at 441)). "Considering the undisclosed evidence cumulatively means adding up the force of it all and weighing it against the totality of the evidence that was introduced at the trial." *Smith*, 572 F.3d at 1334. As the Eleventh Circuit explained:

> Cumulative analysis of the force and effect of the undisclosed pieces of favorable evidence matters because the sum of the parts almost invariably will be greater than any individual part. Whether the sum of the withheld evidence favorable to the defense will be enough to create a reasonable probability that the jury would have acquitted will depend on two factors. One factor is the net inculpatory weight of the evidence on both sides that actually was presented at trial. The other factor is the aggregate effect that the withheld evidence would have had if it had been disclosed. These two factors are brought to bear at the crucial second step of the materiality process, which begins with putting on the scales the evidence that was presented at trial - evidence favoring the prosecution on one side, that favoring the

defense on the other. Then the force and effect of all of the undisclosed exculpatory evidence is added to the weight of the evidence on the defense side, while the force and effect of all the undisclosed impeachment evidence is subtracted from the weight of the evidence on the prosecution's side. *Id.* at 437, 115 S.Ct. at 1567 (referring to the .responsibility to gauge the likely net effect of all such evidence.).

Once the evidence on the scales is adjusted to take into account the combined force and effect of the undisclosed evidence favorable to the defense, the standard that is applied is not one of sufficiency of evidence to convict. It is instead whether what is left on both sides of the scale after adjusting for the withheld evidence creates a reasonable probability that a jury would acquit, and a reasonable probability is one sufficient to undermine our confidence in the guilty verdict. Id. at 453, 115 S.Ct. at 1575 ("[T]he question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same."). Of course, the stronger the evidence of guilt to begin with, the more favorable to the defense the undisclosed evidence will have to be to create a reasonable probability that a jury would have acquitted had the evidence been disclosed. *See United States v. Amiel*, 95 F.3d 135, 146 (2d Cir. 1996); *United States v. Gonzalez*, 93 F.3d 311, 317 (7th Cir. 1996); *see also United States v. Noriega*, 117 F.3d 1206, 1219-20 (11th Cir. 1997). When a federal habeas court conducts or reviews a *Brady* materiality analysis, it considers in the cumulative weighing process only the undisclosed evidence covered in the *Brady* claims that are not procedurally barred. *See Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir.2004) ("Thus, the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief.") . . . .

* * *

So, in the present case, the only undisclosed evidence to be considered at the cumulative materiality stage is that which was properly raised in the *Brady* claims Smith brought before the state courts. *Smith,* 572 F.3d at 1346-1348.

**Evidence presented at trial**:

In *Smith,* 572 F.3d at 1330-1332, the Eleventh Circuit set forth the following

summary of Smith's 1990 trial proceedings:

At the 1990 trial, the State argued that Smith and his codefendant Derrick Johnson had planned to rob a taxi driver. The State's evidence indicated that shortly after midnight on March 21, 1983, one of them called

the Yellow Cab company from the local Hogley Wogley BBQ. Fingerprint evidence connected Smith to the phone at the Hogley Wogley. David McGruder, the cook on duty, described seeing two men who looked like Johnson and Smith loitering outside. McGruder also testified that he saw Smith use the phone and that when the cab arrived, Smith got into the back seat and Johnson into the front. On cross-examination, however, McGruder became confused and admitted that he was not sure whether he actually saw Smith.

To explain how Smith acquired a gun, the State presented the 1983 testimony of his uncle, Roy Cone, who had died before the 1990 trial. Cone had testified that he purchased a blued revolver and a single box of bullets in 1972. Cone kept the gun under his mattress for many years. He saw it there in January of 1983, but it was gone two months later. He did not know what happened to it. Smith did not live at Cone's house during that time, but he did visit.

To establish that Smith was the triggerman, the State presented the testimony of Ernest Rouse, Carolyn Mathis, Priscilla Walker, and James Matthews. All of them testified that they had seen Smith with a revolver on the night of the murder. Carolyn Mathis' sister Regina also testified that Smith had told her he was planning to "hustle" some money that night. Matthews heard Smith say a similar thing. Rouse, who knew Johnson, said that Smith and Johnson were together on the night of the murder, and both Mathis sisters saw a man matching Johnson's description with Smith. No one saw Johnson with a gun.

The State also presented eyewitness testimony from Melvin Jones, who lived near the crime scene. Jones said that on the night of the murder he had been walking home, watching for police cars because he had outstanding warrants, when he saw the cab arrive. He recognized Smith and Johnson "from the street" but testified that he had never talked to either of them. Jones saw Smith get out of the cab's back seat and Johnson get out of the front seat. Smith had a gun, and when the cab driver ran Jones saw Smith shoot him. After witnessing the shooting Jones hurried home, where he eventually told his wife, Mellow Jones, what he had seen. She testified that Jones had told her that night that he had seen a man get shot.

After first denying it, Jones acknowledged that had he had made a deal with the State involving his 1983 testimony. The deal gave him leniency for the seventeen unrelated felony charges that Jones had been facing at the time of Smith's first trial. Jones was never asked whether he had received any new promise or benefit from the State in 1990 for his second (current) round of testimony.

For his part, Smith's codefendant Derrick Johnson pleaded guilty to second degree murder and testified for the State. Johnson told the jury that he and Smith had agreed to rob a cab and had gone to the Hogley Wogley, where Smith had called the cab company. Johnson described Smith's gun as a black revolver with a brown handle, which was consistent with Cone's gun. Johnson said that Smith had sat in the rear of the cab. The driver had seen the gun and tried to run away but Smith fired at him. Johnson and Smith then ran off and separated. On cross-examination, it became clear that Johnson had lied to police initially about the crime, but he stated again that there had never been a plan to shoot anyone. Johnson admitted to one felony conviction but was never questioned about his plea deal with the State. [FN1]

> FN1. The defense agreed not to cross-examine Johnson about his plea deal in return for the State not producing evidence that, the morning after the murder, Johnson had told several women that he had been involved in a shooting and that it was Smith who had fired the fatal shot.

To recount what happened after the crime, the State presented Priscilla Walker and James Matthews, who were living together at the time of the murder. They both said that Smith had come to their home that night. Walker testified that Smith had told her that he "shot a cracker in the back." The victim, Jeffrey Songer, was white. Matthews testified that Smith had said that he "might have shot someone." The State also presented Marcel DeBulle, a Canadian tourist who described how Smith had robbed him in the early afternoon of March 21, about twelve hours after the murder. DeBulle testified that Smith had carried a black or blue revolver, had entered DeBulle's hotel room, and had handled his briefcase. Fingerprints from the briefcase were matched to Smith. Smith was convicted of that robbery and is serving a life sentence for it.

The State also presented physical evidence and expert testimony linking Smith to the murder. FBI Agent Robert Sibert testified that Smith's jeans pocket contained lead residue consistent with bullets. The State put into evidence a bullet fragment taken from Songer's clothing. Two other FBI agents, Asbery and Havekost, were qualified as experts and testified that the bullet fragment, according to lead compositional analysis, "matched" bullets from the ammunition box Roy Cone had purchased in 1972 and still possessed at the time of the murder. The State used this evidence to argue that it was Smith who had stolen his uncle's gun and some bullets that had come from the box-bullets that were used to kill the victim. The gun itself was never found.

The only witness for the defense was Larry Martin, a prisoner who had

been incarcerated with Johnson. Martin testified that Johnson told him that Smith was not the shooter, but he also conceded that Johnson did not say who was or what Johnson's own role had been. On cross-examination, the State brought out that Martin had eight felony convictions.

In its closing argument the State stressed the consistencies in the testimony given by its witnesses. It pointed out the number of witnesses who had seen Smith with a gun on the night of the murder and the fact that none had seen Johnson with one. The State emphasized that both Johnson and Jones had actually seen Smith shoot Songer. Referring to its bullet lead analysis, the State argued that it had proven the bullet that killed Songer and those in the box at Smith's uncle's house were "materially indistinguishable. They're the same." The chance of that compositional similarity occurring coincidentally "boggles the mind." The State pointed out that in order to find Smith not guilty the jury would have to believe Larry Martin and disbelieve all of the State's witnesses.

The defense's closing argument focused on reasonable doubt. Smith's counsel conceded that it "look[ed] very suspicious" for Smith, but argued the State's circumstantial evidence failed to show who shot Songer. Counsel stressed that the only two eyewitnesses against his client, Johnson and Jones, each had much to gain from the State. He argued that Johnson's only goal was to pin the murder on Smith and that Melvin Jones either was lying to save himself from unrelated charges or was involved in the murder himself.

In its rebuttal argument the State argued the idea of Jones and Johnson cooking up the story to frame Smith was "ludicrous" because Jones and Johnson did not even know each other at the time of the crime. The State also reiterated that the fingerprint evidence connected Smith to the phone used to call the cab, and reminded the jury that the bullet fragment found on Songer "match[ed]" the bullets from Smith's uncle's house. After an hour-and-a-half of deliberation, the jury found Smith guilty.

*Smith*, 572 F.3d at 1330–1332.

## Assessing the collective impact of all the suppressed evidence against the totality of the circumstances:

The collective impact of all of the suppressed evidence must now be considered against the totality of the circumstances. *Smith*, 572 F.3d at 1346. For the following reasons, the undisclosed evidence, viewed cumulatively, did not create a reasonable

probability that a jury would have acquitted had the evidence been disclosed. One of the six *Brady* claims on remand involved McGruder's erroneous estimate of Smith's weight, another claim related to Smith's attempt to locate Nellie Dixon's daughter at 1:20 a.m., and the four remaining *Brady* claims related, primarily, to Melvin Jones. This is not a case where the nondisclosure of impeachment evidence was material because the prosecution's case hinged on the testimony of just one witness. With regard to Jones, the jury knew that (1) on the night of the shooting, Jones "had some warrants for [his] arrest and [he] had to make sure the neighborhood didn't have no [sic] cop cars"; (App B6/975); (2) Jones was afraid that he'd be arrested (App B6/603); (3) Jones hid behind a tree because he thought the taxi might have been a police car (App B6/977); (4) Jones had 24 felony convictions (App B6/990); (5) Jones had been incarcerated, along with Smith, in maximum security at the Pinellas County Jail (App B6/989); and (6) while in the jail, Smith threatened to kill Jones and Jones' family. (App B6/989). On cross-examination, defense counsel reiterated that (1) Jones had arrest warrants out for him at the time of the shooting; (2) Jones was facing criminal charges at that point; (3) Jones was later arrested on the warrants (App B6/991); and (4) after Jones was arrested, Jones wrote a letter to the State Attorney's Office and to the Public Defender, telling them what he'd seen. (App B6/991-992) When defense counsel asked if Jones wrote the letter in order to .cut a deal. for himself, Jones answered, "[w]ell, when I wrote that letter, that wasn't the purpose of it." (App B6/992). When defense counsel asked Jones how many felony charges he faced when he came forward to the police, Jones thought it "was like seventeen or eighteen." (App B6/998).[4]

---

[4] The Eleventh Circuit rejected Smith's *Giglio* claim regarding a purported "deal" as procedurally barred. The Eleventh Circuit explained:

During the 1990 trial, Jones testified that when he first came forward to tell the police what he saw on March 21, 1983, he had been facing "seventeen or eighteen" felony charges. Then came this cross-examination:

Q. Did you ever do time on all those felony charges?
A. Yes, I had.
Q. How much time did you get?
A. I did three years on it.
Q. Total three years?
A. Yes.

It would have been more accurate for Jones to say that in December 1983 he had received a three-year suspended sentence plus two years of probation, but he ended up serving the three-year sentence anyway. [FN3] The reason is that in 1985 he ran afoul of the law again (which is hardly surprising given the number of felony charges he had been facing when he came forward in connection with this case). Smith argues that Jones should have testified to those details.

> FN3. Precisely how long Jones was actually behind bars on the three-year sentence is unclear. The defense counsel asked him, but the prosecution objected. After a bench conference, the judge ruled that the question would be allowed, but the defense counsel moved on without re-asking it.

The Florida trial court that ruled on Smith's Rule 3.850 motion decided that this claim was insufficiently pleaded. *Florida v. Smith*, 83-02653 at 8-9 (Fla.Cir.Ct. Jan. 3, 2002) . . . The Florida Supreme Court agreed that this claim had been insufficiently raised at the trial court level. *Smith,* 931 So.2d at 800 ("First, as the circuit court correctly found, the claim was insufficiently pled."). This federal district court found no reason to disturb the state procedural bar. *Smith*, 2007 WL 2302207 at *11. The State has consistently pressed its procedural bar defense to this claim.

* * *

Smith does not contend that he has established either the "cause and prejudice" or the "fundamental miscarriage of justice" exception. Accordingly, federal habeas review of this claim is barred. . . .

In summary, we reject all of Smith's *Giglio* claims. It follows that there is no need to conduct a materiality inquiry for any of the allegedly false testimony.

Defense counsel later inquired:

> Q. Now, Mr. Jones, when you went up for sentencing on all these charges, the State Attorney came and testified on your behalf based on the fact that you had come forward with this information, is that correct?
>
> A. Yes, it is.
>
> Q. And you did, in fact, get a break on you sentence as a result of the State Attorney's actions, is that correct?
>
> A. Well from my side, I don't think so, but you can say so.

(App B6/1000).

In rejecting the holding cell encounter claim, the Florida Supreme Court found:

> At most, Johnson's statement acknowledging contact was of limited value to support a theory of collusion between Johnson and Jones. First, the evidence from the evidentiary hearing and trial demonstrated that Johnson and Jones did not know each other before the murder and did not discuss the facts of the case during their brief meeting. In fact, Johnson was so unnerved by the encounter with this stranger that he asked to be removed from the cell. Further, the State did not provide Jones with a deal in exchange for his testimony. In addition, at retrial, the defense challenged Jones's credibility in light of his felony convictions and his efforts to make a deal in exchange for his testimony.
>
> Smith's theory of defense was that he was not in the cab that night and that Jones and Johnson were lying. The evidence at retrial, however, showed that on the day of the murder, Smith tried to sell a gun to Carolyn Mathis and later that evening told Regina Mathis that he was going to "hustle". some money because he had none. Before going out on the night of the murder, Smith showed a gun to his friend James Matthews, who in turn showed it to his live-in girlfriend, Priscilla Walker. Smith told Matthews he was going out to get some money that evening. Later that evening, Smith was at a nightclub, where Ernest Rouse saw him place a revolver under a turntable in the disc jockey booth and later retrieve it. Jones and Johnson saw the handgun and saw Smith fire the fatal shot.
>
> After the murder, in the early morning hours, Smith returned to his

---

*Smith*, 572 F.3d at 1336-1337.

friends' home and admitted to both Matthews and Walker that he had shot someone. To Walker, he said that he shot a cab driver who would not give him any money. He told Matthews he was scared and needed a place to stay. Within twelve hours after the murder, Smith robbed two Canadian tourists, using a handgun. Finally, Smith's uncle testified that his revolver was missing. The descriptions of the gun Smith had immediately preceding, during, and after the murder matched his uncle's gun, which was missing. In addition, a bullet from the victim was consistent with the bullets from Smith's uncle's ten-year-old box of bullets.

Finally, Smith made a call from a restaurant telephone, and his fingerprint was found on the phone. A request for a cab was made on that phone at 12:28 a.m. on March 21, 1983, and Smith and Johnson were seen entering the cab that arrived shortly thereafter. Accordingly, the undisclosed evidence of a brief jail contact does not meet the materiality prong of *Brady*.

*Smith*, 931 So. 2d at 797-798

This Court has previously addressed the state court's dispositive findings, including that (1) Smith's theory of collusion was inadequately supported and (2) the evidence at retrial and the evidentiary hearing established that Johnson and Jones did not know each other before the murder, nor did they discuss the case during their brief encounter in the holding cell. In addition, this Court previously detailed the "[o]ther testimony which further undermined the defense's theory of collusion between Johnson and Jones," specifically:

. . . David McGruder, a restaurant employee, identified Smith as the person who got into the backseat and Johnson as the person who got into the front seat when the taxi arrived. (App. B5/859-860). McGruder also identified Smith as the person who used the payphone on which Smith's fingerprint was later found. (App. B5/855-57, 859-60, 862-63).

The State also established that Smith had a gun with him in the hours just before the murder occurred. Caroline Mathis stated that Smith tried to sell her and Frank Bellamy a gun for $ 50.00 on Sunday afternoon, March 20, 1983. (App. B6/913-916). Ernest Rouse saw Smith with a gun around 7:30 to 8:00 P.M. at the Name of the Game Lounge. While Smith was at the Lounge, he asked Rouse for permission to place the gun under a turntable while he played records. When Smith finished playing records, he retrieved the gun. (App. B5/895-99).

Priscilla Walker's and James Matthews' testimony confirmed that Smith had a gun with him after the murder occurred around midnight on March 21, 1983. Smith took a gun with him to the residence that Walker and Matthews shared. Smith told Walker, when he returned to her residence after the murder, that he had just shot a "cracker cab driver" in the back because the driver had acted like he did not want to give up his money. (App. B6/1020-21).

Smith told Matthews that he might have shot someone. (App. B6/1029). Smith also asserted "that he was scared and he needed a place to stay. (App. B6/1030).

Moreover, defense counsel had adequate opportunities to impeach Johnson and Jones. Counsel impeached Jones on his testimony that he did not expect leniency for testifying at Smith's trial. (App. B8/1332-43). Counsel also identified outside the jury's presence two prior inconsistent statements made by Johnson: (1) that he never had the gun in his hand and (2) that he was the one who gave the address to the taxi driver. (App. B7/1168). Counsel recognized, however, that "some of the inconsistent statements [Johnson] made in the past are more damaging to Mr. Smith than the statements he's made on the stand." (App. B7/1168). So counsel offered, as a matter of trial strategy, not to cross-examine Johnson about his deal to plead to a reduced charge for testifying against Smith if the court prohibited the State from introducing Johnson's prior consistent statements. (App. B7/1165-73).

Johnson's Prior Statements

Johnson previously told Octavia Jones and Maxine Nelson (Johnson's mother) about the murder and attempted robbery of Songer. (App. B7/1149-54). Octavia Jones testified in her August 5, 1983 deposition that Johnson arrived at her classroom on the day after the shooting, asking for a newspaper. Since she did not have one, she sent him to his mother's classroom at Head Start. Johnson returned to Octavia about twenty minutes later, after reading the newspaper. He told Octavia that he and his friend "Rerun" (Smith) called a taxi the night before, intending to rob the driver. He and Smith directed the driver to stop at Fairfield Avenue and 30th Street. Then Smith shot the driver as the driver was running away. (App. A4/471-78).

Nelson confirmed in her August 8, 1983, deposition that Johnson, her son, came to her classroom on the Monday of the shooting and told her that he was involved in it. Johnson related that he and Smith called a taxi after talking about robbing someone. He mentioned that he sat in the taxi's front seat, while his friend Smith sat with a gun between his legs in the back.

When he and Smith arrived at Fairfield Avenue, they exited the taxi, as did the driver. Johnson walked around to Smith, who told Johnson he was going to shoot the driver, who was running away. Johnson heard a gunshot as he too ran away. (App. A4/523-24, 529-33).

The state trial court found that the "major tone" of Johnson's prior statements was that they were consistent and that the inconsistencies in Johnson's statements were immaterial. (App. B7/1164-65). The court allowed defense counsel to question Johnson about prior inconsistent statements as going to his ability to recall what occurred on the night or early morning of the murder. (App. B7/1169-70). Because sufficient evidence undermines Smith's theory of collusion and because defense counsel had the opportunity to impeach both Johnson and Jones, Smith fails to show that the State's failure to disclose the contact between Johnson and Jones was prejudicial under *Brady*. *Bagley*, 473 U.S. at 682.

*Smith v. Sec'y*, 2007 U.S. Dist. LEXIS 57703.

Defense counsel Sanders argued in closing that Melvin Jones' testimony – of not expecting leniency – was less than credible. (App. B8/1332-1343). The jury was aware via Jones' testimony and cross-examination that Jones had an extensive criminal record and the circumstances of his approaching law enforcement with his information. Defense counsel cross-examined co-defendant Johnson at length in the second trial concerning any inconsistencies in Johnson's prior statements. (App. B7/1175-1180). Johnson's trial testimony was consistent in material details with his statements made to his mother and Octavia Jones within twelve hours of the shooting. (App. A10/1466, 1468-1494; App. B7/1114-1149). In addition, the clerk at the Hogley-Wogley Barbecue, Mr. McGruder, identified the shorter, darker man [Smith] as the man who came used the telephone. (App. B5/855-857, 859-860, 862-863). Smith's fingerprint was identified on the telephone at the barbecue restaurant. (App. B5/834, 838-843, 1209, 1214-1216). 52 of 5953 According to Mr. McGruder, the shorter, darker black male [Smith] got into the rear of the cab, and the taller, lighter-skinned black male [Johnson] got into the front seat of the taxi when it arrived

at the Hogley-Wogley Barbecue. (App. B5/859-860).

As previously noted, several witnesses confirmed that Smith was the one who was in possession of the handgun on the night of the murder. Ernest Rouse saw Smith with the gun around 7:30 to 8:00 p.m. at the Name of the Game Lounge. Smith asked Rouse for permission to place the gun under a turntable while Smith played records; and, when Smith finished playing records, Smith retrieved the gun. (App. B5/895-899). Smith also had the gun with him at the residence of Priscilla Walker and James Matthews. (App. B6/1017-1019, 1025-1028). Caroline Mathis saw Smith try to sell the gun to her and to Frank Bellamy for $50.00 on the Sunday afternoon of March 20 before the murder, which occurred shortly after midnight on March 21st. (App. B6/913-916).

Smith told Priscilla Walker, when he returned to her house between midnight and 1:00 a.m., that he'd just shot a "cracker cab driver" in the back because he had acted like he did not want to give up his money. Smith told Walker that he'd dropped the gun at the scene. (App. B6/1020-1021). Smith told James Matthews that he might have shot someone. (App. B6/1029-1030). The failure to disclose what Smith himself would have known – that Smith went to Nellie Dixon's residence at 1:20 a.m. – is inconsequential and not material under *Brady*, individually or cumulatively. *See, U.S. v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004) (no *Brady* violation despite failure to disclose witness' statements regarding alibi because the defendant knew who he was with on the night of the crime).

At trial, co-defendant Johnson's trial testimony was also corroborated by Melvin Jones, who recognized "New York" [Johnson] as exiting from the front passenger side of the cab and running back the way the cab had come when it stopped, and Rerun [Smith] getting out of the back of the taxi and running after the fleeing cab driver. Jones identified

Smith as the one who ran by him trying to put a gun into his waistband after the driver was shot. Jones' testimony, that "New York" got out of the front of the cab and "Rerun" got out of the back, (App. B6/978; 987), was consistent with the testimony of Mr. McGruder, as to which seats the two men had taken on entering the cab. (App. B5/860). Mr. McGruder did not know Smith or Johnson, but identified the shorter, darker man [Smith] as the one who got into the back of the cab. (App. B5/859; 863). Regardless of McGruder's vacillating ability to identify Smith, which prosecutor Hogan suspected was prompted by reluctance and fear, and the wide range of estimates which McGruder provided of Smith's weight, it was still Smith's fingerprint which was recovered from the telephone used by the shorter, darker man - the same person that McGruder saw enter the back seat of the taxicab. As the post-conviction court concluded, "[g]iven the doubt McGruder expressed, and the inconsistencies in his testimony, which the jury heard, the court cannot find that the undisclosed evidence - def. Ex. 10 - undermined confidence in the guilty verdict." Evaluating the cumulative effect of all the evidence the trial court found, "Together, def. Ex. 8 and def. Ex. 10, had they been disclosed, would not have 'put the whole case in such a different light as to undermine confidence in the verdict.'" (App. D22/4097, citing *Strickler*, 119 S.Ct. at 1952 (quoting *Kyles*, 115 S.Ct. at 1566 (1995)); *See also, Mincey v. Head*, 206 F.3d 1106 (11th Cir. 2000) (Mincey failed to convince us that there [was] a reasonable probability that the result "would have been different if the [prosecutor's notes] had been disclosed to the defense.").

The retrial record includes the lengthy argument defense counsel conducted with the trial court about impeaching Johnson with prior inconsistent statements as balanced against keeping the State from introducing Johnson's prior consistent statements. (App.

B7/1149-1173). On cross-examination, defense counsel impeached Johnson with his prior inconsistent statements to police. (App. B7/1175-1179). Johnson admitted it was his idea to rob the Hogley-Wogley and that he first brought up robbing the cab driver. (App. B7/1179). Defense counsel's efforts to keep Johnson from testifying about Johnson's prior consistent statements about the robbery/murder, which he had made to his mother and other instructors where she worked, were successful. (App. B7/1149-1154). In closing argument for the second trial, defense counsel informed the jury that Johnson and Jones were not credible witnesses. (App. B8/1332-1343). Smith's defense counsel was always aware that both Jones and Johnson had admitted that their initial statements to law enforcement were altered versions of the facts. The record reflects that defense counsel's impeachment of Johnson with prior inconsistent statements was self-restricted to accomplish the desired result of preventing the State from introducing Johnson's multiple prior consistent statements. (App. B7/1165-1173). Defense counsel asked for the trial court's ruling that the State would be prohibited from presenting Johnson's prior consistent statements in exchange for the defense not cross-examining Johnson about his deal to testify against Smith for a plea to a reduced charge.

As demonstrated by the foregoing facts and circumstances of this case, after considering the collective impact of all of the suppressed evidence against the totality of the circumstances, Smith's habeas corpus petition must be denied. *See, Moon v. Head,* 285 F.3d 1301, 1311 (11th Cir. 2002) (no *Brady* violation because undisclosed evidence impeaching witnesses did nothing to bolster the defense's case and was not material)*; Maharaj v. Sec'y.*, 432 F.3d 1292, 1309-1310 (11th Cir. 2005) (no *Brady* violation where cumulative effect of undisclosed evidence was outweighed by ample evidence of motive

and physical evidence); *Morrow v. Dretke*, 367 F.3d 309, 322-23 (5th Cir. 2003) (no *Brady* violation despite failure to disclose FBI reports because cumulative effect of evidence would not result in different verdict); *Hutchison v. Bell*, 303 F.3d 720, 747 (6th Cir. 2002) (no *Brady* violation because cumulative impact of nondisclosure of alleged exculpatory and impeaching evidence did not undermine confidence in jury's verdict).

Assessing the effect of the undisclosed evidence, cumulatively, does not "put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566 (1995). There is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34.

Accordingly, the Court orders:

1. That, because the Eleventh Circuit affirmed the district court's judgment denying Smith's habeas petition **except as it concerned the six *Brady* claims discussed above,** this Court, having complied with the remand order to conduct for the six claims a cumulative prejudice analysis as required by the *Kyles* decision, 514 U.S. at 434, 115 S.Ct. at 1566, Smith's petition for writ of habeas corpus is denied. The Clerk is directed to enter judgment against Petitioner and to close this case.

2. That Petitioner's motion to hold this case in abeyance (Doc. No. 69) is denied.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court

must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances. Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on October 19, 2009.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record